UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------

CARMEL SPITERI,

                               Plaintiff,

                v.

JOHN LEO RUSSO, ARTHUR GEORGE
TRAKAS, SUPREME COURT JUDGE FERNANDO
CAMACHO, in his official capacity, NEW YORK
STATE GOVERNOR ANDREW M. CUOMO,
in his official capacity, NEW YORK STATE SEX
OFFENDER BOARD OF EXAMINERS
COMMISSIONER MICHELLE HARRINGTON,
in her official capacity, THE NEW YORK STATE
SEX OFFENDER REGISTRY DIRECTOR
MICHELLE MULLIGAN, in his official capacity,
NEW YORK STATE, NEW YORK CITY
POLICE DEPARTMENT OFFENDER UNIT, and
DOES 1-10,

                            Defendants.

**<u>MEMORANDUM & ORDER</u>**
12-CV-2780 (MKB) (RLM)

----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

        Plaintiff Carmel Spiteri brings the above-captioned action *pro se* seeking a writ of

mandamus, declaratory relief and injunctive relief against Defendants John Leo Russo and

Arthur George Trakas, attorneys practicing in New York, (collectively the "Attorney

Defendants"), the Governor of New York, Andrew Cuomo, New York State Court Judge,

Fernando Camacho, Michelle Harrington as Commissioner of New York State Sex Offender

Board of Examiners (the "Board"), Michelle Mulligan as Director of the New York State

Division of Criminal Justice Services[1] (the "Division"), New York State, (collectively the "State

---

[1] Plaintiff incorrectly named "New York State Division of Criminal Justice System"

Defendants"), the New York City Police Department ("NYPD") Sex Offender Unit and Does 1–

10. Plaintiff asserts various federal constitutional claims against the State Defendants and

federal and state law claims against the Attorney Defendants. On September 3, 2012, Plaintiff

moved for injunctive relief to, among other things, enjoin the State Defendants from "imposing

sanctions, or taking any action" with respect to Plaintiff's registration as a sex offender. On

February 15, 2013, the State Defendants and the Attorney Defendants filed separate motions to

dismiss the complaint and in opposition to Plaintiff's motion for injunctive relief. The Court

heard oral argument on June 14, 2012. For the reasons set forth below, the State Defendants'

motion to dismiss the complaint is granted and the complaint is dismissed with prejudice in its

entirety as to the State Defendants. Accordingly, Plaintiff's request for injunctive relief as to the

State Defendants is denied. The Attorney Defendants' motions to dismiss the complaint as to

Plaintiff's federal claims are granted and these claims are dismissed with prejudice. The Court

declines to exercise supplemental jurisdiction over Plaintiff's state law claims and dismisses

those claims against the Attorney Defendants without prejudice.

**Table of Contents**

I.     Procedural Background ................................................................................................. 3
II.    Factual Background ..................................................................................................... 6
    a.  Plaintiff's California Conviction............................................................................. 6
    b.  Plaintiff Living and Working in New York ............................................................ 8
    c.  Plaintiff's New York State SORA Proceedings..................................................... 10
III.   Discussion .................................................................................................................. 16
    a.  Standard of Review.................................................................................................. 16
        i.   Rule 12(b)(1)...................................................................................................... 16
        ii.  Rule 12(b)(6)...................................................................................................... 16

instead of "New York State Division of Criminal Justice Services."

b.  SORA Legislative Scheme ........................................................................... 18

    i.    General Provisions ............................................................................ 18

    ii.   Nonresident Worker Provisions........................................................ 21

    iii.  Level III Sex Offender Requirements................................................ 22

c.  State Defendants' Motion to Dismiss the Complaint ....................................... 24

    i.    *Rooker-Feldman* Doctrine ................................................................ 24

    ii.   Absolute Immunity — Judge Camacho............................................ 29

    iii.  Sovereign Immunity......................................................................... 32

d.  Plaintiff's Substantive Claims Against the State Defendants ........................... 42

    i.    Procedural Due Process — Generally................................................ 42

    ii.   Due Process — Vagueness ................................................................ 50

    iii.  Substantive Due Process .................................................................. 55

    iv.  Equal Protection................................................................................ 65

    v.    Privileges and Immunities................................................................ 74

    vi.   Right to Travel ................................................................................. 77

    vii.  *Ex Post Facto* ................................................................................. 79

    viii. Cruel and Unusual Punishment........................................................ 80

    ix.   Full Faith and Credit ........................................................................ 81

    x.    Premption ......................................................................................... 84

    xi.   Commerce Clause and Dormant Commerce Clause............................... 90

e.  Plaintiff's Substantive Claims Against the Attorney Defendants..................... 92

    i.    RICO Claim ..................................................................................... 93

    ii.   RICO Conspiracy........................................................................... 111

    iii.  FLSA............................................................................................. 112

    iv.  State Law Claims ........................................................................... 125

f.  Motions to Strike............................................................................................ 129

g.  Motions to Take Judicial Notice ..................................................................... 132

IV.   Conclusion ........................................................................................................... 134

## I.   Procedural Background

Plaintiff commenced this action on May 31, 2012 by filing a complaint seeking, among

other things, damages, declaratory and injunctive relief against several individuals including

Governor Cuomo, the Attorney Defendants, Judge Camacho,[2] the Queens District Attorney,

Richard Brown, and several agencies including the Sex Offender Monitoring Unit of the

NYPD's Special Victims Division, the Division, the Board, and others.  Plaintiff served only the

Attorney Defendants with the initial complaint.

On August 24, 2012, Plaintiff filed the amended complaint (the "Complaint") seeking a

writ of mandamus, declaratory relief and injunctive relief against the Attorney Defendants,

Governor Cuomo, Judge Camacho, Harrington,[3] Mulligan, the NYPD Sex Offender Unit and

Does 1–10.[4]  In the Complaint, Plaintiff asserts several constitutional claims against the State

Defendants including violations of the Due Process, Equal Protection, *Ex Post Facto* and Full

Faith and Credit Clauses.  In his opposition to the State Defendants' motion to dismiss the

---

[2]  Plaintiff incorrectly named Judge Ricardo Camacho instead of Fernando Camacho.

[3]  Plaintiff incorrectly named Michael Green instead of Michelle Harrington as the Commissioner of the Board.

[4]  Plaintiff did not properly serve the NYPD Sex Offender Unit, and, in any event, cannot sue the NYPD Sex Offender Unit.  Section 396 of the New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law."  N.Y.C. Admin. Code & Charter Ch. 16 § 396.  This provision has been construed to mean that the NYPD, as an agency of New York City, is not a suable entity.  *See, e.g.*, *Jenkins v. City of New York*, 478 F.3d 76, 93 n. 19 (2d Cir. 2007) ("The district court correctly noted that the NYPD is a non-suable agency of the City."); *Thomas v. N.Y.C. Police Dep't*, No. 12-CV-6327, 2013 WL 431335, at *1 (E.D.N.Y. Feb. 4, 2013) (finding that "[t]he complaint cannot proceed against the NYPD" because of NY.C. Admin Code & Charter Ch. 16 § 396); *Richardson v. N.Y.C. Police Dep't*, No. 12-CV-5753, 2013 WL 101403, at *2 (E.D.N.Y. Jan. 7, 2013) ("The NYPD and its divisions, including the Transit Police, may not be sued directly; instead, any suit against a City agency must be brought against the City of New York."); *Johnson v. N.Y.C. Police Dep't*, No. 12-CV-5423, 2012 WL 5607505, at *3 (E.D.N.Y. Nov. 15, 2012) ("New York City departments and agencies, as distinct from the City itself, lack the capacity to be sued.  Therefore, any claims against the NYPD are dismissed." (citations omitted)).  The Complaint is therefore dismissed against the NYPD Sex Offender Unit.  *See, e.g.*, *Thomas*, 2013 WL 431335, at *1 (dismissing claims against the NYPD); *Richardson*, 2013 WL 101403, at *2 (same); *Johnson*, 2012 WL 5607505, at *3 (same).  Suits against the NYPD must be brought against the City of New York.

Complaint, Plaintiff asserts additional constitutional claims for cruel and unusual punishment and violations of the Privileges and Immunities Clause, Commerce Clause, Dormant Commerce Clause and Supremacy Clause, as well as a right of access to the courts and right to travel claims. As to the Attorney Defendants, Plaintiff asserts several federal claims, including Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise, RICO conspiracy and Fair Labor Standard Act ("FLSA") unpaid overtime along with a Thirteenth Amendment constitutional claim. In addition, Plaintiff asserts state law claims against the Attorney Defendants for unjust enrichment, fraud, deceit and misrepresentation, fraudulent concealment, legal malpractice, unpaid wages, unpaid overtime wages and unpaid spread-of-hours wages.

By letter dated September 3, 2012, Plaintiff sought to file a motion to seek a temporary restraining order to, among other things, "declare that Plaintiff [was] not subject" to New York State Sex Offender Registration Act ("SORA") requirements, enjoin the State Defendants from imposing sanctions or taking any other action against Plaintiff, and enjoin the Attorney Defendants from "[m]entioning, discussing, annotating and/or documenting in any of their pleadings, motions and/or legal papers" that Plaintiff has or continues to violate New York State or federal sex offender registration requirements. (Docket Entry No. 52, Sep. 3, 2012 Letter.) On September 28, 2012, the Court converted Plaintiff's request for a temporary restraining order to a request for a preliminary injunction.[5] On October 12, 2012, Plaintiff filed a motion for "Permanent Injunction" which the Court has construed as a motion for preliminary injunction. Plaintiff requests relief from New York SORA registration requirements, including relief from having to return to New York State every 90 days, relief from being on the New York State

_____

[5] Plaintiff subsequently withdrew his request for injunctive relief against the Attorney Defendants. The Court issued a decision on October 19, 2012, denying a subsequent application by Plaintiff for a temporary restraining order. (*See* Docket Entry No. 79.)

SORA website, and injunctive relief to prevent any arrests of Plaintiff for his failure to register. Plaintiff also seeks several declarations regarding the constitutionality of SORA.

On February 15, 2013, the State Defendants and the Attorney Defendants filed separate motions to dismiss the Complaint and in opposition to Plaintiff's motion for a preliminary injunction. The Attorney Defendants and Plaintiff moved for sanctions against each other, which were denied at oral argument. In addition to the motions to dismiss and the motion for preliminary injunction, Plaintiff filed several other motions including: (1) motions to strike various portions of documents filled by the Attorney Defendants; and (2) several motions for the Court to take judicial notice of many items including cases and court filings.

The Court heard oral argument on June 14, 2013. At oral argument, the Court (1) dismissed Judge Camacho and New York State as defendants, (2) dismissed the claims for damages against the individual State Defendants, (3) dismissed Plaintiff's Thirteenth Amendment claim against the Attorney Defendants, (4) denied the Attorney Defendants' and Plaintiff's motions for sanctions, and (5) denied Plaintiff's motions to strike, except as to Plaintiff's motion to strike statements that he forged signatures.

## II. Factual Background

### a. Plaintiff's California Conviction

In 1998, Plaintiff pled guilty to unlawful sex acts on a minor and was sentenced to sixteen months in prison and three years' probation, (State Def. Mem. 3), an offense that required registration on California's sex offender registry.[6] (Compl. ¶¶ 23, 44.) At the time Plaintiff pled guilty he was required to register as a sex offender for life.[7]

---

[6] The facts alleged in the Complaint are assumed to be true for the purposes of deciding the motions to dismiss, except where Plaintiff's pleadings in the Complaint are inconsistent.

*U.S. Bank Nat. Ass'n v. Bank of Am., N.A.*, No. 12-CV-4873, 2012 WL 6136017, at *7 (S.D.N.Y. Dec. 11, 2012). In view of Plaintiff's *pro se* status and because of the Court's responsibility to construe *pro se* pleadings liberally, the Court will consider all the facts submitted in Plaintiff's submissions and presented at oral argument, in addition to the facts in the Complaint. *See Pietri v. N.Y. Office of Court Admin.*, No. 11-CV-3205, 2013 WL 1312002, at *1 n.2 (E.D.N.Y. Mar. 28, 2013) ("The facts alleged in the Complaint are assumed to be true for the purposes of this motion. Since Plaintiff is *pro se*, the Court will also consider facts contained in Plaintiff's opposition papers."); *Small v. Ortlieb*, No. 10-CV-1616, 2012 WL 3229298, at *1 (E.D.N.Y. Aug. 6, 2012) ("[A]s part of this Court's duty to construe *pro se* pleadings liberally, the Court will take account of all the facts contained in both [plaintiff's] amended complaint and his opposition papers."); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 461 (N.D.N.Y. 2009) ("[T]he mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint.").

[7]  At the time Plaintiff pled guilty, he signed a form which stated that his offense required a lifetime registration. (*See* Hartfolis Decl. Ex. B.) Plaintiff has cited case law to the Court and argues that the law in California has changed and he is no longer required to register. (Pl. Opp'n to State Defs. 89–91.) Whether or not Plaintiff was required to register as a sex offender for this offense in California is not determinative of whether Plaintiff was required to register in New York. Under New York Corrections Law Section 168-a (2)(d), a sex offender is required to register in New York if the crime would require registration in New York pursuant to SORA or the federal Sex Offender Registration and Notification Act ("SORNA"), even if the crime does not require registration in the state where the sex offender was convicted. *See* N.Y. Correct. Law § 168-a (2)(d); *Kasckarow v. Bd. of Examiners of Sex Offenders of State*, 964 N.Y.S.2d 650, 651 (App. Div. 2013) ("The definition of a 'sex offense' with respect to an offense committed in another jurisdiction is 'a conviction of [i] an offense in any other jurisdiction which includes all of the essential elements of any such crime' that constitutes a 'sex offense' under SORA." (quoting N.Y. Correct. Law § 168–a(2)(d)(i))); *Smith v. Devane*, 898 N.Y.S.2d 702, 704 (App. Div. 2010) ("[E]ntry of a guilty plea constitutes a 'conviction' under New York law, the Board correctly determined that petitioner was required to register as a sex offender under Correction Law § 168–a(2)(d)(ii), notwithstanding that he received a discretionary deferred adjudication under Texas criminal procedure upon that guilty plea" which petitioner argued was not a conviction under Texas law); *see also People v. Mann*, 859 N.Y.S.2d 278, 280 (App. Div. 2008) (noting that the plaintiff's two "misdemeanor counts" that "arose from defendant touching the breasts of females ages 13 and younger . . . would constitute the crime of sexual abuse in the second degree if committed in New York, and is a registrable offense under SORA" (citations omitted)); *People v. Whibby*, 855 N.Y.S.2d 250, 251 (App. Div. 2008) (holding that since the defendant was "convicted of the crime of rape in the Commonwealth of Pennsylvania in 1987 . . . [which] includes all the essential elements of rape in the first degree as defined in New York State Penal Law § 130.35(1)" that he committed a registrable offense in New York and he was properly classified as a sex offender in New York). The Court will not opine on whether or not Plaintiff is currently required to register in California as this issue is not before the Court. The Court notes that the form signed by Plaintiff and referred to by the Court was not attached to the

### b. Plaintiff Living and Working in New York

Plaintiff asserts that in "early 2009," he began to "lend[] emotional and moral support to his cousin, who resided in Borough of Queens, City of Astoria, State of New York, through a divorce proceeding." (Compl. ¶ 41.) "It was then when Plaintiff was introduced to attorney/defendant Trakas, who was, at that time, representing Plaintiff's cousin in said divorce proceedings." (*Id.*) According to Plaintiff, he helped Trakas in a case before the New York Board of Prisons and Trakas asked Plaintiff if he was interested in working for him as "a civil rights and constitutional consultant, temporary legal assistant, researcher, investigator and process server." (*Id.* ¶¶ 42, 43.) Plaintiff agreed that he would travel back and forth between California and New York until the Attorney Defendants had an opportunity to research sex offender registration in New York "to make sure that Plaintiff [did] not suffer any collateral consequence which could potentially expose him to more severe restrict [sic] and public notification then [sic] he had been exposed [to] in his state of conviction." (*Id.* ¶ 47.)

The Attorney Defendants told Plaintiff that in their professional opinion, he would not be subject to registration in New York that would require him to be on the public website or have a classification level but he would be required to notify the Division of his presence in New York. (*Id.* ¶ 49.) Plaintiff asserts that he was "induced" to live in New York by the Attorney Defendants who told Plaintiff he could work for them as a "non-New York citizen and non-resident worker." (*Id.* ¶ 187.) Plaintiff does not allege when in 2009 he met the Attorney

----

Complaint and is therefore not considered by the Court in deciding the pending motions. The document is relied on simply to give context to the facts since Plaintiff asserts in the Complaint that "in his home State of California, Plaintiff was similar to a Level I" and he is no longer required to register in California. (Compl. ¶¶ 268, 291–92; *see also id.* ¶¶ 151, 178, 261–62, 279.)

Defendants nor does he allege when he began to have discussions with them regarding working for them in New York.

Plaintiff began working and living in New York in November 2009. (*Id.* ¶ 52.) He first lived in Flushing, Queens and then in Astoria, Queens. (*Id.*) His apartment in Astoria was "only one block away from Bryant High School, and two blocks away from other public schools." (*Id.*) According to Plaintiff, the Attorney Defendants paid for his first month's rent and Trakas purchased Plaintiff's bed and other furniture. (*Id.*) The Attorney Defendants agreed to pay Plaintiff his customary rate of $75.00 an hour. (*Id.* ¶ 55.) They also agreed that Plaintiff would receive ten percent commission for cases he brought to the Attorney Defendants and ten percent of any judgment or settlement. (*Id.*)

Plaintiff alleges that the Attorney Defendants "together agreed to manipulate the Plaintiff to induce him, through the use of the United States Postal Service, internet, and the telecommunications system, an [sic] other interstate communications means, to accept a position within their respective law office, in order to enrich themselves from his knowledge of civil rights, criminal, and other fields of litigation . . . ." (*Id.* ¶ 56.) Plaintiff claims that the Attorney Defendants enriched themselves by "using Plaintiff's experience in civil rights, I.D.E.A., ADA and the Rehabilitation Act of 1974, including his knowledge of constitutional issues arising from criminal cases." (*Id.* ¶ 158.) Plaintiff maintains that he "had been trained and taught by deceased renowned New York Civil Rights attorney Mel Sachs, and that Plaintiff was working on Mel Sachs [sic] cases when he passed." (*Id.*)

### c. Plaintiff's New York State SORA Proceedings

Plaintiff asserts that within 10 days of arriving in Queens in November 2009, he went with the Attorney Defendants and Trakas's paralegal to the Division's offices in Manhattan. (Compl. ¶¶ 50, 54.)[8] Plaintiff alleges that he notified California "that he was temporarily working in the State of New York and would have a secondary address, and that he would continue to have is [sic] primary residence in City of Palm Springs, State of California." (*Id.* ¶ 51.) However, Plaintiff told officials in both New York and California that he was planning to reside in New York. By letter dated December 22, 2009, Plaintiff wrote to the New York State Sex Offender Registry, stating:

> I would like to inform you that I would like to reside in New York. I am subject to sex registration in California and I am told I would have to register in New York. Can you please send me the required form to complete my registration. I have been in New York for less than ten (10) days from the signing of this letter.
>
> I have also notified Sonoma County, California, my place of residence of this action and am providing you a copy of said letter as attached.

(Hartfolis Decl. Ex. D.)[9] The letter to Sonoma County that Plaintiff refers to is also dated

---

[8]  In another part of the 149-page Complaint, Plaintiff asserts that "on or about January 11th, 2010 [sic], upon being temporary [sic] hired by attorneys/defendants Russo and Trakas, Plaintiff went with attorney/defendant Trakas' paralegal to the Division located in New York City to register in accordance with Correction Law 168-f(6)." (Compl. ¶ 283.)

[9]  Generally, a court may only consider materials encompassed in the "four corners" of a complaint when deciding a motion to dismiss. *See Friedl v. City of New York*, 210 F.3d 79, 83–84 (2d Cir. 2000) (holding that "a district court errs when it 'consider[s] affidavits and exhibits submitted by' defendants, or relies on factual allegations contained in legal briefs or memoranda, in ruling on a 12(b)(6) motion to dismiss" (citations omitted)). All documents that are "attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference" are considered part of the complaint. *Chambers v. Time Warner, Inc*., 282 F.3d 147, 153 (2d Cir. 2002) (citations omitted). A court may also consider "a document [that] is not incorporated by reference . . . where the complaint 'relies heavily upon its terms and effect,' which renders the

December 22, 2009 and states:

> While visiting New York, I decided to relocate to the State of New York. I do not have a permanent address as of yet, and I am informed by my California lawyers that once I get a permanent address I have to immediately notify you. I have notified New York of my presence in accordance with their [sic] statutes. A copy of the notification is hereto attached. By the time I receive the NY Board's form for registration I would have a permanent address and I will send you that information contained in said form.

(Hartfolis Decl. Ex. D.) Plaintiff asserts that he amended his original letter. (Pl. Opp'n to State Defs. 58.) The amended letter Plaintiff refers to is a letter dated June 10, 2010, six months after he notified New York that he was moving to New York and requested the relevant registration forms from New York State. (*Id.* Ex. 3.) Plaintiff's June 10, 2010 letter written to Judith Condo "Member, Board of Examiners," responds to the Board notification to Plaintiff that he is required to register as a sex offender and that his case had been referred to the court for a SORA risk level classification proceeding. (*Id.*) In the June 10, 2010 letter Plaintiff wrote:

> 1. I am in receipt of your determination and purported evaluation where you have referred this matter for a SORA hearing proceeding for a Level Classification and Designation.
>
> 2. Madam, you nor any Court have jurisdiction on this matter to institute or prosecute a SORA proceeding.
>
> 3. I am a non-resident worker and as such pursuant to New York Corrections Law § 168(f)(6) my only obligation is to notify the Division, which I did, and the Division is required to notify the local law enforcement of my resident address and employment address. The statute does not authorize you nor the Court to take

---

document 'integral' to the complaint." *Id.* at 153 (citations omitted). The Complaint relies on the terms and effect of the letter since the Complaint relies on Plaintiff's discussions and correspondences with New York State and California State authorities regarding his work in New York and his registration requirements. (*See* Compl. ¶¶ 51, 54.)

> any further action nor does it confer on the Court, in personam
> jurisdiction or subject matter jurisdiction.

(*Id.*)

Despite his letter to the Board, Plaintiff did litigate the SORA proceeding. According to Plaintiff, he appeared at some of the hearings before Judge Camacho, (Compl. ¶ 166.), and he relied on Trakas's legal advice and agreed to have Russo represent him at his SORA proceeding. (*Id.* ¶ 66.) Plaintiff claims that "[i]t was clear to Plaintiff that attorney/defendant Russo had not studied nor reviewed any of the legal briefs, evidences and facts that he had prepared for attorney/defendant Russo, and appeared so incompetent at the hearings, that attorney/defendant would ask for a continuance." (*Id.* ¶ 166.) Plaintiff asserts that "it was for [sic] Attorney/defendant Russo' [sic] failure to file the aforementioned Petition and seeking a stay of the S.O.R.A. Level III Classification hearing before Judge Camacho, Plaintiff would not have been subjected to such a process, but would have immediately returned to his home State of California." (*Id.* ¶ 167.)

Plaintiff does not state when, but asserts generally that sometime prior to his final risk level determination by Judge Camacho, he "discovered that Queens Supreme Court had posted on its New York State Criminal Website (NYS Crimweb) that Plaintiff had been charged with a Felony in regards to the New York registrations." (*Id.* ¶ 68 (emphasis omitted).) Plaintiff asserts that the registration information listed him as having committed an E Felony, which was false. (*Id.*) Plaintiff told the Attorney Defendants about this information, and they agreed to raise the issue at the next hearing with Judge Camacho. (*Id.* ¶ 69.) The Attorney Defendants also asked Plaintiff to draft an Article 78 petition and an order to show cause. (*Id.*)

According to Plaintiff, prior to the final hearing before Judge Camacho, he had a meeting with the Attorney Defendants. (*Id.* ¶ 83.) They informed Plaintiff that if he returned to

California, Judge Camacho would have no jurisdiction over him. (*Id.*) The Attorney Defendants and Plaintiff agreed that Plaintiff should return to California and that the Attorney Defendants would assist Plaintiff with shipping his belongings to California.[10] (*Id.*) Plaintiff was to appear before Judge Camacho during the last week of May 2011 for his registration determination hearing. (*Id.* ¶ 74.) Plaintiff suffered a seizure that week and was hospitalized. (*Id.*) While at the hospital, he received a call from Russo that Judge Camacho wanted to see Plaintiff the next day. (*Id.* ¶ 75.) Russo told Plaintiff that he was not under any obligation to appear at the hearing since Russo had given Judge Camacho sufficient notice that Plaintiff was returning to California. (*Id.* ¶ 76.) Russo also told Plaintiff that the hearing would be canceled because Judge Camacho would no longer have jurisdiction over Plaintiff. (*Id.*) On May 25, 2011, Judge Camacho determined that Plaintiff was a risk level III sex offender. (Hartofilis Decl. Ex. C.)

While Plaintiff was at Newark Airport on his way to California, he received a call from Russo. (Compl. ¶ 77.) Russo told Plaintiff that Judge Camacho issued an order classifying Plaintiff a Level III sex offender. (*Id.*) Plaintiff asked Russo if he should return to New York and was told by Russo that he did not have to return because Russo was going to file a motion for reconsideration, an Article 78 petition, and a notice of appeal. (*Id.*)

Plaintiff asserts that "[u]pon arriving in the City of Palm Springs, County of Riverside, State of California, Plaintiff with his lawyer, David L. Wright, went to the Police Department and registered." (*Id.* ¶ 78.) Plaintiff "made copies of the registration business card provided by the registry officer, scanned it and sent it to the New York Sex Offender's Registry in Albany

---

[10] Plaintiff claims he lost $100,000 in personal property when the Attorney Defendants failed to ship Plaintiff his belongings, including "computer, air-conditioner, furniture, expensive cowboy designer cloths [sic] and cowboy hats, wheelchair, Canadian walking cains [sic], etc." (Compl. ¶ 83.)

and to attorney/defendant Russo to file before Judge Camacho and provide a [sic] to the Assistant District Attorney" who was the attorney in the SORA proceeding. (*Id.*)

Plaintiff subsequently tried to find out the status of the SORA proceeding. (*Id.* ¶ 80.) He emailed Russo on June 29, 2011, to inquire whether the order had been withdrawn and was told by Russo that "Camacho is out until after the fourth [sic] of July. The ADA will get 20 days to respond and the matter will be decided." (*Id.*) Plaintiff understood the email to mean that Russo had filed the motions. (*Id.*) At some point, Plaintiff began to suspect that the Attorney Defendants had not acted in his best interest and he contacted the Clerk of the Supreme Court and was told that no motions or notice of appeal had been filed on his behalf.[11] (*Id.* ¶ 88.) Plaintiff immediately contacted the Attorney Defendants and "requested an explanation." (*Id.* ¶ 89.) Plaintiff received a series of offensive emails. (*Id.*) Plaintiff was told in those emails that the time to appeal had lapsed and this lawsuit followed. (*Id.* ¶¶ 90–91.) Plaintiff alleges in the Complaint that "[u]ntil the time to file (a) Motion for Reconsideration, (b) Article 78 Petition and (c) a Notice of Appeal had elapsed, [the Attorney Defendants] kept leading on the Plaintiff to believe that they had performed the above obligations, duties and responsibilities owed to Plaintiff as their client." (*Id.* ¶ 82.)

In his papers submitted in opposition to the State Defendants' motion to dismiss the Complaint, Plaintiff, for the first time, asserts that he tried to file a timely Article 78 petition and appeal but was "obstructed, prevented, interfered with and denied by officers or agents of the [S]tate [D]efendants."[12] (Pl. Opp'n. to State Defs. 24.) Email "excerpts" inserted into Plaintiff's

---

[11] Plaintiff does not state in the Complaint when he contacted the Clerk of the Supreme Court. (Compl. ¶ 88.)

[12] It is not plausible that Plaintiff did not know that the Attorney Defendants did not

submissions in opposition to the State Defendants' motions to dismiss, appear to show that Plaintiff may have attempted to file an Article 78 petition and an appeal in the appellate court.[13] (*Id.*) Plaintiff was initially informed (1) that the papers had to be filed in Supreme Court, (2) that the Appellate Clerk would be unable to file his papers for him sent via email, and (3) that Plaintiff should have an attorney file the papers. (*Id.* at 24–25.) Plaintiff then had Dr. Busuttil file the papers in the Appellate Division because he thought it was the right court. (*Id.*)

There are many email excerpts between Plaintiff and several individuals in the New York State Court system beginning in December 2011, discussing whether documents Plaintiff mailed to the court were received. (*Id.* at 26–31.) Plaintiff was emailed the appropriate forms to file his petition and to file an application to receive "poor person" status in the New York State court and was told that the forms had to be notarized in order to be accepted by the court. (*Id.* at 28–31.) Plaintiff objected to the requirement that the documents had to be notarized. (*Id.* at 29.) Plaintiff requested that the notary requirement be waived because he was outside the United States and it was too costly to notarize the documents. (*Id.*) Plaintiff was advised that there was a free notary at the court but he would have to be physically present to use the services of the free notary public. (*Id.*) Plaintiff was informed that "[r]equiring that an affidavit be signed and properly notarized is not a mere administrative rule, but a required legal procedure to safeguard

---

timely appeal or file the Article 78 petition until the time to do so had expired and, at the same time, that Plaintiff tried to file a timely appeal but was thwarted in his attempts to do so. Clearly, both of these things cannot be true. In Plaintiff's motion for preliminary injunction, he admits that when he first attempted to submit his Article 78 petition and appeal that the time to do so had expired. (Pl. Prelim. Inj. Mem. 43.)

[13] No actual emails were provided as attachments to Plaintiff's Complaint or to his submissions in opposition to the motions to dismiss. However, as discussed *supra* in footnote 6, in view of Plaintiff's *pro se* status and because of the Court's responsibility to construe *pro se* pleadings liberally, the Court will consider these factual allegations.

against fraud.  In any event, the county clerk is not 'the court' as you put it, and we cannot 'waive' the law."  (*Id.*)  Plaintiff argues that his application should have been accepted as a declaration signed under the penalty of perjury pursuant to Title 28 U.S.C. Section 1746.  (*Id.*)

## III.  Discussion

### a.  Standard of Review

#### i.  Rule 12(b)(1)

"[A] district court may properly dismiss a case for lack of subject matter jurisdiction under Rule 12(b)(1) if it lacks the statutory or constitutional power to adjudicate it."  *Shabaj v. Holder*, 704 F.3d 234, 237 (2d Cir. 2013) (alteration in original) (quoting *Aurecchione v. Schoolman Transp. Sys., Inc*., 426 F.3d 635, 638 (2d Cir. 2005)).  "'[T]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'"  *Morrison v. Nat'l Austl. Bank Ltd*., 547 F.3d 167, 170 (2d Cir. 2008) (alterations in original) (citations omitted), *aff'd*, 561 U.S. ---, 130 S. Ct. 2869 (2010).  A court may consider matters outside of the pleadings when determining whether subject matter jurisdiction exists.  *M.E.S., Inc. v. Snell*, 712 F.3d 666, 671 (2d Cir. 2013); *Romano v. Kazacos*, 609 F.3d 512, 520 (2d Cir. 2010); *Morrison*, 547 F.3d at 170.

#### ii.  Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court "must take all of the factual allegations in the complaint as true."  *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 320 (2d Cir. 2009)).  A complaint must "contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson*, 631 F.3d at 63 (quoting *Iqbal*, 556 U.S. at 678); *see also Pension Ben. Guar. Corp.*, 712 F.3d at 717–18. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Where plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true in deciding a motion to dismiss." *U.S. Bank Nat. Ass'n v. Bank of Am., N.A.*, No. 12-CV-4873, 2012 WL 6136017, at *7 (S.D.N.Y. Dec. 11, 2012) (quoting *Nationwide Mut. Ins. Co. v. Morning Sun Bus. Co.*, No. 10-CV-1777, 2011 WL 381612, at *6 (E.D.N.Y. Feb. 2, 2011)); *see also Vaughn v. Strickland*, No. 12-CV-2696, 2013 WL 3481413, at *6 (S.D.N.Y. July 11, 2013) (noting that a court is not required "to accept as true allegations that conflict with a plaintiff's" other allegations (internal quotation marks omitted) (quoting *Green v. Niles*, No. 11-CV-1349, 2012 WL 987473, at *5 (S.D.N.Y. Mar. 23, 2012)); *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 n.3 (S.D.N.Y. July 12, 2012) (same); *In re Int'l Tobacco Partners, Ltd.*, 462 B.R. 378, 385 (Bankr. E.D.N.Y. 2011) ("Where an allegation in the complaint conflicts with other allegations, or where the plaintiff's own pleadings are contradicted by other matters asserted or relied upon or incorporated by reference by a plaintiff in drafting the complaint, the court is neither obligated to reconcile the pleadings with the other matter nor accept the allegation in the

pleadings as true in deciding a motion to dismiss." (quoting *In re Vanarthos*, 445 B.R. 257, 261 (Bankr. S.D.N.Y. 2011)).

### b. SORA Legislative Scheme

### i. General Provisions

SORA, codified at N.Y. Correction Law § 168 *et seq.*, became effective January 21, 1996. *Doe v. Pataki*, 120 F.3d 1263, 1266 (2d Cir. 1997); *Moore v. County of Suffolk*, 851 F. Supp. 2d 447, 453 (E.D.N.Y. 2012); *State v. Rashid*, 16 N.Y.3d 1, 17 (2010). It requires that sex offenders register with the Division. *Pataki*, 120 F.3d at 1266. The registration provisions apply not only to sex offenders who were convicted at trial of a registrable crime but also those sex offenders who plead guilty and enter nolo contendere pleas. *See, e.g.*, *Kasckarow v. Bd. of Examiners of Sex Offenders of State*, 964 N.Y.S.2d 650, 650 (App. Div. 2013) (holding that "out-of-state nolo contendere pleas" are convictions under SORA); *Smith v. Devane*, 898 N.Y.S.2d 702, 704 (App. Div. 2010) (holding that the "petitioner's Texas guilty plea and deferred adjudication [w]as a conviction requiring registration as a sex offender in" in New York).

The statute also applies to sex offenders convicted in other states who move to New York. "The procedure for registration of sex offenders who move to New York from other states is set out in Correction Law § 168–k." *People v. Liden*, 19 N.Y.3d 271, 275 (2012). According to this provision, a sex offender shall notify the Division of his or her address "no later than ten calendar days after such sex offender establishes residence in this state." N.Y. Correct. Law § 168-k(1). The Division is required to notify the Board that an out-of-state convicted sex offender has notified the Division of his or her presence in New York State, and the Board is responsible for making a determination as to whether the offender is required to register, and, if so, makes a recommendation to the county court or supreme court as to the risk level classification for the out-of-town convicted sex offender.

The statute provides in pertinent part:

> The division shall advise the board that the sex offender has established residence in this state. The board shall determine whether the sex offender is required to register with the division. If it is determined that the sex offender is required to register, the division shall notify the sex offender of his or her duty to register under this article and shall require the sex offender to sign a form as may be required by the division acknowledging that the duty to register and the procedure for registration has been explained to the sex offender. No later than thirty days prior to the board making a recommendation, the sex offender shall be notified that his or her case is under review and that he or she is permitted to submit to the board any information relevant to the review. After reviewing any information obtained, . . . . the board shall within sixty calendar days make a recommendation regarding the level of notification . . . and whether such sex offender shall be designated a sexual predator, sexually violent offender, or predicate sex offender . . . .

N.Y. Correct. Law § 168-k(2). While the Board makes a recommendation as to the classification level of the offender, the county court or supreme court determines the level of classification after a hearing. *Id.*; *see also Liden*, 19 N.Y.3d at 275 ("Thus the statute assigns the registrability determination to the Board, and the risk level ('level of notification') determination to the court.").

The statute further provides:

> At least thirty days prior to the determination proceeding, such court shall notify the district attorney and the sex offender, in writing, of the date of the determination proceeding and the court shall also provide the district attorney and sex offender with a copy of the recommendation received from the board and any statement of the reasons for the recommendation received from the board. This notice shall include the following statement or a substantially similar statement . . . This proceeding . . . will determine how long you must register as a sex offender and how much information can be provided to the public concerning your registration. *If you fail to appear at this proceeding, without sufficient excuse, it shall be held in your absence. Failure to appear may result in a longer period of registration or a higher level of community notification because you are not present to offer evidence or contest evidence offered by the district attorney.* The court shall also advise the sex

offender that he or she has a right to a hearing prior to the court's determination, that he or she has the right to be represented by counsel at the hearing and that counsel will be appointed if he or she is financially unable to retain counsel.

*Id.* (emphasis added). "If a sex offender, having been given notice, including the time and place of the determination proceeding in accordance with this section, fails to appear at this proceeding, without sufficient excuse, the court shall conduct the hearing and make [a] determination[]." N.Y. Correct. Law § 168-k(4). At the hearing, the sex offender can also obtain counsel appointed by the court if the sex offender applies for counsel and the court finds that the sex offender cannot afford to retain counsel. N.Y. Correct. Law § 168-k(2).

If the parties dispute issues, including whether the sex offender is required to register, the court may also consider that dispute. *Id.* "Where there is a dispute between the parties concerning the determinations, the court shall adjourn the hearing as necessary to permit the sex offender or the district attorney to obtain materials relevant to the determinations from the state board of examiners of sex offenders or any state or local facility, hospital, institution, office, agency, department or division. Such materials may be obtained by subpoena if not voluntarily provided to the requesting party." *Id.* The New York Court of Appeals has held that the court may consider not only the level of classification but also whether a sex offender is under any obligation to register if there is a dispute among the parties.[14] *Liden*, 19 N.Y.3d at 276 ("Where

---

[14] At the time of Plaintiff's classification hearing, Plaintiff could only challenge his risk level and not the determination that he was required to register at the classification hearing. *See In re Mandel*, 742 N.Y.S.2d 321, 322 (App. Div. 2002) ("SORA limits the court's function to determining the duration of registration and the level of notification. Since the court's function in a proceeding pursuant to Correction Law article 6–C is limited, in the absence of a proceeding pursuant to CPLR article 78, the court may not review the Board's registration determination."), *abrogated by People v. Liden*, 19 N.Y.3d 271 (2012); *see also Liden*, 19 N.Y.3d at 274 (noting that "several Appellate Division decisions h[eld] that a determination of registrability may be challenged only in an article 78 proceeding" and making it clear that a plaintiff could challenge

the initial determination that the person must register is disputed, . . . that registrability can be considered in the risk level proceeding."). "The state has the burden of establishing by clear and convincing evidence the risk level assessment." *People v. Arotin*, 796 N.Y.S.2d 743, 745–46 (App. Div. 2005). "Case summaries often satisfy this burden." *Id.*

The court is ultimately required to provide an order with findings of fact and law, which order can be appealed by either party.[15] N.Y. Correct. Law § 168-k(2). "Where counsel has been assigned to represent the sex offender upon the ground that the sex offender is financially unable to retain counsel, that assignment shall be continued throughout the pendency of the appeal, and the person may appeal as a poor person pursuant to article eighteen-B of the county law." *Id.*

## ii. Nonresident Worker Provisions

Under SORA, a "nonresident worker" is defined as "any person required to register as a sex offender in another jurisdiction who is employed or carries on a vocation in New York State, on either a full-time or a part-time basis, with or without compensation, for more than fourteen consecutive days, or for an aggregate period exceeding thirty days in a calendar year." N.Y. Correct. Law § 168-a(15). Section 168-f(6) of SORA provides in pertinent part that:

---

the Board's determination at the classification hearing); *People v. Teagle*, 884 N.Y.S.2d 80, 81 (App. Div. 2009) ("The defendant's argument that he is not properly subject to SORA at all is not properly before this Court since a CPLR article 78 proceeding is the only proper vehicle in which to raise a challenge to an agency determination that an out-of-state conviction subjects a defendant to SORA."). Plaintiff could have brought a separate Article 78 proceeding to challenge the Board's determination that he was required to register as a sex offender.

[15] "Upon application of either party, the court shall seal any portion of the court file or record which contains material that is confidential under any state or federal statute." N.Y. Correct. Law § 168-k(2).

> Any nonresident worker or nonresident student, as defined in subdivisions fourteen and fifteen of section one hundred sixty-eight-a of this article, shall register his or her current address and the address of his or her place of employment or educational institution attended with the division within ten calendar days after such nonresident worker or nonresident student commences employment or attendance at an educational institution in the state. Any nonresident worker or nonresident student shall notify the [D]ivision of any change of residence, employment or educational institution address no later than ten days after such change. The [D]ivision shall notify the law enforcement agency where the nonresident worker is employed or the educational institution is located that a nonresident worker or nonresident student is present in that agency's jurisdiction.[16]

N.Y. Correct. Law § 168-f(6). New York Court of Appeals has held that any sex offender, as defined by New York Corrections Law Section 168-a (2)(d), may be required to appear on the registry and whether or not a sex offender is required to register is a determination made pursuant to N.Y. Corrections Law Section 168-k. *See Liden*, 19 N.Y.3d at 275 ("The procedure for registration of sex offenders who move to New York from other states is set out in Correction Law § 168–k."). Under N.Y. Corrections Law Section 168-k, the determination as to whether a sex offender has to register is made by the Board, but the risk level classification determination is made by a judge of the county court or supreme court. *Id.*

### iii.   Level III Sex Offender Requirements

A sex offender is given a Level III classification when "risk of repeat offense is high and there exists a threat to the public safety." N.Y. Correct. Law § 168-l(6)(c); *see also* N.Y.

---

[16] Plaintiff asserts that according to this provision, he was required only to notify the Division that he was present in New York and would not appear on the public registry if he complied with this provision. (Pl. Opp'n to State Defs. 65, 70.) Contrary to Plaintiff's claims, this is a first step rather than the only step with which a nonresident worker is required to comply. Whether a sex offender will ultimately be subject to registration in New York State and the level of classification is governed by the procedures set forth in New York Corrections Law Section 168-k.

Correct. Law § 168-d(2) (discussing notification given to individuals about risk levels); N.Y. Correct. Law § 168-k(2) (same); N.Y. Correct. Law § 168-n(3) (same).  Level III sex offenders are required to register and "shall personally appear at the law enforcement agency having jurisdiction within twenty days of the first anniversary of the sex offender's initial registration and every year thereafter during the period of registration for the purpose of providing a current photograph of such offender.  The law enforcement agency having jurisdiction shall photograph the sex offender and shall promptly forward a copy of such photograph to the [D]ivision."  N.Y. Correct. Law § 168-f(2)(b-2).  Additionally, a Level III sex offender "shall also personally verify his or her address every ninety calendar days with the local law enforcement agency having jurisdiction where the offender resides."  N.Y. Correct. Law § 168-h(3).

As a Level III sex offender, pursuant to New York Correction law, Plaintiff has a lifetime registration requirement.  N.Y. Correct. Law § 168-h(2).  Once it has been determined that a sex offender is under a life-time registration, he may be removed from the registry only if he or she has his or her conviction overturned or is pardoned.  *See* N.Y. Correct. Law § 168-f(5); *Doe v. O'Donnell*, 924 N.Y.S.2d 684, 686 (App. Div. 2011) ("[W]hile SORA expressly addresses an offender's relocation to another state, it does not provide for his or her removal from the sex offender registry under such circumstances.  Had the Legislature intended to require the Division to remove a sex offender from New York's registry upon his or her relocation from this state, it would have so provided.").  SORA also requires that all sex offenders register any change of address with the Division "no later than ten calendar days after any change of address."  N.Y. Correct. Law § 168-f(4).  SORA makes clear that both nonresident workers and nonresident students are to inform the Division within ten days of their relocation to a new address.  N.Y. Correct. Law § 168-f(6).  The Division will inform law enforcement officials in the new place of

residence of the individual's relocation.  N.Y. Correct. Law § 168-f(6); N.Y. Correct. Law § 168-j(4).[17]

### c.    State Defendants' Motion to Dismiss the Complaint

The State Defendants assert that the Court lacks jurisdiction over Plaintiff's claims against them for several reasons: (1) the *Rooker-Feldman* doctrine bars the suit, (2) Judge Camacho is immune because of the absolute immunity doctrine, (3) the State Defendants are immune because of sovereign immunity, and (4) the State Defendants have no personal involvement and therefore they are not proper parties.  For the reasons set forth below, the Court finds that the *Rooker-Feldman* doctrine does not bar the bulk of Plaintiff's suit, only a small portion of it, Judge Camacho is immune from prosecution for all claims because of judicial immunity and sovereign immunity, New York State is also immune from all claims because of sovereign immunity, the Individual State Defendants are immune from all claims for money damages, the Governor is not a proper party, and Plaintiff's claims against Harrington and Mulligan have no merit.  Therefore, Plaintiff's preliminary injunction request is denied, and the State Defendants' motion to dismiss is granted.

### i.    *Rooker-Feldman* Doctrine

Plaintiff is not barred from bringing the bulk of this action against the State Defendants by the *Rooker-Feldman* doctrine.  Under the *Rooker-Feldman* doctrine, federal district and circuit courts lack subject-matter jurisdiction in cases that are essentially "appeals from state-court judgments."  *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005); *see*

---

[17]  The State Defendants argue that if Plaintiff had properly notified the appropriate New York agency of his change of address, while he would still be on the registry, he would no longer be under an obligation to report every 90 days to his local law enforcement agency, since New York Correction Law Section 168-h(3) only requires a sex offender to report to the local law enforcement where the offender "resides."  (*See* State Def. Reply 17.)

*also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that *Rooker-Feldman* bars "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments"); *McKithen v. Brown*, 626 F.3d 143, 154 (2d Cir. 2010) ("[T]he *Rooker-Feldman* doctrine deprives a federal court of jurisdiction to consider a plaintiff's claim" which applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review of those judgments." (citations and internal quotation marks omitted)); *Galtieri v. Kelly*, 441 F. Supp. 2d 447, 453 (E.D.N.Y. 2006) ("[F]ederal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments." (quoting *Hoblock*, 422 F.3d at 84)). "Underlying the *Rooker-Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." *Hoblock*, 422 F.3d at 85; *see also Williams v. 2720 Realty Co.*, No. 12-CV-6408, 2013 WL 55685, at *2 (E.D.N.Y. Jan. 3, 2013) ("[O]nly the United States Supreme Court is vested with jurisdiction over appeals from final state court judgments.").

In order for *Rooker-Feldman* to apply, a four-part test must be satisfied: "First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must 'complain of injuries caused by a state-court judgment.' Third, the plaintiff must 'invite district court review and rejection of that judgment.' Fourth, the state-court judgment must have been 'rendered before the district court proceedings commenced . . . .'" *Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009) (alteration and citations omitted); *see also McKithen*, 626 F.3d at 154 (outlining the *Rooker-Feldman* test); *Jelks v. Menorah Home & Hosp. for the Aged & Infirm.*, No. 13-CV-

2995, 2013 WL 4008734, at *2 (E.D.N.Y. Aug. 5, 2013) (same); *Baumgarten v. Suffolk County*,

No. 12-CV-0171, 2013 WL 3973089, at *6 (E.D.N.Y. July 31, 2013) (same).  As discussed

below, only two of the four requirements have been met by the State Defendants.

The State Defendants argue that Judge Camacho's May 25, 2011 determination of

Plaintiff's risk level assessment (1) is a loss in state court, (2) is a state court judgment that has

caused the injuries Plaintiff complains of in this action, (3) that Plaintiff seeks review and

rejection of Judge Camacho's decision, and (4) that the decision was rendered before Plaintiff

commenced this action.  (*See generally* State Defs. Mem.)  The State Defendants are correct only

as to the first and fourth elements — Plaintiff did commence this proceeding on May 31, 2012, a

year after Judge Camacho's May 25, 2011 decision and Judge Camacho's decision was a loss for

Plaintiff in state court.[18]

As to the other two *Rooker-Feldman* elements, the State Defendants are wrong.  The

issue before Judge Camacho was Plaintiff's risk level classification, not whether he was required

to register as a sex offender.  Indeed, at the time of the risk level classification proceeding before

---

[18]  Plaintiff argues that there is no final state court decision because he can appeal Judge
Camacho's decision.  (Pl. Opp'n to State Def. 25–39.)  It is unclear why Plaintiff believes he can
timely appeal a May 2011 court decision, but, in any event, even assuming that Plaintiff could
timely appeal Judge Camacho's decision, the ability to do so does not bar the application of the
*Rooker-Feldman* doctrine since the doctrine applies not only to final orders but also to
interlocutory decisions.  *Green v. Mattingly*, 585 F.3d 97, 101 (2d Cir. 2009) (noting that the
"doctrine applied both to final state court judgments and to interlocutory state court orders");
*Shelley v. Brandveen*, No. 06-CV-1289, 2012 WL 3903472, at *3 (E.D.N.Y. Sept. 6, 2012)
("*Rooker-Feldman* doctrine, applies not only to final judgments, but also to interlocutory
orders." (citing *Campbell v. Greisberger*, 80 F.3d 703, 707 (2d Cir. 1996))); *see also Citibank,
N.A. v. Swiatkowski*, No. 12-CV-0196, 2012 WL 542681, at *4 n.7 (E.D.N.Y. Feb. 21, 2012);
("The fact that [the plaintiff] had an appeal pending before the Appellate Division at the time of
removal does not affect the Rooker–Feldman analysis."); *Bobrowsky v. Yonkers Courthouse*, 777
F. Supp. 2d 692, 706 (S.D.N.Y. 2011) (holding that the initial criminal conviction and civil
protective order were both final decisions prior to any 440 motions seeking to overturn the
conviction).

Judge Camacho, Plaintiff could *not* challenge the Board's determination that he was required to register as a sex offender during the proceeding before Judge Camacho. *See In re Mandel*, 742 N.Y.S.2d 321, 322 (App. Div. 2002) ("SORA limits the court's function to determining the duration of registration and the level of notification. Since the court's function in a proceeding pursuant to Correction Law article 6–C is limited, in the absence of a proceeding pursuant to CPLR article 78, the court may not review the Board's registration determination."), *abrogated by Liden*, 19 N.Y.3d 271; *see also People v. Teagle*, 884 N.Y.S.2d 80, 81 (App. Div. 2009) ("The defendant's argument that he is not properly subject to SORA at all is not properly before this Court since a CPLR article 78 proceeding is the only proper vehicle in which to raise a challenge to an agency determination that an out-of-state conviction subjects a defendant to SORA."). Plaintiff's primary challenge in the proceeding before this Court is to the requirement that, as an alleged nonresident worker, he is required to register as a sex offender in New York.[19] This determination was made by the Board, and while Plaintiff could have brought an Article 78

---

[19] To the extent Plaintiff is challenging his risk level determination that was decided by Judge Camacho on May 25, 2011, such a challenge is barred by the *Rooker-Feldman* doctrine. *See Burfeindt v. Postupack*, 509 F. App'x 65, 66 (2d Cir. 2013) (upholding district court's dismissal which rested partially on *Rooker–Feldman* grounds); *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 83 (2d Cir. 2005) (finding suit barred by *Rooker-Feldman* doctrine); *Zuneska v. Cuomo*, No. 12-CV-0949, (E.D.N.Y. Feb. 1, 2013) (finding that the supreme court's determination that a level one registered sex offender could not be declassified was barred from review by the federal court because of the *Rooker-Feldman* doctrine); *Anderson v. UMG Recordings Inc.*, No. 12-CV-25826, 2012 WL 6093776, at *2 (E.D.N.Y. Dec.7, 2012) ("[A]lthough plaintiff's complaint does not detail the specific injuries that the rulings in the State Court Action cause him, a fair reading of the complaint is that plaintiff seeks to continue pressing the claims underlying the State Court Action . . . ."); *White v. White*, No. 12-CV-200, 2012 WL 3041660, at *13–14 (S.D.N.Y. July 20, 2012) (finding that the state court decision was the real cause of the plaintiff's injury and therefore the federal district court lacked jurisdiction over the matter); *Munsch v. Evans*, No. 11-CV-2271, 2012 WL 528135, at *6 (E.D.N.Y. Feb. 17, 2012) (barring a plaintiff from bringing a case in which the plaintiff sought to have supervision for life by the parole board found unconstitutional because it would require the court to overturn the state court decision).

proceeding to challenge the Board's determination, Plaintiff did not challenge the determination

in court. Thus, as to the Board's determination that Plaintiff was required to register, there is no

court proceeding that Plaintiff is challenging in this action. Judge Camacho's decision did

nothing more than determine Plaintiff's risk level classification. It had no effect on whether

Plaintiff was *required to register*. Therefore, as to the determination that Plaintiff had to register,

Plaintiff is not complaining of any injuries caused by Judge Camacho's decision, nor is he

seeking a review or rejection of Judge Camacho's decision. Plaintiff is therefore not barred from

bringing this action by the *Rooker-Fedlman* doctrine.[20]

---

[20] Plaintiff also asserts a denial of access to the courts claim. (Pl. Opp'n to State Def. 25–39.) Plaintiff claims that the State Defendants should be barred from asserting that the *Rooker-Feldman* doctrine bars his claims because they prevented him from filing his Article 78 petition and his appeal. (*Id.*) The Court denied this claim at oral argument, (Oral Arg. Tr. 18:15–22:22), but explains the basis for the dismissal here. "To sustain a cause of action for denial of access to the courts, a plaintiff must show that '(1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury.'" *DeMeo v. Kean*, 754 F. Supp. 2d 435, 445 (N.D.N.Y. 2010); *see also Dawes v. VanBenschoten*, 21 F. App'x 29, 31 (2d Cir. 2001) ("To find an unconstitutional denial of access to the courts, a plaintiff must demonstrate that the defendant acted deliberately and maliciously."); *Hendricks v. Boltja*, 20 F. App'x 34, 37 (2d Cir. 2001) ("[D]enial of access to the courts . . . requires a showing of actual injury."). "A plaintiff must assert more than mere allegations that the 'false and deceptive information and concealment foreclosed Plaintiff from effectively seeking adequate legal redress.'" *DeMeo*, 754 F. Supp. 2d at 445 (quoting *Christopher v. Harbury*, 536 U.S. 403, 418 (2002)). Plaintiff argues that several individuals employed in the court system prevented him from filing his appeal. (Pl. Opp'n to State Def. 25–39.) According to Plaintiff, these individuals refused to accept Plaintiff's appeal papers without having them notarized and Plaintiff felt notary fees were too expensive in Europe and therefore he should have been allowed to submit non-notarized documents. (*Id.*) Accepting the facts alleged by Plaintiff as true for the purposes of deciding the motions, they do not support a denial of access claim, since enforcing procedural rules of the court does not deny access to the court. *See Yadav v. Brookhaven Nat. Lab.*, 487 F. App'x 671, 672 (2d Cir. 2012) ("Although *pro se* litigants must be afforded a certain amount of latitude, they are still required to attempt to comply with procedural rules, especially when they can be understood without legal training and experience."); *Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("*[P]ro se* litigants generally are required to inform themselves regarding procedural rules and to comply with them." (citations omitted)). Plaintiff, although *pro se* and litigating this case from Malta, is required to comply with all procedural rules. Courts have found that requiring plaintiff to pay fees related to filing papers in court does not amount to a denial of access to court claim.

### ii. Absolute Immunity — Judge Camacho

On December 28, 2012, Plaintiff requested that all claims against Judge Camacho be dismissed. (Docket Entry No. 113, Dec. 28, 2012 Letter.) However, in his opposition to the State Defendants' motion to dismiss the Complaint filed on February 16, 2013, Plaintiff asserts that Judge Camacho is not entitled to judicial immunity because he was performing ministerial and administrative duties on May 25, 2011 when he determined Plaintiff's risk level III classification. (Pl. Opp'n to State Def. 81.) The Court dismissed all claims against Judge Camacho at oral argument. The Court sets forth its legal basis for the dismissal in this decision.

"It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions and even allegations of bad faith or malice cannot overcome judicial immunity." *Basile v. Connolly*, 513 F. App'x 92, 93–94 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009)); *Pietri v. N.Y. Office of Court Admin.*, No. 11-CV-3205, 2013 WL 1312002, at *6 (E.D.N.Y. Mar. 28, 2013) (discussing judicial immunity). Judges are afforded absolute immunity "in order to insure

---

*See, e.g.*, *Moncla v. Kelley*, 430 F. App'x 714, 717–18 (10th Cir. 2011); *In re Diet Drugs*, 325 F. Supp. 2d 540, 541–43 (E.D. Pa. 2004). Plaintiffs do not have a right to file papers any way they want. *See, e.g.*, *Wells v. Welborn*, 165 F. App'x 318, 322 (5th Cir. 2006) (holding that the plaintiff had no right to file his papers by facsimile); *see also Wolfe v. George*, 486 F.3d 1120, 1126 (9th Cir. 2007) ("A state may set the terms on which it will permit litigations in its courts."). Moreover, according to Plaintiff's own submission, he did not learn that the Attorney Defendants had failed to file his Article 78 proceeding or appeal Judge Camacho's determination until *after* the time to do so had expired. (*See, e.g.*, Compl. ¶ 164 ("Attorney/defendant Russo told Plaintiff to prepare a different Article 78 Petition, addressing the jurisdiction of the court to adjudicate a Level III Classification upon a non-New York citizen and non-resident worker in violation of Correction Law § 168-f(6), and that attorney/defendant Russo would file it. However, once again after the time to so do had elapsed Plaintiff learned that attorney/defendant Russo did not file the aforementioned Petition." (emphasis omitted)); Pl. Prelim. Inj. Mot. 43 (admitting that he was told that he was outside of the time to file a timely appeal).) Plaintiff also asserted at oral argument that he was unable to perfect his appeal because Russo never returned his case file to him. (Oral Arg. 86:8–20.) Therefore, Plaintiff has failed to sufficiently allege a claim for denial of access to the courts.

that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bliven*, 579 F.3d at 209 (internal quotation marks omitted) (quoting *Bradley v. Fisher*, 80 U.S. (13 Wall.) 335, 347 (1871)). A judge is immune "even if [the judge's] exercise of authority is flawed by the commission of grave procedural errors," *Basile*, 513 F. App'x at 94 (alteration in original) (quoting *Stump v. Sparkman*, 435 U.S. 349, 359 (1978)), or if the "judge acted 'in excess of his or her jurisdiction' or authority," *id.* (quoting *Maestri v. Jutkofsky*, 860 F.2d 50, 52 (2d Cir. 1988)). *See also Pietri*, 2013 WL 1312002, at *6 (finding that absolute immunity is not affected by procedural errors or a judge acting in excess of authority); *Collins v. Miller*, No. 06-CV-5179, 2007 WL 2891414, at *2 (E.D.N.Y. Sept. 28, 2007) ("[A]bsolute judicial immunity 'is not overcome by allegations of bad faith or malice,' nor can a judge 'be deprived of immunity because the action he took was in error . . . or was in excess of his authority.'" (quoting *Mireles*, 502 U.S. at 11)), *aff'd*, 338 F. App'x 34 (2d Cir. 2009).

Plaintiff asserts that Judge Camacho's actions were ministerial and administrative. "In determining whether an act by a judge is 'judicial,' thereby warranting absolute immunity, we are to take a functional approach, for such 'immunity is justified and defined by the *functions* it protects and serves, not by the person to whom it attaches.'" *Bliven*, 579 F.3d at 209–10 (emphasis in original) (quoting *Forrester v. White*, 484 U.S. 219, 227 (1988)). "In employing this functional analysis, the Supreme Court has generally concluded that acts arising out of, or related to, individual cases before the judge are considered judicial in nature." *Bliven*, 579 F.3d at 210; *see also Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 365 (S.D.N.Y. 2011) (holding that judicial immunity is applied when a government official performs "the function of resolving disputes between parties, or of authoritatively adjudicating

private rights." (quoting *Antoine v. Byers & Anderson,* 508 U.S. 429, 435–36 (1993))). Judicial

immunity will not apply only if "an individual's duties do not require him to exercise

discretionary judgment but rather are 'purely ministerial and administrative' in nature." *Tomlins*,

812 F. Supp. 2d at 365 (citations omitted); *see also Quitoriano v. Raff & Becker, LLP*, 675 F.

Supp. 2d 444, 450 (S.D.N.Y. 2009) (finding that judicial immunity applies when the function

involves "exercise[ing] discretionary judgment"). "Even 'informal and *ex parte*' proceedings

that are 'otherwise within a judge's lawful jurisdiction' are considered judicial." *Zeigler v. New*

*York*, No. 11-CV-037, 2013 WL 2461453, at *6 (N.D.N.Y. June 7, 2013) (quoting *Forrester*,

484 U.S. at 227). As pled in the Complaint, the only act Judge Camacho engaged in was

judicially designating Plaintiff a risk level III sex offender, which was clearly an act that required

his "discretionary judgment."[21] (Compl. ¶¶ 29, 64, 69–71, 74–88, 120, 161, 166–167, 172, 252,

258, 285, 287, 296–298.) Judge Camacho is therefore entitled to the absolute immunity.[22] *See,*

---

[21] The Second Circuit has provided a list of examples of administrative functions performed by judges — none of which are similar to the actions engaged in by Judge Camacho. The list includes administrative actions like "demoting or dismissing a court employee; and compiling general jury lists to affect all future trials." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009) (citations omitted). The list also includes "promulgating a code of conduct for attorneys," although the court stated that the judge performing such a task would be "entitled to legislative immunity." *Id.*

[22] In addition, all actions against Judge Camacho are barred by sovereign immunity. Plaintiff sued Judge Camacho for actions he took in his official capacity as a judge of Queens County Supreme Court — determining that Plaintiff was a risk level III sex offender. The Eleventh Amendment bars all suits against states, state agencies and individuals sued in their official capacity, including judges. *See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006) ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." (internal quotation marks omitted) (quoting *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997))); *Zahl v. Kosovsky*, No. 08-CV-8308, 2011 WL 779784, at *7 (S.D.N.Y. Mar. 3, 2011) ("Official-capacity sovereign immunity extends to a state judge sued in her official capacity."), *aff'd*, 471 F. App'x 34 (2d Cir. 2012), *cert. denied*, 568 U.S. ---,

*e.g.*, *Myers v. Sperazza*, No. 11-CV-292, 2012 WL 6690303, at *2 (W.D.N.Y. Dec. 21, 2012) (finding the judge who determined the plaintiff a level III sex offender to be absolutely immune under judicial immunity).

### iii.  Sovereign Immunity

"As a general matter, states enjoy sovereign immunity from suit in federal court, even if the claim arises under federal law." *KM Enterprises, Inc. v. McDonald*, --- F. App'x ---, ---, 2013 WL 1799866, at *1 (2d Cir. Apr. 30, 2013).  States may only be sued in federal court when they have waived their sovereign immunity, Congress has acted to abrogate state sovereign immunity pursuant to Section 5 of the Fourteenth Amendment, or the plaintiff is suing a state official in his or her official capacity for prospective injunctive relief from an ongoing constitutional violation.  U.S. Const. amend. XI; *Va. Office for Prot. & Advocacy v. Stewart*, 564 U.S. ---, ---, 131 S. Ct. 1632, 1638 (2011); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 152 (2d Cir. 2013), *cert. dismissed*, 569 U.S. ---, ---, 133 S. Ct. 2823 (2013); *KM Enterprises*, --- F. App'x at ---, 2013 WL 1799866, at *1; *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006).  "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Mary Jo C.*, 707 F.3d at 152 (quoting *Woods*, 466 F.3d at 236) (alterations omitted).  In addition, "[t]he Eleventh Amendment bars the award of money damages against state officials in their official capacities." *Ford v. Reynolds*, 316 F.3d 351, 354–55 (2d Cir. 2003); *see also Woods*, 466 F.3d at 236 (holding that officials in their official capacities cannot be sued for money

---

133 S. Ct. 1460 (2013).  Furthermore, as discussed *supra* in the *Rooker-Feldman* section, this Court is barred from direct review of any judicial determination made by Judge Camacho.

damages). "[T]he Supreme Court has frequently instructed that a state will not be deemed to have waived its sovereign immunity unless the waiver is 'express' and 'unequivocal.'" *Doe v. Pataki*, 481 F.3d 69, 78 (2d Cir. 2007).

### 1. Claims for Money Damages

In order to sue a state for a constitutional violation under the Fourteenth Amendment, a party must rely on an act of Congress which explicitly allows suit and abrogates sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 566 U.S. ---, ---, 132 S. Ct. 1327, 1338 (2012) ("To abrogate the States' immunity from suits for damages under § 5 [of the Fourteenth Amendment], Congress must identify a pattern of constitutional violations and tailor a remedy congruent and proportional to the documented violations."); *see also United States v. Georgia*, 546 U.S. 151, 158 (2006) ("Section 5 authorizes Congress to create a cause of action through which the citizen may vindicate his Fourteenth Amendment rights." (citations omitted)). If a plaintiff wants to sue someone acting under the color of state law for money damages because of a constitutional violation, the relief comes from § 1983. *Zigmund v. Foster*, 205 F.3d 1327 (2d Cir. 2000) ("42 U.S.C. § 1983, . . . makes a Fourteenth Amendment due process violation actionable."); *Sank v. City Univ. of N.Y.*, No. 10-CV-4975, 2011 WL 5120668, at *6 (S.D.N.Y. Oct. 28, 2011) ("Because []Section 1983[] provides a remedy for alleged constitutional violations, [plaintiff] cannot base claims directly on the First, Fourth and Fourteenth Amendments."); *see also Wimmer v. Suffolk Cnty. Police Dep't*, 176 F.3d 125, 136 (2d Cir. 1999) ("Section 1983 permits an individual deprived of a federal right by a person acting under color of state law to seek compensation in federal court."). However, under § 1983 statutory scheme, § 1983 only applies to states if they consent to its application and waive their immunity. *Gross v. New York*, 428 F. App'x 52, 53 (2d Cir. 2011) ("The Eleventh Amendment bars § 1983 claims against states, absent their consent."); *Mamot v. Bd. of Regents*, 367 F. App'x 191, 192

(2d Cir. 2010) ("It is well-established that . . . § 1983 was not intended to override a state's sovereign immunity." (citations omitted)); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1147 (2d Cir. 1995) ("[T]he Supreme Court has ruled that Congress did not intend § 1983 to abrogate immunities well-grounded in history and reason." (alterations omitted) (citing *Buckley v. Fitzsimmons,* 509 U.S. 259, 268 (1993)).

New York State has not waived its sovereign immunity in § 1983 suits, and Congress has not abrogated its immunity. *See Vincent v. Yelich*, 718 F.3d 157, 177 (2d Cir. 2013) (holding that "suits against [New York] State under § 1983 are barred by sovereign immunity"); *McCluskey v. N.Y. Unified Court Sys.*, 442 F. App'x 586, 588 (2d Cir. 2011) (dismissing § 1983 claims because "there is no evidence suggesting any waiver of sovereign immunity" by New York State), *cert. denied*, 568 U.S. ---, 132 S. Ct. 1553 (2012); *Gross*, 428 F. App'x at 53 ("Because New York [State] has waived its immunity from liability and consented to be sued only to the extent that claims are brought in the New York Court of Claims, as opposed to federal court, the district court correctly dismissed Gross's complaint for lack of subject matter jurisdiction."); *Mamot*, 367 F. App'x at 192 ("It is well-established that New York has not consented to § 1983 suits in federal court . . . ." (citations omitted)); *see also Jones v. N.Y. Div. of Military & Naval Affairs*, 166 F.3d 45, 49 (2d Cir. 1999) (finding that New York State has not waived it sovereign immunity and Congress has not abrogated its sovereign immunity in a § 1983 action); *Keitt v. New York City*, No. 09-CV-8508, 2011 WL 4526147, at *3 (S.D.N.Y. Sept. 29, 2011) ("[T]here has been no waiver of immunity by the state or abrogation of immunity by Congress" in § 1983 claims.).[23] Since New York State has not waived its sovereign immunity

---

[23] Furthermore, "neither a State nor its officials acting in their official capacities are 'persons' under [42 U.S.C.] § 1983[;]" and therefore, they cannot be sued under § 1983.

in § 1983 claims and § 1983 has not abrogated state's immunity, all claims for money damages where New York State is the real party in interest are barred by sovereign immunity. *See, e.g.*, *Nolan v. Cuomo*, No. 11-CV-5827, 2013 WL 168674, at *7 (E.D.N.Y. Jan. 16, 2013).

Moreover, as discussed above, sovereign immunity applies not only to the State but to "'state agents and state instrumentalities' when 'the state is the real, substantial party in interest.'" *Henny v. New York*, 842 F. Supp. 2d 530, 544 (S.D.N.Y. 2012) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)); *see also Mary Jo C.*, 707 F.3d at 151–52 ("The immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state." (alteration omitted) (quoting *Woods*, 466 F.3d at 236)). Where a claim is brought against an official in their official capacity, the state is considered the real party in interest and therefore the same sovereign immunity principles apply as if the claim was brought directly against the state.[24] *KM Enterprises*, --- F. App'x at ---, 2013 WL 1799866, at *1 (finding that a suit against a government official in her "official capacity as Commissioner of the New York State

---

Huminski v. Corsones, 386 F.3d 116, 133 (2d Cir. 2004) (alteration omitted) (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)); *see also Cowder v. Dep't for Children & Families*, No. 09-CV-0628, 2010 WL 3834008, at *2 (E.D.N.Y. Sept. 27, 2010) ("§ 1983 only applies to 'persons' acting under the color of state law. 'Government entities that are considered arms of the State for Eleventh Amendment purposes,' . . . are not persons under § 1983." (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70 (1989))).

[24] State officials may only be liable under § 1983, when officials are sued in their individual capacity and are "individual[ly] and personal[ly] liabl[e]." *Hafer v. Melo*, 502 U.S. 21, 30 (1991); *see also Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'"); *Fowlkes v. Rodriguez*, 584 F. Supp. 2d 561, 572 (E.D.N.Y. 2008) (personal involvement is necessary for damages against state officials). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

Department of Transportation ('DOT')" was "effectively . . . a suit against the State of New York" and covered by sovereign immunity); *Gollomp v. Spitzer*, 568 F.3d 355, 369 (2d Cir. 2009) ("Eleventh Amendment sovereign immunity 'is not a mercurial area of law, but has been definitively settled by the Supreme Court since 1890 with respect to actions against the state itself, and 1945 with respect to actions against state agencies or state officials named in their official capacity.'" (citations omitted)); *Huminski v. Corsones,* 386 F.3d 116, 133 (2d Cir. 2004) ("[S]tate officials cannot be sued in their official capacities for retrospective relief under section 1983."); *Anghel v. N.Y. Dep't of Health*, No. 12-CV-03484, 2013 WL 2338153, at *9 (E.D.N.Y. May 29, 2013) ("A suit for damages against a state official in his or her official capacity 'is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.'" (quoting *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993))); *Pietri*, 2013 WL 1312002, at *4 ("The Eleventh Amendment also bars suits against state officials in their official capacities for money damages."). Here, Plaintiff specified in the Complaint that he is only suing the individually named State Defendants in their "official capacity." (Comp. ¶¶ 29–32.) Therefore, Plaintiff is barred from bringing this action against all the State Defendants for money damages pursuant to § 1983, since the Individual State Defendants are sued in their official capacities and the suit is therefore considered a suit against the state. All of Plaintiff's claims seeking money damages are therefore dismissed as to all of the State Defendants. [25]

---

[25] Furthermore, the Court has no authority to grant a writ of mandamus. Mandamus is a writ that has been codified in 28 U.S.C. § 1361. *See Moore v. N.Y. Appellate Div. Fourth Dep't*, No. 10-CV-5952, 2011 WL 703711, at *3 (E.D.N.Y. Feb. 17, 2011) (discussing mandamus). Pursuant to the statute, a plaintiff may seek mandamus in federal court "to compel an officer or employee *of the United States* or any agency thereof to perform a duty owed to the plaintiff." *Binder & Binder PC v. Barnhart*, 399 F.3d 128, 133 (2d Cir. 2005) (quoting 28 U.S.C. § 1361)

## 2. Injunctive and Declaratory Claims

Under *Ex Parte Young* and its progeny, a person may sue a state for prospective injunctive and declaratory relief under the Fourteenth Amendment of the Constitution. *See Mary Jo C.*, 707 F.3d at 166 ("Under the well-known exception to [the Eleventh Amendment's grant of sovereign immunity from suit] first set forth in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), . . . 'a plaintiff may sue a state official acting in his official capacity — notwithstanding the Eleventh Amendment — for prospective, injunctive relief from violations of federal law.'" (alterations in original) (quoting *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007))); *see also McKeown v. N.Y. State Comm'n on Judicial Conduct*, 377 F. App'x 121, 123 (2d Cir. 2010) ("[A] state official acting in his or her official capacity may be sued only for prospective injunctive relief from ongoing violations of federal law . . . .").

The *Ex parte Young* jurisprudence "rests on the premise — less delicately called a 'fiction,' — that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes," and therefore

---

(emphasis added); *Lutheran Med. Ctr. v. Thompson*, 520 F. Supp. 2d 414, 419 (E.D.N.Y. 2007) (quoting 28 U.S.C. § 1361); *see also Jones v. Astrue*, 526 F. Supp. 2d 455, 459 (S.D.N.Y. 2007) (same). Federal courts have jurisdiction over claims against federal officers under the statute but do not have jurisdiction over mandamus actions brought against state officers. *See Davis v. Lansing*, 851 F.2d 72, 74 (2d Cir. 1988) (holding that the federal courts have no jurisdiction over mandamus actions brought against state officials because "[t]he federal courts have no general power to compel action by state officials"); *Chinn v. Bradt*, No. 11-CV-0376, 2012 WL 2325850, at *6 (N.D.N.Y. June 19, 2012) (dismissing the petitioner's mandamus claim because "[d]istrict courts are not authorized . . . to compel a state or state officials to perform a particular duty" (alteration in original) (quoting *Reyes v. New York*, No. 08-CV-1679, 2008 WL 2120783, at *1 (E.D.N.Y. May 19, 2008))); *Moore*, 2011 WL 703711, at *3 (holding that the federal court had no jurisdiction to compel a state official); *Main v. Vt. Supreme Court*, No. 09-CV-157, 2009 WL 1940876, at *1 (D. Vt. June 30, 2009) (noting that federal courts have "no jurisdiction to compel action by state officials via a writ of mandamus"); *Lebron v. Armstrong*, 289 F. Supp. 2d 56, 58 (D. Conn. 2003) ("By its terms, the federal mandamus statute does not apply to an action to compel a state or state officials to perform a particular duty."). Therefore, Plaintiff's mandamus request is denied.

sovereign immunity does not apply. *Stewart*, 564 U.S. at ---, 131 S. Ct. at 1638. The *Ex parte Young* doctrine is limited to the situation where an official is acting individually to violate federal constitutional rights and "does not apply when the state is the real, substantial party in interest." *Id.* (citations and internal quotation marks omitted). "In defining whether a state official is a proper party to a suit seeking to enjoin the enforcement of an allegedly unconstitutional statute, the Supreme Court has held: '[I]t is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the state, and thereby attempting to make the state [a] party.'" *Nolan*, 2013 WL 168674, at *9 (quoting *Ex parte Young*, 209 U.S. at 157). Thus, to obtain injunctive and declaratory relief against an official, the official must have a direct connection to the illegal action. *See Davidson v. Scully*, 148 F. Supp. 2d 249, 254 (S.D.N.Y. 2001) ("Actions involving claims for prospective declaratory or injunctive relief are permissible provided the official against whom the action is brought has a direct connection to, or responsibility for, the alleged illegal action." (citations and alterations omitted)); *see also Coleman*, 566 U.S. at ---, 132 S. Ct. at 1350 (finding that a plaintiff may "seek injunctive relief against the responsible state official" under *Ex parte Young*).

### A. Relief Sought by Plaintiff

Plaintiff's injunctive claims are not entirely clear. Plaintiff appears to seek his removal from the New York State sex offender registry because he asserts his placement on the registry is unconstitutional. Plaintiff states in his Preliminary Injunction Memorandum that:

> Petitioner brings this proceeding for preliminary injunction to enjoin the State Defendants and the co-defendant New York City

> Police Department Sex Offender Unit (NYCPDSOU)[26] from
> continuing to engage in discriminatory, deceptive, fraudulent and
> illegal practices in connection with providing alleged public safety
> notification of Petitioner, who does not reside, nor was he ever a
> resident at anytime as stated in the [Complaint].

(Pl. Prelim. Inj. Mem. 30.)  Plaintiff also appears to seek relief from what he believes is the

requirement that he return to New York every ninety days to register.  (*Id.* at 44.)  In addition,

Plaintiff seeks "[a]n [o]rder commanding the State Defendants and the NYPDSOU Defendants

that any application seeking the arrest of the Petitioner to be sole [sic] brought before this

Honourable [sic] Court and no other jurist and/or court of competent jurisdiction."  (*Id.* at 45.)

Plaintiff further seeks an order that he "will no longer be required to register nor update his

registration, as long as he continues to be a nonresident of the State of New York, and/or does

not visit New York more than 10 days and not more that [sic] 30 days in one year."  (*Id.*)  Lastly,

Plaintiff seeks declarations of SORA's unconstitutionality, including (1) "the application,

implementation and enforcement of SORA has [sic] it is being applied to the Petitioner is

unconstitutional;" (2) "the application, implementation and enforcement of SORA has [sic] it is

being applied to the Petitioner is cruel and unusual punishment;" (3) "the application,

implementation and enforcement of SORA has [sic] it is being applied to the Petitioner has no

relationship to a State protected interest;" (4) "the application, implementation and enforcement

of SORA in regards to nonresident workers as prescribed in Correction Law § 168-f(6) does not

provide nor assign the State Defendants with discretion and/or authority to refer such nonresident

---

26  As discussed *supra* in footnote 4, the NYPD is not a suable entity and is not a party to
this action.

worker for a Level Classification determination;" and (5) "the Order by Defendant Camacho is declared null and void and unenforceable."[27]  (*Id.*)

## B.   State Defendants' Alleged Involvement

Plaintiff alleges that the Governor had direct involvement to establish § 1983 liability, since Governor Cuomo would be responsible for recommending Plaintiff's extradition from Malta to the United States.  (Pl. Opp'n to State Def. 82–84.)  Plaintiff has presented no evidence that there is an extradition request for Plaintiff or that such an extradition request will be made, nor has Plaintiff shown that the Governor would be involved in making such an extradition request.  *Cf. Nolan*, 2013 WL 168674, at *10 (finding in a case challenging a denial of the plaintiff's request for a reclassification of his risk assessment level as a sex offender "that Cuomo is not a proper party to the extent that plaintiff has asserted Section 1983 claims for injunctive relief against him in his official capacity" and dismissing the claims against Governor Cuomo).  The fact that the Governor is charged generally with executing the laws of New York is insufficient to allege that the Governor is involved in (a) having Plaintiff extradited from Malta and (b) removing Plaintiff from the New York's sex offender registry.  *See Nolan*, 2013 WL 168674, at *9 (holding that the governor's duty to take care that the law is enforced is not sufficient to make the governor a proper party); *Wang v. Pataki*, 164 F. Supp. 2d 406, 410 (S.D.N.Y. 2001) ("[S]tate official's duty to execute the laws is not enough by itself to make that official a proper party in a suit challenging a state statute." (quoting *Warden v. Pataki*, 35 F. Supp. 2d 354, 359 (S.D.N.Y. 1999), *aff'd*, *Chan v. Pataki,* 201 F.3d 430 (2d Cir. 1999), *cert. denied*, 531 U.S. 849 (2000)))).  Given that Plaintiff has failed to plead that Governor Cuomo had

---

[27]  As discussed *supra* in footnote 19, any challenge to Judge Camacho's decision is barred by the *Rooker-Feldman* Doctrine.

direct involvement with Plaintiff's classification as a sex offender and has not plausibly alleged

that Governor Cuomo is seeking to extradite him, the Complaint is dismissed with prejudice as to

Governor Cuomo. The Court finds that, as a matter of law, Plaintiff cannot seek injunctive relief

against Governor Cuomo.

For the reasons set forth below, the Court also finds that, assuming, without deciding,

Plaintiff can seek injunctive relief against Harrington and Mulligan,[28] Plaintiff is not entitled to

any injunctive relief against Harrington or Mulligan because Plaintiff has not stated and cannot

state a claim upon which relief can be granted. The Court, therefore, denies Plaintiff's motion

for injunctive[29] and declaratory relief[30] and grants the State Defendants' motion to dismiss all of

Plaintiff's claims.

---

[28] The Court notes that based on the language of SORA, Harrington and Mulligan appear not to be proper parties since neither Harrington nor Mulligan can grant Plaintiff the relief that he seeks. The only manner in which an individual can be removed from the registry is by being pardoned by the governor of the state of conviction or if his conviction is overturned. *See* N.Y. Correct. Law § 168-f(5); *O'Donnell*, 924 N.Y.S.2d at 686 (discussing the two limited manners in which a lifetime registrant can be removed from the registry); *see also Nolan v. Cuomo*, No. 11-CV-5827, 2013 WL 168674, at *10 (E.D.N.Y. Jan. 16, 2013) (dismissing the head of the Division because the statute does not provide for the Division to enforce the statute or change someone's registration).

[29] In order to prevail on his claim for a preliminary injunction, Plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 209 (2008); *see also Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012). As discussed *infra*, Plaintiff's numerous claims of constitutional violations fail on the merits, and therefore, his motion for injunctive relief is denied. *See Monserrate v. N.Y. Senate*, 599 F.3d 148, 154 (2d Cir. 2010) (finding that a failure "to establish a likelihood of success on the merits of any claim . . . is fatal" to a claim for preliminary injunction).

[30] A plaintiff cannot maintain a claim for a declaratory judgment where the underlying substantive claim has been dismissed since the Declaratory Judgment Act ("DJA") only created a procedural mechanism and not an independent cause of action. *Chevron Corp. v. Naranjo*, 667 F.3d 232, 244 (2d Cir. 2012) ("The DJA gives a district court the discretion to 'declare the legal

### d. Plaintiff's Substantive Claims Against the State Defendants

Plaintiff is not entitled to injunctive relief against the State Defendants because Plaintiff's numerous claims fail to state any constitutional violations. In the Complaint, motion for preliminary injunction and opposition to the State Defendants' motion to dismiss, Plaintiff asserts that requiring him to register under SORA violates his rights under the Constitution, including procedural due process, substantive due process, equal protection, privileges and immunities, right to travel and his right to be free from cruel and unusual punishment; Plaintiff also argues that SORA violates many provisions of the Constitution including the Due Process Clause because it is vague, the *Ex Post Facto* Clause, the Full Faith and Credit Clause, the Supremacy Clause, Commerce Clause and Dormant Commerce Clause. For the reasons set forth below, the Court finds that none of Plaintiff's constitutional claims have merit.

### i. Procedural Due Process — Generally

"To plead a violation of procedural due process, a plaintiff must plausibly allege that he was deprived of property without constitutionally adequate pre- or post-deprivation process." *J.S. v. T'Kach*, 714 F.3d 99, 105 (2d Cir. 2013). "In order to do this, a plaintiff must 'first

_____

rights and other legal relations of any interested party seeking such declaration.' But that discretion does not extend to the declaration of rights that do not exist under law. Like a preliminary injunction, a declaratory judgment relies on a valid legal predicate. The DJA is 'procedural only,' and 'does not create an independent cause of action.'"), *cert. denied*, 568 U.S. ---, ---, 133 S. Ct. 423 (2012); *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 80 (S.D.N.Y. 2012) ("But the Declaratory Judgment Act is not a source of federal substantive rights, because it does not 'provide an independent cause of action. Its operation is procedural — to provide a form of relief previously unavailable.'"); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) ("Declaratory judgments and injunctions are remedies, not causes of action."); *Propst v. Ass'n of Flight Attendants*, 546 F. Supp. 2d 14, 22–23 (E.D.N.Y. 2008) ("The Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, does not provide 'an independent cause of action' but rather its 'operation is procedural only — to provide a form of relief previously unavailable.' The court may 'only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief.' (quoting *In re Joint Eastern & Southern District Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993)), *aff'd*, 330 F. App'x 304 (2d Cir. 2009).

identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process.'" *J.S.*, 714 F.3d at 105 (alteration in original) (citations omitted); *see also Palacio v. Pagan*, 345 F. App'x 668, 669 (2d Cir. 2009) (discussing the elements of procedural due process); *Looney v. Black*, 702 F.3d 701, 706–07 (2d Cir. 2012) (same); *Schweitzer v. Crofton*, --- F. Supp. 2d ---, ---, 2013 WL 1208999, at *10 (E.D.N.Y. Mar. 25, 2013) (same).

Plaintiff alleges that the State Defendants infringed upon his due process rights by their "(1) failure to grant Plaintiff a continuance to seek and obtain exculpatory evidence to rebut the prosecution case [at his risk assessment classification hearing]; (2) stating on the record that Judge Camacho would only consider prosecution' [sic] evidence to make his determination; (3) refusing to order the prosecution to turn over its' [sic] entire evidentiary/investigatory file for Plaintiff's review and rebuttal; [(4)] conducting the S.O.R.A. hearings and proceedings in an oppressive and criminal mode of operation rather affording [sic] Plaintiff equal protection of the law, otherwise afforded to civil litigants in cases; [and (5)] issuing an [sic] Level Classification judgment without complying with the statutory mandate of provided [sic] reason, facts and detailed analysis on what basis and admissible evidence he reached his conclusions." (Compl. ¶ 252.)

Plaintiff is barred by the *Rooker-Feldman* doctrine from pursuing this claim. In any event, Plaintiff was not deprived of any property interest without due process and this claim is without merit.

### 1. *Rooker-Feldman* Doctrine

Plaintiff is clearly challenging the proceedings before Judge Camacho which resulted in the May 25, 2011 decision classifying Plaintiff as a level III sex offender. Because each of the four elements of the *Rooker-Feldman* doctrine is satisfied — Plaintiff lost in the state court

proceeding, is complaining of the injury caused by the state court judgment, is asking this Court to review the proceedings that led to the state court judgment and therefore the judgment itself, and the judgment was rendered almost a year before this action was commenced — Plaintiff is barred from bringing this challenge. *See Burfeindt v. Postupack*, 509 F. App'x 65, 66 (2d Cir. 2013) (upholding district court's dismissal which rested partially on *Rooker–Feldman* grounds); *Hoblock*, 422 F.3d at 83 (finding suit barred by *Rooker-Feldman* doctrine since it was an appeal of a state court determination); *Zuneska v. Cuomo*, No. 12-CV-0949, 2013 WL 431826, at *3–5 (E.D.N.Y. Feb. 1, 2013) (finding that the supreme court's determination that a level one registered sex offender could not be declassified was barred from review by the federal court because of the *Rooker-Feldman* doctrine); *Anderson v. UMG Recordings Inc.*, No. 12-CV-25826, 2012 WL 6093776, at *2 (E.D.N.Y. Dec.7, 2012) ("[A]lthough plaintiff's complaint does not detail the specific injuries that the rulings in the State Court Action cause him, a fair reading of the complaint is that plaintiff seeks to continue pressing the claims underlying the State Court Action . . . ."); *Munsch v. Evans*, No. 11-CV-2271, 2012 WL 528135, at *6 (E.D.N.Y. Feb. 17, 2012) (barring a plaintiff from bringing a case in which the plaintiff sought to have supervision for life by the parole board found unconstitutional because it would require the court to overturn the state court decision). Moreover, even if Plaintiff were not barred by the *Rooker-Feldman* doctrine, his claim would fail on the merits.

### 2. Liberty Interest

Plaintiff does not articulate in the Complaint or any of his submissions any protected liberty interest, but the Complaint can be read as articulating that requiring Plaintiff to register as a level III sex offender, and therefore publishing Plaintiff's name on the New York State website for registered sex offenders, resulted in "stigma plus." Under stigma plus analysis a plaintiff may bring a due process claim if he can show that he suffered a "'stigma resulting from the

defamatory character of [a government statement] combined with some other state-imposed alteration in [the plaintiff's] legal status.'" *McCaul v. Ardsley Union Free Sch. Dist.*, 514 F. App'x 1, 3–4 (2d Cir. 2013) (citations omitted); *Carter v. Inc. Vill. of Ocean Beach*, 415 F. App'x 290, 293 (2d Cir. 2011) ("'Stigma plus' refers to a claim brought for injury to one's reputation (the stigma) coupled with the deprivation of some 'tangible interest' or property right (the plus), without adequate process." (quoting *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003)); *Balentine v. Tremblay*, No. 11-CV-196, 2012 WL 1999859, at *5 (D. Vt. June 4, 2012) ("The Second Circuit has recognized a constitutional right to be free from a false stigmatizing statement that alters a person's legal status or rights."); *see also Hefferan v. Corda*, 498 F. App'x 86, 89 (2d Cir. 2012) ("A defamation action can be grounded in 42 U.S.C. § 1983 when th[e] plaintiff can demonstrate a stigmatizing statement plus a deprivation of a tangible interest." (citations and internal quotations mark omitted)); *Woe v. Spitzer*, 571 F. Supp. 2d 382, 387 (E.D.N.Y. 2008) ("Thus, to show a liberty interest, Plaintiff must show more than the stigma attached to his inclusion on the sex offender registry.  Specifically, he must show what has been referred to as 'stigma plus,' i.e., stigma accompanied by the potential loss of rights under law."). "Damage to someone's reputation alone is insufficient 'to invoke the procedural protection of the Due Process Clause' . . . ." *McCaul*, 514 F. App'x at 3–4 (quoting *Valmonte v. Bane*, 18 F.3d 992, 999, 1000–02 (2d Cir. 1994))); *see also Balentine*, 2012 WL 1999859, at *5 ("The protected interest is a narrow one and requires more than a derogatory public statement by a government official."); *Woe*, 571 F. Supp. 2d at 387 ("The Supreme Court has held clearly that injury to reputation alone is insufficient to implicate a liberty right under the due process clause.").  "In order to state a claim for deprivation of an intangible legal right to one's reputation, commonly known as a 'stigma plus', a plaintiff must allege facts showing both '(1) the utterance of a

statement about her that is injurious to her reputation, that is capable of being proved false, and

that . . . she claims is false, and (2) some tangible and material state-imposed burden . . . in

addition to the stigmatizing statement.'" *Kalderon v. Finkelstein*, 495 F. App'x 103, 107 (2d Cir.

2012) (alterations in original) (quoting *Velez v. Levy,* 401 F.3d 75, 87 (2d Cir. 2005)); *see also*

*Lawson v. Rochester City Sch. Dist.*, 446 F. App'x 327, 329 (2d Cir. 2011) (discussing the two

part test). "In addition, the 'defamatory statement must be sufficiently public to create or

threaten a stigma; hence, a statement made only to the plaintiff, and only in private, ordinarily

does not implicate a liberty interest.'" *Kalderon*, 495 F. App'x at 107 (quoting *Velez*, 401 F.3d

at 87).

Courts in this Circuit have not conclusively determined whether requiring a plaintiff to

register as a sex offender implicates a liberty interest, even under a stigma plus analysis.[31] *See*

*Singleton v. Lee*, No. 09-CV-6654, 2012 WL 864801, at *9 (W.D.N.Y. Mar. 13, 2012) ("It is not

altogether clear that the determination of risk-level under the SORA implicates a cognizable

liberty interest for purposes of the Due Process Clause of the Fourteenth Amendment."); *Fowlkes*

---

[31] Some courts in other circuits have found that a stigma plus claim can be implicated by requiring a person to register as a sex offender, but other courts have found that there is not sufficient stigma to meet the test. *Compare Brown v. Montoya*, 662 F.3d 1152, 1168 (10th Cir. 2011) (finding that "requiring a person to register as a sex offender triggers the protections of procedural due process" under a stigma plus theory); *Gwinn v. Awmiller*, 354 F.3d 1211, 1224 (10th Cir. 2004) (same); *Lemay v. N.H. State Police Dep't of Sex Offender Registration*, No. 11-CV-185, 2011 WL 6983993 (D.N.H. Dec. 20, 2011) (finding stigma plus implicated by registry as a sex offender), *report and recommendation approved sub nom. Lemay v. NH Dep't of Safety*, No. 11-CV-185, 2012 WL 83736, at *3 (D.N.H. Jan. 10, 2012); *Fortner v. United States*, No. 06-CV-02148, 2008 WL 410396, at *7 (D. Colo. Feb. 12, 2008) (same); *Gwinn v. Awmiller*, No. 99-CV-00308, 2005 WL 2450154, at *3 (D. Colo. Sept. 8, 2005) (same), *report accepted*, No. 99-CV-308, 2005 WL 2450153 (D. Colo. Sept. 30, 2005); *with Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 502 (6th Cir. 2007) (holding that due process was not implicated under stigma plus theory because of sex registration); *John Does I-VIII v. Munoz*, 462 F. Supp. 2d 787, 794 (E.D. Mich. 2006) (same), *aff'd sub nom. Does v. Munoz*, 507 F.3d 961 (6th Cir. 2007).

*v. Parker*, No. 08-CV-1198, 2010 WL 5490739, at *7 (N.D.N.Y. Dec. 9, 2010) ("[T]here is not unanimity on the question of whether the requirement to register as a sex offender in and of itself implicates such a liberty interest."), *report and recommendation adopted*, No. 08-CV-1198, 2011 WL 13726 (N.D.N.Y. Jan. 4, 2011). However, two courts in this Circuit have found that a stigma plus liberty interest is implicated when an individual is required to register under SORA, since the stigma attached to registration may affect the registered person in other areas such as employment. *See Woe*, 571 F. Supp. 2d at 387 (holding that SORA implicates a protected liberty interest under SORA); *Doe v. Pataki*, 3 F. Supp. 2d 456, 466 (S.D.N.Y. 1998) (finding the two prongs of the stigma plus analysis met).[32]

### 3. Deprivation of Liberty Interest Without Process

Assuming, without deciding, that Plaintiff has a liberty interest that was implicated by his registration, the Court must determine whether there was a deprivation of Plaintiff's liberty interest without sufficient process. *See Woe*, 571 F. Supp. 2d at 387 ("To state a claim under the due process clause, a plaintiff must first show the existence of a constitutionally protected right. Second, plaintiff must show the deprivation of that right without due process of law."); *Doe*, 3 F. Supp. 2d at 466 ("The Supreme Court has stated that procedural due process claims are to be examined 'in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" (citing *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989))).

---

[32] The *Doe v. Pataki* district court decision analyzed SORA prior to its amendment pursuant to the settlement that was reached in 2004, discussed *infra*. *See Doe v. Pataki*, 481 F.3d 69, 73–74 (2d Cir. 2007) (discussing the settlement).

The right to have a hearing to determine risk level, prior notice of the hearing, the right to appeal any determination, the right to an attorney during the proceedings and the right to the discovery of evidence were established as a result of a litigation agreement between New York State and a class of sex offenders. *See Doe*, 481 F.3d at 77–79 (finding that all the procedural safeguards suggested by the district judge were implemented in the settlement and subsequent amendment to SORA, and finding the settlement to be binding and valid); *United States v. Kimble*, 905 F. Supp. 2d 465, 475 (W.D.N.Y. 2012) (finding that the settlement put in procedural safeguards of notice and an opportunity to be heard to bring SORA in compliance with due process demands); *Singleton v. Lee*, No. 09-CV-6654, 2011 WL 2421226, at *2 (W.D.N.Y. June 13, 2011) ("Extensive litigation regarding the constitutionality of the SORA was resolved in a 2004 consent decree providing that all level two and three sex offenders who were required to register under the SORA were afforded the right to a new hearing to redetermine their sex offender level."); *Woe*, 571 F. Supp. 2d at 389 (holding that SORA post-settlement did not violate procedural due process).

Plaintiff was notified of the SORA hearing in advance and appeared personally and through the Attorney Defendants at multiple hearings before Judge Camacho. (*See* Compl. ¶¶ 62–64, 66, 74–76, 166.) Plaintiff could have appealed Judge Camacho's classification determination — as Plaintiff claims the Attorney Defendants told him they did and as he attempted to do himself. (*Id.* ¶ 77.) Plaintiff also could have challenged the Board's determination that he was required to register as a sex offender by bringing an Article 78 proceeding as Plaintiff claimed he asked the Attorney Defendants to do on his behalf. (*See id.* ¶¶ 23, 77, 79, 80, 82, 86, 88, 172, 295.) Even assuming that there were procedural irregularities throughout the proceeding before Judge Camacho as Plaintiff alleges, because Plaintiff was

given notice, an opportunity to be heard and legally had the ability to appeal Judge Camacho's decision and to challenge the Board's determination that he was required to register as a sex offender, Plaintiff's due process rights were not violated. *See, e.g.*, *Kimble*, 905 F. Supp. 2d at 475 (finding that the plaintiff's "due process rights were not violated" by his SORA risk level redetermination hearing where he received notice and had an opportunity for redetermination and was represented by counsel); *Singleton*, 2012 WL 864801, at *9 (holding that the fact that the sex offender received "notice and an opportunity to be heard before a neutral decision-maker" is sufficient to find that procedural due process has been met); *Fowlkes*, 2010 WL 5490739, at *8 (holding that "the availability of these procedural safeguards [in SORA] satisfies the Fourteenth Amendment's procedural due process requirements and demonstrates that plaintiff's due process claim lacks merit"); *People v. Montanez*, 930 N.Y.S.2d 380, 382 (App. Div. 2011) (holding that the defendant's due process rights were not violated during his SORA proceeding where the plaintiff was notified about the hearing and appeared with counsel who was able to respond to the allegations that plaintiff should register at a certain risk level).

The fact that Plaintiff alleges that his lawyers failed to perform to his satisfaction at his classification hearing, failed to file his appeal, failed to commence an Article 78 proceeding or that he was unaware that his presence was required at his classification hearing, is insufficient to state a procedural due process claim. Plaintiff had all of these various procedural processes available to him. In addition, Plaintiff could have addressed his claims that he was not granted sufficient continuances, that Judge Camacho only considered prosecution evidence, that he was not given all of the prosecution's evidence, the manner in which his hearing was conducted, and the written order of Judge Camacho in an appeal of Judge Camacho's decision. Since an appeal was available to Plaintiff, Plaintiff cannot maintain a due process claim against the State

Defendants.  *See Hefferan v. Corda*, 498 F. App'x 86, 88 (2d Cir. 2012) (holding that since "a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies," the plaintiff could not maintain a due process claim where he "either knew or should have known of the complained of irregularities prior to the grievance deadline and chose not to take advantage of available process" (quoting *N.Y. Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169 (2d Cir. 2001), *cert. denied*, 534 U.S. 1128 (2002))); *Chase Grp. Alliance LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 152–53 (2d Cir. 2010) ("The fact that a state proceeding is required by due process does not mean that Section 1983 provides a remedy for every error committed in the state proceeding.  So long as state appellate remedies are available, a Section 1983 action is not an available vehicle for relief."); *De Asis v. N.Y.C. Police Dep't*, 352 F. App'x 517, 518 (2d Cir. 2009) (holding that a plaintiff could not maintain a due process claim where "a post-deprivation remedy was available, in the form of an Article 78" proceeding).  Plaintiff has not and cannot establish a due process violation and this claim is dismissed with prejudice.

### ii.   Due Process — Vagueness

In his submission in opposition to the State Defendants' motion to dismiss, Plaintiff articulates a due process challenge to SORA based on a void for vagueness theory.  This was the first time that Plaintiff has asserted that the SORA statute is unclear.  "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory

way."[33] *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. ---, ---, 132 S. Ct. 2307, 2317 (2012); *see also Hayes v. N.Y. Attorney Grievance Comm. of the Eight Judicial Dist.*, 672 F.3d 158, 168–69 (2d Cir. 2012) (discussing the void for vagueness test); *see also Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 621 (2d Cir. 2011) (same). "Although a law has to provide 'minimal guidelines' in the form of 'explicit standards' regarding what conduct is unlawful, 'it need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth.'" *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013) (quoting *Mannix v. Phillips,* 619 F.3d 187, 197 (2d Cir. 2010)); *see also Cunney*, 660 F.3d at 621 ("[R]egulations may embody 'flexibility and reasonable depth,' and 'satisfy due process as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require.'" (citations omitted)). "The degree of vagueness tolerated in a statute varies with its type: economic regulations are subject to a relaxed vagueness test, laws with criminal penalties to a stricter one, and laws that might infringe constitutional rights to the strictest of all." *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 213 (2d Cir. 2012) (alteration in original) (citations omitted); *see also Advance Pharm., Inc. v. United States*, 391 F.3d 377, 396 (2d Cir. 2004) (describing the various vagueness tests).

---

[33] The Second Circuit has established that, when determining whether or not a statute has sufficient procedures in order to guide enforcers of the statute, courts should consider "whether: (1) . . .'[the ordinance] as a general matter provides sufficiently clear standards to eliminate the risk of arbitrary enforcement'; or (2) 'even in the absence of such standards, the conduct at issue falls within the core of the [ordinance's] prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the [ordinance].'" *Cunney v. Bd. of Trs. of Vill. of Grand View, N.Y.*, 660 F.3d 612, 621–22 (2d Cir. 2011) (citations omitted).

Plaintiff argues that it is unclear under the SORA statute that a nonresident worker would be subject to a risk level classification and placement on the public registry. (Pl. Opp'n to State Defs. 8; *see also id.* at 1, 52.) According to Plaintiff:

> *Correction Law* § 168-f(6) is constitutionally and structurally vague and ambagious [sic] as to failing to alter [sic] a nonresident worker, such as Plaintiff that the Division, the Board of Examiners and the Supreme Court could subject him to a SORA proceedings, posting on the internet, and ultimately retain him on the internet and cause such nonresident, such as the Plaintiff, to continue [to] physically appear before the local law enforcement to register in accordance to his/her level classification, whether or not such nonresident worker continue to reside or lives outside the border of the State of New York, or in this case, overseas, nowhere close to the 50 states, the District of Columbia, and the principal U.S. territories, to include also federally recognized Indian tribes.

(Pl. Opp'n to State Defs. 8; *see also id.* at 1, 52.) Plaintiff does state in the Complaint that the statute is clear and only requires him to report his name and address to the Division. (Compl. ¶ 63.)

Contrary to Plaintiff's current argument that he was a nonresident worker, it is clear from the allegations in the Complaint that Plaintiff was living in New York and therefore required to register in New York. According to the Complaint, Plaintiff moved to New York and was living in an apartment in Queens, New York with furniture and significant clothing for a period of at least two years. (Compl. ¶¶ 12, 41, 52, 93, 136.) Plaintiff notified New York State that he was moving to New York and requested the necessary forms to register. (Harfolis Decl. Ex. B.) However, even accepting Plaintiff's additional, unsupported and contradictory claim that he was a nonresident worker, the plain language of the SORA statute clearly informed Plaintiff that even as a nonresident worker, he was subject to the provisions of New York Corrections Law Section 168-k. *Liden*, 19 N.Y.3d at 275 ("The procedure for registration of sex offenders who move to New York from other states is set out in Correction Law § 168–k.").

The Second Circuit has instructed district courts to look at statutory provisions in context. *See Commack Self-Serv. Kosher Meats*, 680 F.3d at 213 ("[T]he court does not look at the statutory language in isolation; rather, the court considers the language in context, with the benefit of the canons of statutory construction and legislative history."); *JWJ Indus., Inc. v. Oswego County*, No. 09-CV-740, 2012 WL 5830708, at *3 (N.D.N.Y. Nov. 16, 2012) (stating that a court must look at a statute in context); *Vt. Right to Life Comm., Inc. v. Sorrell*, 875 F. Supp. 2d 376, 390 (D. Vt. 2012) (same). Plaintiff incorrectly focusses only on a specific subsection of the statute, namely, Section 168-f(6) of New York Corrections Law. New York Corrections Law makes clear that sex offenders convicted in other jurisdictions may be required to register in New York if their crime is a registrable offense in the state of conviction or if it shares the same elements of a crime that would require registration in New York. *See Kasckarow*, 964 N.Y.S.2d at 650 (finding that an out of offense will be registrable in New York if it shares the same elements as a registrable state offense in New York); *Smith*, 898 N.Y.S.2d at 704 (same); *People v. Whibby*, 855 N.Y.S.2d 250, 251 (App. Div. 2008) (same); *People v. Mann*, 859 N.Y.S.2d 278, 280 (App. Div. 2008) (same).

New York Corrections Law Section 168-k sets out the procedure for determining registration and risk level classification for offenders who were convicted in other jurisdictions. *See Liden*, 19 N.Y.3d at 275 (discussing the procedures). As discussed in part III.b in the SORA Legislative Scheme section, a sex offender is required to notify the Division of his or her address "no later than ten calendar days after such sex offender establishes residence in this state." N.Y. Correct. Law § 168-k (1); *People v. Melzer*, 933 N.Y.S.2d 705, 706 (App. Div. 2011) (finding that people with offenses from other jurisdictions are required to register in New York). The very next subsection of the law requires the Division to advise the Board of the sex offender's

presence in the state and the Board is responsible under the statute for determining whether the sex offender must register. N.Y. Correct. Law § 168-k (2); *see Liden*, 19 N.Y.3d at 275 (discussing the fact that it is the Board that makes the initial determination whether a person should register); *People v. Wyatt*, 931 N.Y.S.2d 85, 89–90 (N.Y. App. Div. 2011) (stating that "the procedure for determining the risk level of out-of-state sex offenders who relocate to New York" is in § 168-k(2)). The same provision provides that if required to register, the sex offender is notified within thirty days of a determination that he must register and is permitted to submit information to the Board. N.Y. Correct. Law § 168-k (2). The Board is responsible for making a recommendation of the level of registration required by the offender to the county court or supreme court and the offender is given at least 30 days notice of the Board's risk assessment recommendation and the reason for the recommendation. *Id.*; *see Liden*, 19 N.Y.3d at 275 (stating that the Board only makes a recommendation of the risk level to the court). The offender is entitled to a court hearing by a county or supreme court judge to determine his or her classification level as well as whether the sex offender must register. N.Y. Correct. Law § 168-k (2); *see Melzer*, 933 N.Y.S.2d at 706 ("[T]he Supreme Court was statutorily required to hold a risk level assessment hearing after receiving the recommendation of the Board of Examiners regarding the defendant's level of notification."). The sex offender may appeal the decision of the hearing judge. N.Y. Correct. Law § 168-k (2); *see Liden*, 19 N.Y.3d at 276 (finding that persons required to register have the right to appeal). In addition, New York Correction Law Section 168-j specifies what a sex offender is required to do when he or she leaves the state. N.Y. Correct. Law § 168-j. If a sex offender leaves the State, he or she is required to notify the Division and provide his or her new address. *Id.* The sex offender is only required to register every 90 days in the jurisdiction in which he resides. N.Y. Correct. Law § 168-h(3).

This statutory scheme clearly sets forth all the necessary steps that must be complied with, even for a nonresident worker, and there is nothing vague about the requirements. It informs a nonresident worker, such as Plaintiff claims he was, what he or she is required to do. Plaintiff was aware of the relevant provisions and even alleged in the Complaint that he complied with SORA. (Compl. ¶¶ 68, 172, 288, 300.) Plaintiff did comply with the first step of the process — he registered with the Division. (*Id.* ¶ 283.) The fact that Plaintiff believes that only one provision of the statute applied to him does not make the other applicable provisions vague. Plaintiff simply had to read the subsection after the one he complied with to recognize that it was applicable to him, and, in any event, he was notified by the Board that he had to register. (*Id.* ¶ 62.) Plaintiff's vagueness challenge to SORA is without merit and his vagueness claim is dismissed with prejudice. *See Conn. Bar Ass'n v. United States*, 620 F.3d 81, 99–100 (2d Cir. 2010) (holding in a bankruptcy case that the "Plaintiffs' vagueness argument is patently meritless [since] [t]he provisions provide explicit notice of the disclosures required, and, to the extent the statute affords some flexibility, it imposes no greater burden on attorneys' exercise of professional judgment than plaintiffs already carry"); *Advance Pharm.*, 391 F.3d at 397 (holding that the statute at issue was not vague both because "the common sense meaning" of the words in the statute were clear and plaintiffs had been directly advised that they were in violation of the statute multiple times before any action was taken).

### iii. Substantive Due Process

Plaintiff's substantive due process claim is not entirely clear but appears to encompass many different arguments. In general, Plaintiff appears to claim that requiring him to register when he is a nonresident worker was a violation of his substantive due process rights. (*See* Pl. Opp'n to State Defs. 16–26, 37, 47.) Plaintiff also appears to argue that his substantive rights were violated because he was no longer in New York at the time Judge Camacho adjudicated his

risk level assessment, therefore, requiring him to be present at the final adjudication of his risk level determination was a violation of his substantive due process rights.[34] (*Id.* at 60.) Plaintiff also appears to argue that his substantive due process rights, as well as his equal protection and procedural due process rights, were violated because New York State failed to consider new data which shows that first time sex offenders like Plaintiff need not register as sex offenders, and New York State failed to modify its registration requirements in accordance with these new studies.[35] (*Id.* at 19–22.)

"[I]t is well established that any substantive component to the Due Process Clause protects only those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, as well as implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *United States v. Windsor*, 570 U.S. ---, ---, 133 S. Ct. 2675, 2714 (2013) (Roberts, Chief J. dissenting) (citations and internal quotation marks omitted). Depending on the interest at stake, a court may review a claim that a statute is unconstitutional pursuant to substantive due process either under a rational basis test,

---

[34] Plaintiff also appears to argue that his substantive due process rights were violated because he was not assigned a lawyer to file his appeal of Judge Camacho's determination and his Article 78 petition, even though Plaintiff had private counsel, the Attorney Defendants, representing him before Judge Camacho. Plaintiff's claim is without merit. The statute requires assigned representation on appeal if a plaintiff had demonstrated that he was financially unable to retain counsel at the hearing and had assigned counsel at the hearing. N.Y. Correct. Law § 168-k (2). Plaintiff does not even claim that he sought counsel on appeal and was denied. Plaintiff additionally appears to argue that his substantive rights were violated when the clerk refused to accept his appeal documents without notarization. (Pl. Opp'n. to State Def. at 33, 37–39.) As discussed *supra* in footnote 20, Plaintiff's claim of denial of access to the court based on the requirement that Plaintiff submit notarized documents to the court is without merit.

[35] Plaintiff argues "that in ignoring the new data that proves that first time offenders whose conviction arose from factors of a willing participant, where no violence, no coercion, no threats of physical violence, no unlawful imprisonment, no kidnaping, etc. . . . such as Plaintiff's situation, only supports that the State Defendants have twisted the New York State Legislature intent from purely administration and ministerial to punitive . . . ." (Pl. Opp'n to State Defs. 17.)

intermediate scrutiny or a strict scrutiny test.  *See Windsor v. United States*, 699 F.3d 169, 196

(2d Cir. 2012) (discussing the three levels of scrutiny), *aff'd*, 570 U.S. ---, 133 S. Ct. 2675

(2013); *see also F.C.C. v. Beach Commc'ns., Inc*., 508 U.S. 307, 313 (1993) ("[A] statutory

classification that *neither* proceeds along suspect lines *nor* infringes fundamental constitutional

rights must be upheld . . . if there is any reasonably conceivable state of facts that could provide a

rational basis for the classification. (emphasis added)); *Bryant v. N.Y. Educ. Dep't*, 692 F.3d 202,

217 (2d Cir. 2012), (discussing the various tests for substantive due process), *cert. denied*, 569

U.S. ---, 133 S. Ct. 2022 (2013).  Given that Plaintiff does not claim his rights were infringed

because he is a member of one of the suspect classes, the first step is to determine whether the

right at issue is fundamental.[36]  *Bryant*, 692 F.3d at 217 ("In examining whether a government

rule or regulation infringes a substantive due process right, the first step is to determine whether

the asserted right is fundamental, — i.e., implicit in the concept of ordered liberty, or deeply

rooted in this Nation's history and tradition." (citations and internal quotation marks omitted));

*Alleyne v. N.Y. Educ. Dep't*, 691 F. Supp. 2d 322, 336 (N.D.N.Y. 2010) ("In assessing whether a

government regulation impinges on a substantive due process right, the first step is to determine

whether the asserted right is 'fundamental.'" (quoting *Leebaert v. Harrington*, 332 F.3d 134, 140

(2d Cir. 2003))).  If "the right infringed is fundamental," the case must be analyzed under strict

scrutiny and "the regulation must be narrowly tailored to serve a compelling government

---

[36]  There are two methods of determining which test should be used to determine if substantive due process has been violated — one method is dependent on whether the right at stake is fundamental and the other depends on whether the law affects or is applied based on a suspect classification.  *See United States v. Windsor*, 570 U.S. ---, ---, 133 S. Ct. 2675, 2714 (2013) (Roberts, Chief J. dissenting).  Under the suspect classification analysis, laws and government actions that affect suspect classes such as race and religion are subject to strict scrutiny, those that affect quasi-suspect classes such as gender are subject to intermediate scrutiny and all others are subject to a rational basis test.  *Id.*

interest." *Bryant*, 692 F.3d at 217; *see also Windsor*, 1570 U.S. at ---, 133 S. Ct. at 2717

(discussing strict scrutiny).  However, "[w]here the right infringed is not fundamental," the

regulation is analyzed under a rational basis test and "the governmental regulation need only be

reasonably related to a legitimate state objective."  *Bryant*, 692 F.3d at 217 (citations omitted).

An individual may also allege a substantive due process claim, if the individual can

demonstrate that the government took an "action that is arbitrary, conscience-shocking, or

oppressive in a constitutional sense . . . ."  *Cunney*, 660 F.3d at 626 (citations omitted).  "It is not

enough that the government act be 'incorrect or ill-advised;' it must be 'conscience-shocking.'"

*Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (citations omitted); *see

also Cunney*, 660 F.3d at 626 (substantive due process does not apply to "government action that

is incorrect or ill advised"); *Phillips v. County of Orange*, 894 F. Supp. 2d 345, 379 (S.D.N.Y.

2012) ("Conduct that is merely 'incorrect or ill-advised' is insufficient to state a claim." (quoting

*Cox*, 654 F.3d at 275)).  "Only the most egregious official conduct can be said to be arbitrary in

the constitutional sense and therefore unconstitutional."  *Cox*, 654 F.3d at 275.  In order to

demonstrate that a government's individual action violated substantive due process under this

theory, a plaintiff must meet a two prong test: (1) the plaintiff had an actual interest protected by

the Fifth Amendment — life, liberty or property — at stake, and (2) Defendants infringed on that

interest in a manner that was "so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience."  *Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012);

*see also McCaul*, 514 F. App'x at 3 (discussing the two part test); *Schweitzer v. Crofton*, --- F.

Supp. 2d at ---, 2013 WL 1208999, at *13 (same); *RI, Inc. v. Gardner*, 889 F. Supp. 2d 408, 413

(E.D.N.Y. 2012) (same), *aff'd*, --- F. App'x ---, 2013 WL 3185437 (2d Cir. June 25, 2013);

*Sutera v. Transp. Sec. Admin.*, 708 F. Supp. 2d 304, 313 (E.D.N.Y. 2010) ("To prevail on either

a procedural or a substantive due process claim, a claimant must establish that he possessed a liberty or property interest of which the defendants deprived him."). To satisfy this standard, a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." *Schweitzer*, 2013 WL 1208999, at *13 (quoting *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989)).

SORA's registration provision is rationally related to a legitimate government interest and none of the actions taken by the State concerning Plaintiff violate Plaintiff's substantive due process rights.

## 1. SORA's Registration Requirement Does Not Violate Substantive Due Process

SORA requires all sex offenders in New York State who meet the requirement of the statute to register as a sex offender, including Plaintiff, accepting his claim that he is a nonresident worker. Plaintiff claims that as a nonresident worker, he should only be required to notify the Division that he is in New York, and should not be required to register. (Pl. Opp'n 47.) Plaintiff claims that as a nonresident worker, being required to register is a violation of his substantive due process rights. (*Id.*) This claim is an attack on the constitutionality of SORA. As discussed below, since SORA does not implicate a fundamental right, it is analyzed under a rational basis test and survives this test. Plaintiff cannot sustain a claim under a theory that SORA's registration requirement violates his substantive due process rights.

The New York Court of Appeals has considered the issue of whether a rational basis test or strict scrutiny test should apply to a challenge to a SORA registration requirement.[37] The New York Court of Appeals found that "while defendants may be asserting a liberty interest, we

_____

[37] The Court is not aware of any courts that have considered whether intermediate scrutiny applies to SORA.

conclude that they are not asserting a 'fundamental right,' as due process cases use that term" in their SORA registration claim. *People v. Knox*, 12 N.Y.3d 60, 67 (2009) (citing *Immediato v. Rye Neck School Dist.*, 73 F.3d 454, 463 (2d Cir. 1996)). Similarly, the appellate courts in New York State that have considered the issue have also found that a rational basis test applies to a SORA registration claim. *People v. Liden*, 913 N.Y.S.2d 200, 201–02 (App. Div. 2010), (applying rational basis test to the plaintiff's claim that his SORA classification violated substantive due process), *reversed on other grounds by Liden*, 19 N.Y.3d at 275; *People v. Taylor*, 835 N.Y.S.2d 241, 244 (App. Div. 2007) (same); *People v. Hood*, 790 N.Y.S.2d 757, 758 (App. Div. 2005) (same).

Federal courts in this Circuit and across the country have ruled, similarly to the courts in New York, that a rational basis test is the correct level of scrutiny to be applied where there is a challenge to a sex offender registration requirement.[38] *See Balentine v. Tremblay*, No. 11-CV-196, 2012 WL 1999859, at *3 (D. Vt. June 4, 2012) ("[P]lacement on a sex offender registry, regardless of how the right has been characterized, courts have concluded that it is not a fundamental one."); *Travis v. N.Y. Div. of Parole*, No. 96-CV-759, 1998 WL 34002605, at *4 (N.D.N.Y. Aug. 26, 1998) ("[T]he placement of residential conditions on sex offenders, or holding them beyond their conditional release dates if the conditions are not met, [does not] deprive these inmates of a fundamental right." (citing *Greenholtz v. Inmates of the Neb. Penal and Corr. Complex*, 442 U.S. 1, 7 (1979))); *see also Doe v. Mich. Dep't of State Police*, 490 F.3d

---

[38] "The law in this Circuit is clear that [w]here, as here, a statute neither interferes with a fundamental right nor singles out a suspect classification, we will invalidate [that statute] on substantive due process grounds only when a plaintiff can demonstrate that there is no rational relationship between the legislation and a legitimate legislative purpose." *Molinari v. Bloomberg*, 564 F.3d 587, 606 (2d Cir. 2009) (alteration in original) (citations and internal quotation marks omitted).

491, 500 (6th Cir. 2007) (stating that freedom from appearing on a sex offender registry "is not a fundamental right deeply rooted in our Nation's history"); *Doe v. Moore*, 410 F.3d 1337, 1345 (11th Cir. 2005) (finding that sex offender registration is not "a fundamental right classification" and therefore strict scrutiny does not apply); *Doe v. Tandeske*, 361 F.3d 594, 597 (9th Cir. 2004) (per curiam) ("[P]ersons who have been convicted of serious sex offenses do not have a fundamental right to be free from the registration and notification requirements . . . ."); *Gunderson v. Hvass*, 339 F.3d 639, 643 (8th Cir. 2003) ("[A] fundamental right is not implicated" in state's sex registration requirement.); *cf. Paul P. v. Verniero*, 170 F.3d 396, 404 (3d Cir. 1999) ("[T]he state interest [in registering sex offenders], which we characterized as compelling, 'would suffice to justify the deprivation even if a fundamental right of the registrant's were implicated.'").

Under the rational basis test, "courts look to any 'conceivable basis' for the challenged law, not limited to those articulated by or even consistent with the rationales offered by the legislature." *Windsor*, 699 F.3d at 196 (quoting *Beach Commc'ns,* 508 U.S. at 312); *see also Beatie v. City of New York*, 123 F.3d 707, 712 (2d Cir. 1997) (finding that under the rational basis test, "[t]o uphold the legislative choice, a court need only find some 'reasonably conceivable state of facts that could provide a rational basis' for the legislative action" (citing *Heller v. Doe,* 509 U.S. 312, 320 (1993))). "Those attacking the rationality of a legislative classification have the burden 'to negative every conceivable basis which might support it.'" *Windsor*, 699 F.3d at 196 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)); *Beatie*, 123 F.3d at 712 ("To succeed on a claim such as this, 'those challenging the legislative judgment must convince the court that the legislative facts on which the classification

is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" (citing *Vance v. Bradley*, 440 U.S. 93, 111 (1979))).

New York courts have found that the legislature's intent in enacting SORA was to "'protect[] vulnerable populations[,] and in some instances the public, from potential harm' posed by sex offenders." *People v. Alemany*, 13 N.Y.3d 424, 430 (2009) (citations omitted); *see also North v. Bd. of Exam'rs of Sex Offenders of N.Y.*, 8 N.Y.3d 745, 752 (2007) ("SORA is a remedial statute intended to prevent future crime; its aim is to 'protect communities by notifying them of the presence of individuals who may present a danger and enhancing law enforcement authorities' ability to fight sex crimes'" (citing *Pataki*, 120 F.3d at 1276)); *Melzer*, 933 N.Y.S.2d at 706 ("[T]he dual purposes of [SORA] . . . are to monitor sex offenders' whereabouts and to aid law enforcement in prosecuting recidivist offenders . . . ."); *O'Donnell*, 924 N.Y.S.2d at 686–87 (describing SORA's "dual purposes of monitoring sex offenders' whereabouts and aiding law enforcement in prosecuting recidivist offenders"). This interest is rationally related to requiring sex offenders to register and allowing for community notification, even for nonresident worker sex offenders as Plaintiff claims he was, since under the statute, these nonresident workers would have spent 14 continuous days or 30 non-continuous days in the state, and could be a danger to the state's population. *See, e.g.*, *People v. Knox*, 12 N.Y.3d 60, 69 (2009) (finding that SORA does not violate substantive due process because "[c]onsidering that no fundamental right is at stake — defendants are suffering no worse injustice than being called 'sex offenders'" and that the legislature had a rational reason for the classification); *People v. Belter*, 921 N.Y.S.2d 885, 885 (App. Div. 2011) ("Equally without merit is the defendant's contention that his adjudication as a sexually violent offender based on his having been convicted of attempted rape in the first degree constituted a denial of his substantive due process rights."); *Taylor*, 835 N.Y.S.2d at 246

("Whether in common parlance the defendant is a sex offender, or his offense is a sex offense, is of no legal significance where, as here, the Legislature has rationally chosen to categorize him or his offense as such.  We are not at liberty to depart from that determination."); *Hood*, 790 N.Y.S.2d at 758 ("Despite defendant's contention that the recidivism rate among sex offenders is not higher than the rate for other criminal defendants, we will not dispute the Legislature's wisdom in concluding to the contrary.  As SORA's registration requirement is rationally related to the legitimate government purpose of protecting the public, we reject defendant's equal protection challenge." (citations omitted)); *see also Mich. Dep't of State Police*, 490 F.3d at 501 (finding that the plaintiff's claim for substantive due process violation should be dismissed and that "[a]lthough we believe that the State's justification sweeps too broadly, especially with reference to the plaintiffs in the present case, we are constrained to conclude that the rationale articulated in the statute itself satisfies the rational-basis standard"); *Moore*, 410 F.3d at 1345–46 (finding the state's sex registration law was not a violation of substantive due process under the rational basis test); *Tandeske*, 361 F.3d at 597 (same); *Gunderson*, 339 F.3d at 643–45 (holding that the statute did not violate substantive due process despite the fact that it might at times "perhaps [be] unfair" given the breath of convictions that require registration); *Paul P.*, 170 F.3d at 404 (finding that the state's sex registration law was not a violation of substantive due process); *Balentine*, 2012 WL 1999859, at *3 (same).  This interest also persists even if a plaintiff leaves the state, since the State's interest in "monitor[ing] sex offenders' whereabouts and . . . aid[ing] law enforcement in prosecuting recidivist offenders, would be frustrated if they were to cease when a registered sex offender moves out of the state."  *Melzer*, 933 N.Y.S.2d at 706.  Therefore, Plaintiff's challenge to the constitutionality of the registration provision of SORA is without merit as it is rationally related to New York State's interest in among other

things, protecting its vulnerable population, being able to monitor the whereabouts of sex offenders and aiding law enforcement.

Plaintiff's claim that his risk level assessment hearing should not have been concluded in his absence similarly fails the rational basis test. Pursuant to the text of Section 168-n, the State is required to hold a risk level determination once the Board has recommended that an individual is required to register. *See Melzer*, 933 N.Y.S.2d at 706 (finding that "[c]ontrary to the defendant's contention, the Supreme Court was statutorily required to hold a risk level assessment hearing after receiving the recommendation of the Board of Examiners regarding the defendant's level of notification" even though the defendant claimed he had relocated by the time the hearing occurred). Since as discussed *supra*, the State has a legitimate reason in tracking sex offenders who once lived in the state and have since departed the state, this provision also passes the rational basis test.[39] *See id.*

## 2. Plaintiff's Substantive Due Process Rights Were Not Violated

None of the alleged State actions Plaintiff complains about shock the conscience. The State's failure to consider new data that allegedly shows that first time sex offenders need not register, adjudication of Plaintiff's risk level while he was at the airport leaving New York State to return to California, and New York State's failure to accept Plaintiff's appeal because his documents were not properly notarized do not amount to outrageous government action that shocks the conscience. None of the State's actions are even "incorrect or ill-advised," which would be insufficient to sustain a substantive due process claim. *See Cox*, 654 F.3d at 275 (discussing the standard for substantive due process). Plaintiff cannot state a substantive due

---

[39] Moreover, Plaintiff was represented by counsel who attended the hearing before Judge Camacho on Plaintiff's behalf. (Compl. ¶¶ 66, 69–71, 75–77.)

process claim and this claim is dismissed with prejudice. *See Kuck v. Danaher*, 600 F.3d 159, 167 (2d Cir. 2010) (upholding the dismissal of a complaint on motion to dismiss because "the fact that state officials required [the plaintiff] to produce proof of citizenship or legal residency in connection with his permit renewal application is hardly outrageous or shocking [and] [e]ven more, substantive due process does not entitle federal courts to examine every alleged violation of state law, especially ones that, while perhaps vexatious, are more routine than egregious"); *Thomas v. N.Y.C. Dep't of Educ.*, No. 10-CV-464, 2013 WL 1346258, at *17 (E.D.N.Y. Mar. 29, 2013) (holding that even if the government's actions may have been discriminatory that "these alleged actions do not shock the conscience or interfere with rights implicit in the concept of ordered liberty" and therefore do not implicate substantive due process); *Phillips*, 894 F. Supp. 2d at 381 ("At most, Plaintiffs have claimed that Defendants were negligent in their handling of the abuse investigation, but they have not alleged sufficient facts to support an inference that Defendants' acts were malicious, such that their actions could 'shock the conscience.'" (quoting *Cox*, 654 F.3d at 276)).

### iv.  Equal Protection

Plaintiff alleges that requiring him to register under SORA violates his equal protection rights.  (Pl. Opp'n to State Defs. 56–71.)  "The Equal Protection Clause has traditionally been applied to governmental classifications that treat certain groups of citizens differently than others."  *Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 (2d Cir. 2012).  According to the Second Circuit, there are "three common methods" "to plead intentional discrimination in violation of the Equal Protection Clause:" (1) "by pointing to a law that expressly classifies on the basis of race," (2) "a facially neutral law or policy that has been applied in an unlawfully discriminatory manner," or (3) "a facially neutral [law or] policy that has an adverse effect and that was motivated by discriminatory animus."  *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009)

(per curiam); *see also Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 915 F.

Supp. 2d 574, 615–16 (S.D.N.Y. 2013) (quoting *Pyke*). When a suspect classification is not at

issue, the Equal Protection Clause requires that individuals are treated the same as "similarly

situated individuals." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 222 (2d Cir. 2012)

(holding that equal protection applies "where the plaintiff alleges that []he has been intentionally

treated differently from others similarly situated" (quoting *Village of Willowbrook v. Olech*, 528

U.S. 562, 564 (2000))); *Vaher v. Town of Orangetown*, N.Y., 916 F. Supp. 2d 404, 433–34

(S.D.N.Y. 2013) (finding that the plaintiff's equal protection claim failed because the plaintiff

failed to "allege differential treatment from 'similarly situated' individuals").

### 1. Suspect Class Claim

Plaintiff's primary equal protection claim, as far as can be ascertained by the Court, is

that he is part of a suspect class of "non-resident workers," which class has been treated

differently from "non-resident students" and "non-resident visitors." [40] (Pl. Opp'n to State Defs.

67.) Plaintiff appears to argue that while nonresident visitors and students simply have to notify

the Division that they are in New York State and that the information will be passed along to law

enforcement, Plaintiff, as a nonresident worker, is treated differently in that he is required to do

much more. (*Id.* at 65–71.) Plaintiff cites no support for this argument. (*Id.*) At oral argument,

Plaintiff asserted that in looking at websites for various universities, they appear to require less

of their students who are sex offenders. (Oral Arg. Tr. 32:17–33:7.) Plaintiff claims that under

---

[40] SORA does not have a defined term labeled "nonresident visitor," (*see* N.Y. Correct. Law § 168-a (defining terms)), this is a term created by Plaintiff. (See Pl. Opp'n to State Defs. 67.) SORA does define "nonresident worker" as "any person required to register as a sex offender in another jurisdiction who is employed or carries on a vocation in this state, on either a full-time or a part-time basis, with or without compensation, for more than fourteen consecutive days, or for an aggregate period exceeding thirty days in a calendar year." *See* N.Y. Correct. Law § 168-a.

the statute, a nonresident student would not be required to register or obtain a risk level classification.  (Pl. Opp'n to State Defs. 56–67.)  The language of the statute applies to both nonresident workers and nonresident students.  N.Y. Correct. Law § 168-k (1)–(2).  All of the provisions discussed above which are applicable to a nonresident worker are also applicable to a nonresident student.  The text of § 168-k makes clear that every sex offender is required to notify the Division of their presence in the State and that person is then referred to the Board for a determination of whether the person is required to register.  *Id.*  Plaintiff's claim that students are treated differently from nonresident workers is simply not supported by the language of the statute.  *Id.*

Moreover, Plaintiff's equal protection challenge to the nonresident worker provision fails the rational basis test.  A classification that is not a suspect class or a quasi-suspect class is analyzed under a rational basis test.  *See Windsor*, 699 F.3d at 192 (discussing Supreme Court jurisprudence on the rational basis test under both equal protection and substantive due process); *Beach Commc'ns*, 508 U.S. at 313 ("[A] statutory classification that *neither* proceeds along suspect lines *nor* infringes fundamental constitutional rights must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." (emphasis added)).  The Second Circuit and district courts in this Circuit have made clear that "[s]ex offenders do not comprise a suspect or quasi-suspect class for Equal Protection purposes." *Travis*, 1998 WL 34002605, at *4; *see also Mich. Dep't of State Police*, 490 F.3d at 503 (holding that sex offenders and sub-groups of sex offenders are not a suspect class; and therefore, the rational basis test applies); *Moore*, 410 F.3d at 1346–47 (same); *Selah v. N.Y. Docs Comm'r*, No. 04-CV-3273, 2006 WL 2051402, at *6 (S.D.N.Y. July 25, 2006) ("Neither sex offenders nor the mentally ill are a suspect class warranting heightened equal protection scrutiny.").

As the Supreme Court has stated, "[o]n rational-basis review, a classification in a statute . . . comes to us bearing a strong presumption of validity." *Beach Commc'ns*, 508 U.S. at 314. To the extent Plaintiff believes he is treated different than the class of individuals Plaintiff refers to as "non-resident visitors," the State of New York has a rational basis for being more concerned about "nonresident workers" who are defined by the statute as sex offenders who have spent significant time in New York — 14 continuous days or an aggregate of 30 days, *see* N.Y. Correct. Law 168-a — as opposed to sex offenders who have spent less time in the state. As discussed *supra*, in the Substantive Due Process section, New York has a legitimate interest in protecting its vulnerable populations from the potential harm posed by sex offenders.

Furthermore, New York State is not treating Plaintiff any differently than it treats other sex offenders who work in the state for a period longer than 14 consecutive days or 30 nonconsecutive days in a calendar year. New York courts that have considered the issue of whether out-of state convicted sex offenders have been treated differently from other sex offenders under New York's statutory scheme have found that both in-state convicted sex offenders and out-of state convicted sex offenders are treated similarly in that the Board determines whether both classes of sex offenders are required to register and, if they are required to register, their level of classification is determined by a court. *See People v. McGarghan*, 920 N.Y.S.2d 329, 331 (App. Div. 2011) ("New York is treating defendant exactly the same way it would treat a lifelong New York resident who committed the same sex crime while visiting [another state]."); *Dewine v. N.Y. Bd. of Examiners of Sex Offenders*, 930 N.Y.S.2d 332, 336 (App. Div. 2011) ("[C]ontrary to petitioner's contention, requiring him to register as a sex offender pursuant to Correction Law § 168–k would not result in disparate treatment on the basis of residency. Rather, such an interpretation would subject petitioner to the same registration and

notification requirements applicable to a similarly situated individual who was on probation in New York at the time of SORA's implementation."). SORA does not intentionally discriminate against nonresident workers and passes the rational basis test.

### 2. Class-of-One Claim

Plaintiff makes several arguments that he was personally treated in a way that violated his equal protection rights. Although "[t]he Equal Protection Clause has traditionally been applied to governmental classifications that treat certain groups of citizens differently than others. . . . the Supreme Court affirmed the existence of a class-of-one theory for equal protection claims . . . ." *Fortress Bible Church*, 694 F.3d at 221 (citations omitted); *see also RI, Inc.*, 889 F. Supp. 2d at 414–15 ("Because plaintiffs do not claim discrimination on the basis of membership in a particular group, they may proceed on an equal protection claim under a 'class of one' theory, as recognized by the Supreme Court . . . .").[41] "[T]o succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ

---

[41] In addition to "class-of-one" claims, there are also selective enforcement claims that could be brought under certain circumstances, which are not present in the case before the Court. "In order to adequately allege a selective enforcement claim, a plaintiff must allege: '(1) [he was] treated differently from other similarly situated individuals and (2) this differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Jones v. Bay Shore Union Free Sch. Dist.*, No. 12-CV-4051, 2013 WL 2316643, at *8 (E.D.N.Y. May 28, 2013); *see also Viteritti v. Inc. Vill. of Bayville*, 918 F. Supp. 2d 126, 134–35 (E.D.N.Y. 2013) (utilizing the same test); *Vaher v. Town of Orangetown, N.Y.*, 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013) (same). A selective enforcement claim is inapplicable since Plaintiff does not allege he was treated differently than other individuals because of "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Nor could Plaintiff make out a selective enforcement theory, since, as discussed *infra*, he has not been treated differently than other similarly situated individuals. *See Jones*, 2013 WL 2316643, at *8 (holding that a person must allege they were treated differently than similarly situated individuals to prevail on a selective enforcement claim); *see also Viteritti*, 918 F. Supp. 2d at 134–35 (same); *Vaher*, 916 F. Supp. 2d at 433 (same).

from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Aliberti v. Town of Brookhaven*, 876 F. Supp. 2d 153, 163 (E.D.N.Y. 2012) (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)); *see also Fortress Bible Church*, 694 F.3d at 222–23 ("The Supreme Court recognized an Equal Protection claim 'where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)); *Jones v. Bay Shore Union Free Sch. Dist.*, No. 12-CV-4051, 2013 WL 2316643, at *8 (E.D.N.Y. May 28, 2013) (discussing the two-part test). "To prevail, the 'class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *RI*, 889 F. Supp. 2d at 415 (quoting *Clubside*, 468 F.3d at 159); *see also Fortress Bible Church*, 694 F.3d at 222–23 (upholding dismissal because the comparators were not sufficiently similar); *Aliberti*, 876 F. Supp. 2d at 163–64 ("[A] plaintiff must show more than a general similarity between her and the comparator . . . as in cases where discrimination based on membership in a protected class is claimed." (citations omitted)).

Plaintiff appears to argue that he was discriminated against on an individual level and is being treated differently than other nonresident workers because he is being required to register in New York, despite the fact that he no longer lives in New York but currently lives in Malta and should therefore not be subject to New York reporting requirements.[42] (Pl. Opp'n to State

---

[42] Plaintiff also argues that other California convicted sex offenders similar to him would no longer be required to register in California and the fact that he is required to register in New

Def. 52.) This claim lacks merit. Plaintiff is not required to do anything more than any similarly situated individual. All sex offenders classified as risk level III are required to register for life and all sex offenders, regardless of risk level, must use the proper procedure to notify New York of their new address if they relocate out of New York State. N.Y. Correct. Law §§ 168-f (4)–(5), 168-j(4) (requiring a life time registration for all individuals listed as level three sex offenders and requiring all individuals required to register to inform the Division of a change in address). Once notified of Plaintiff's new address, if that address is outside of New York State, Plaintiff is no longer required to verify his address in person every 90 days. *See* N.Y. Correct § 168-h (stating that a risk level III sex offender is required to verify in person "where the offender resides"). This allegation does not state an equal protection claim based on a class-of-one theory.

Plaintiff also argues that not allowing him to file his appeal of Judge Camacho's decision and his Article 78 petition without having the documents notarized was a violation of his equal protection rights, since in-state sex offenders could travel to the county clerk's office and have their documents notarized for free. (*Id.* at 33, 35, 38.) Plaintiff does not allege that other similarly situated individuals, i.e., individuals outside of New York State who could not travel to the County Clerk's office, were not required to have their documents notarized. Rather, Plaintiff claims that *an exception* should have been made for him from the State's procedural rules. (*Id.*)

York is a violation of his equal protection rights. (Pl. Opp'n State Defs. 57, 86, 89–91.) However, this is not a cognizable Equal Protection claim since Plaintiff neither claims that he is being required to register in New York because he is part of a protected class or that Plaintiff is being treated differently than similarly situated individuals and thus the statute is being selectively enforced against him or that he is a class-of-one. *RI, Inc. v. Gardner*, 889 F. Supp. 2d 408, 414–15 (E.D.N.Y. 2012) (discussing intentional discrimination based on suspect classification and class-of-one cases), *aff'd*, --- F. App'x ---, ---, 2013 WL 3185437 (2d Cir. June 25, 2013); *DeFalco v. Dechance*, No. 11-CV-05502, 2013 WL 2658641, at *9 (E.D.N.Y. June 13, 2013) (same).

These facts do not and cannot state a claim for a violation of Plaintiff's equal protection rights based on a class-of-one theory.

Plaintiff also claims that since he was no longer physically present in New York at the time of the final adjudication of his risk level, requiring him to attend the final adjudication of this risk level was a violation of his equal protection rights.[43] (*Id.* at 60.) First Plaintiff's assertion is inaccurate. Pursuant to the law, where, as here, Plaintiff was given notice of the risk level classification hearing, but chooses not to attend or to give sufficient excuse, the determination will be held in his absence. N.Y. Correct. Law § 168-k. Plaintiff cannot simply avoid a risk level determination by leaving New York State prior to the hearing. *See Melzer*, 933 N.Y.S.2d at 706 (finding that "the dual purposes of the Sex Offender Registration Act . . . are to monitor sex offenders' whereabouts and to aid law enforcement in prosecuting recidivist offenders" and that those would be frustrated if the sex offender could just move to avoid registration). SORA requires that the risk level determination be held once the Board has recommended that a sex offender should register. *Id.* Thus, Plaintiff cannot state an equal protection claim based on a class-of-one theory since all similarly situated sex offenders who receive notice of a hearing, decide not to participate in the classification hearing and do not give a sufficient excuse for their absence would also be subject to a risk level classification hearing and determination in their absence.

---

[43] Plaintiff also claims that, as with his substantive due process claim, not having a lawyer assigned to him for his appeal was a violation of his equal protection rights. (Pl. Opp'n to State Defs. 38.) According to Plaintiff, he was assigned a lawyer at the hearing before Judge Camacho. (*Id.* at 37.) While Plaintiff may have initially been appointed counsel by the court, Plaintiff subsequently declined the services of the court-appointed counsel and retained the services of the Attorney Defendants. (Compl. ¶ 64.) Nothing in the statute requires that Plaintiff be appointed counsel for appeal under these circumstances. *See* N.Y. Correct. Law § 168-k (2).

Lastly, Plaintiff asserts that his equal protection rights were violated because civil litigants are required to be personally served and he was never personally served "with Judge Camacho's May 25th, 2011 Order or any type of formal notice of his [sic] requirements pursuant to Judge Camacho aforementioned Order." (*Id.* at 58.) Plaintiff provides no legal support for the assertion that he must be personally served, rather than by service on his attorney who was present at the hearing. (*Id.*) Furthermore, the text of 168-k does not require personal service of the order. *See* N.Y. Correct. Law § 168-k(2) (discussing the requirements for the order relating to the sex offender's risk level).

Plaintiff has failed to plausibly allege that he was treated differently because he was part of a suspect class or that he had been treated different from similarly situated individuals and his equal protection claim is without merit and is therefore dismissed with prejudice. *See, e.g.*, *Scott v. Woodworth*, No. 12-CV-0020, 2013 WL 3338574, at *4–5 (N.D.N.Y. July 2, 2013) (holding that the plaintiff's suspect class claim and class-of-one claim were both not adequately pled because he was not part of a suspect class and he had failed to plead that he was treated differently than similarly situated individuals); *Bowens v. Fed. Bureau of Prisons*, No. 12-CV-5591, 2013 WL 3038439, at *8 (S.D.N.Y. June 18, 2013) (same); *DeFalco v. Dechance*, No. 11-CV-05502, 2013 WL 2658641, at *10 (E.D.N.Y. June 13, 2013) (dismissing the complaint for failure to plausibly allege that the plaintiff was treated differently than similarly situated individuals); *Vaher*, 916 F. Supp. 2d at 433–35 (dismissing the complaint because the plaintiff both failed to plead he was "a member of a constitutionally protected class" and that he was treated differently from similarly situated individuals).

### v. Privileges and Immunities

"Under the Privileges and Immunities Clause, '[t]he Citizens of each State [are] entitled to all Privileges and Immunities of Citizens in the several States.'"[44] *McBurney v. Young*, 569 U.S. ---, ---, 133 S. Ct. 1709, 1714 (2013) (quoting U.S. Const., art. IV, § 2, cl. 1). The goal of the Privileges and Immunities Clause is to ensure that states give out-of-state residents substantially similar rights as the states give to their own residents. *Id.* ("We have said that [t]he object of the Privileges and Immunities Clause is to strongly . . . constitute the citizens of the United States [as] one people, by plac[ing] the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned." (alterations in original) (citations and internal quotation marks omitted)). As the Supreme Court has made clear, "[t]his does not mean, we have cautioned, that 'state citizenship or residency may never be used by a State to distinguish among persons.'" *Id.* "Nor must a State always apply all its laws or all its services equally to anyone, resident or nonresident, who may request it so to do." *Id.* (citations omitted). "Rather, we have long held that the Privileges and Immunities Clause protects only those privileges and immunities that are 'fundamental.'" *Id.*; *see also McDonald v. Chicago*, 561 U.S. ---, ---, 130 S. Ct. 3020, 3028 (2010) (holding that privileges and immunities applies only to "fundamental rights"); *Joseph v. Hyman*, 659 F.3d 215, 219 (2d Cir. 2011) (holding that the right to park where one wants without incurring a ticket was not "sufficiently fundamental to trigger protection under the Privileges and Immunities Clause").

---

[44] In addition to "the Privileges and Immunities Clause in the Fourth Amendment" there is the "Privileges or Immunities Clause in the Fourteenth Amendment." *Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 255 n.2 (2d Cir. 2013). Plaintiff only pled Privileges and Immunities in the Complaint. (See Compl. ¶ 263.) However, in his opposition to the State Defendants' motion to dismiss, Plaintiff pleads that his right to travel has been violated pursuant to the "Privileges or Immunities Clause" in the Fourteenth Amendment. (Pl. Opp'n to State Defs. 50.) The Court will discuss his right to travel claim in a separate section.

Plaintiff alleges that New York State's classification of Plaintiff as a risk level III sex offender when Plaintiff was subject to no risk level assessment in California and is no longer required to register in California is a violation of the Privileges and Immunities Clause. (Pl. Opp'n to State Defs. 40–50.) Plaintiff alleges that he is subject to more severe registration requirements in New York than he would have been in California: He is not required to register in California and he is required to register in New York; the California registry only publishes photographs, the conviction, and the zip code, but the SORA website publishes photographs, details about the conviction, and home addresses; in California, registration would have only been once a year, while in New York he is required to register every 90 days; California mandates that law enforcement update their website when he leaves the state, but New York has refused to update its website; California does not require Plaintiff to pay each time he has his photograph taken for the website, but he had to pay each time his photograph was taken for the SORA website; Plaintiff did not have to pay to have his fingerprints taken in California but does have to pay to have his finger prints taken in New York; California does not have community notification but, according to Plaintiff, law enforcement in New York personally notified his neighbors of his presence, and, in addition, the Malta police and the German police were notified of his conviction; California allows Plaintiff to have a United States passport but New York prohibits him from having a passport; and California allows him to travel internationally and New York prohibits him from traveling internationally. (*Id.* at 41–42.) Plaintiff also alleges that New York failed to update his information on the SORA website although he informed New York of his move from New York to California. (*Id.* at 41.) Plaintiff further alleges that he

believes he was given a level III classification because he was a nonresident worker and New York wanted to punish him for working within the state.[45] (*Id.* at 45.)

The fact that Plaintiff may not have been required to register in California or required to register with less community notification, less restrictions, and less frequency than he was required to do by New York does not give rise to a privileges and immunities claim, since the Privileges and Immunities Clause only requires that a state treat a non-citizen the same as it treats the citizens *of its own state*. *See McBurney*, 569 U.S. at ---, 133 S. Ct. at 1714 (discussing the Privileges and Immunities Clause). Thus, under the Privileges and Immunities Clause, New York State was required to treat Plaintiff the same as it treats New York citizens, which it did. The Court need not reach the question of whether Plaintiff is asserting a fundamental right under the Privileges and Immunities Clause because, even assuming Plaintiff is asserting a fundamental right, as a nonresident worker, Plaintiff was required to register and have his classification level determined by a judge, the same as residents of New York State. Thus, Plaintiff cannot claim that the registration requirement or risk level classification determination violated the Privileges and Immunities Clause because he was treated the same as any citizen of New York State would have been treated who had committed a similar crime. *See, e.g.*, *McGarghan*, 920 N.Y.S.2d at 331 (holding that the defendant's claim that requiring him to register in New York State based on his Vermont conviction was a violation of his privileges and immunities was without merit); *Dewine*, 930 N.Y.S.2d at 336 (holding that the defendant's claim that requiring him to register in New York State based on his Wyoming conviction was a violation of his privileges and

---

[45] In addition, Plaintiff asserts that his privileges and immunities were violated when he was prevented from filing his appeal of Judge Camacho's decision and Article 78 petition. (Pl Opp'n to State Defs. 47.) As discussed *supra*, Plaintiff admits that it was beyond the appeal period when he attempted to file his appeal and, in any event, he was not prevented from filing an appeal but rather told to comply with procedural rules.

immunities was without merit). Plaintiff's claim pursuant to the Privileges and Immunities Clause is therefore dismissed with prejudice.

### vi. Right to Travel

Plaintiff asserts that his right to travel has been harmed because under SORA he must register in person in New York every 90 days. (Pl. Opp'n to State Defs. at 76–80.) Plaintiff argues that the cost of travel from Malta to New York is expensive but if he fails to return to New York to register, he will be subject to severe criminal penalties. (*Id.*) Plaintiff therefore argues that essentially, he cannot travel outside of the State of New York. (*Id.*)

"'A state law implicates the right to travel' — thereby triggering strict scrutiny — 'when it actually deters such travel, when impeding travel is its primary objective, or when it uses any classification which serves to penalize the exercise of that right.'" *Selevan v. N.Y. Thruway Auth.*, No. 06-CV-291, 2011 WL 5974988, at *6 (N.D.N.Y. Nov. 28, 2011), (quoting *Attorney Gen. of N.Y. v. Soto–Lopez*, 476 U.S. 898, 903 (1986), *aff'd,* 711 F.3d 253 (2d Cir. 2013)). Minor restrictions on travel are not sufficient to state a constitutional claim. *See Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 258 (2d Cir. 2013) ("[M]inor restrictions on travel simply do not amount to the denial of a fundamental right."); *Joseph v. Hyman*, 659 F.3d 215, 219 (2d Cir. 2011) (same).

Although the Court has only found limited case law challenging SORA as impacting the right to travel, many courts have considered the issue as applied to the Sex Offender Registration and Notification Act[46] ("SORNA") and have determined that SORNA does not implicate the

---

[46] SORNA "requires those convicted of certain sex crimes to provide state governments with (and to update) information, such as names and current addresses, for inclusion on state and federal sex offender registries." *Reynolds v. United States*, 565 U.S. ---, ---, 132 S. Ct. 975, 978 (2012).

right to travel.  SORNA requires registration not only in the jurisdiction where an individual resides, but also the jurisdiction in which an individual works and studies.  *See* 42 U.S.C. § 16913(a) ("A sex offender shall register, and keep the registration current, in each jurisdiction where the offender resides, where the offender is an employee, and where the offender is a student.  For initial registration purposes only, a sex offender shall also register in the jurisdiction in which convicted if such jurisdiction is different from the jurisdiction of residence.").  Despite requiring an individual to register in multiple states, SORNA does not violate the right to travel, since it does not prevent an individual from moving to a new state.  *See United States v. Byrd*, 419 F. App'x 485, 491–92 (5th Cir. 2011) ("SORNA's registration requirements do not implicate the fundamental right to travel [by] convicted sex offenders because nothing in the statute precludes an offender from entering or leaving another state . . . ." (citations and internal quotation marks omitted)); *United States v. Shenandoah*, 595 F.3d 151, 162 (3d Cir. 2010) ("[The defendant] may travel interstate, but when he does, must register in the new state, while a convicted sex offender who remains within a state need only remain properly registered therein. There is simply no Constitutional violation.  Moreover, moving from one jurisdiction to another entails many registration requirements required by law which may cause some inconvenience, but which do not unduly infringe upon anyone's right to travel.  The essential part of the charged crime in this matter is the failure to register; [the defendant's] right to travel is incidental to this obligation, and not constitutionally offended."), *abrogated on other grounds by Reynolds*, 565 U.S. ---, 132 S. Ct. 975; *United States v. Ambert*, 561 F.3d 1202, 1210 (11th Cir. 2009) ("The requirement to update a registration under SORNA is undoubtedly burdensome; however, the government's interest in protecting others from future sexual offenses and preventing sex offenders from subverting the purpose of the statute is sufficiently weighty to overcome the

burden. This statute does not violate [the defendant's] right to travel."); *United States v. Stacey*, No. 12-CR-15, 2013 WL 1891342, at *4 (W.D. Pa. May 6, 2013) (SORNA does not "unconstitutionally infringe[] on . . . [the] right to travel"); *McCarty v. Roos*, No. 11-CV-1538, 2012 WL 6138313, at *7 (D. Nev. Dec. 7, 2012) (same); *United States v. Lesure*, No. 11-CR-30227, 2012 WL 2979033, at *4 (S.D. Ill. July 19, 2012) (same) (collecting cases).

SORA only requires registration in New York when the individual has been present in New York fourteen continuous days or thirty cumulative days. *See* Correct. Law § 168-a; Correct. Law § 168-f. As discussed *supra*, Plaintiff is only required to inform New York State that he has relocated and provide the address of his new location. *See* N.Y. Correct. Law § 168-j(4). At least one New York State appellate division court has held that SORA does not violate the right to travel. *See McGarghan*, 920 N.Y.S.2d at 330 (holding that SORA registration requirements did not violate the plaintiff's right to travel). The Court finds that because Plaintiff is only required to provide New York with his new address when he has relocated to another state, at most, SORA implicates a negligible impact on travel. Plaintiff cannot sustain his right to travel claim and this claim is dismissed with prejudice.

### vii. *Ex Post Facto*

Plaintiff claims that requiring him to register as a sex offender in New York State was a violation of the *Ex Post Facto* Clause. (Compl. ¶ 303.) The basis for this claim is unclear since Plaintiff only argues that he should not have been required to register as a sex offender in New York State and classified as a level III risk offender. (*Id.*) The Second Circuit has made clear that registration and notification requirements under SORA do not implicate the *Ex Post Facto* Clause — "Because we have previously concluded that the legislature's intent in enacting these provisions was nonpunitive and that the text and structure of the Act bear out its prospective, regulatory goals, we hold that the notification requirements of the SORA do not constitute

punishment for purposes of the Ex Post Facto Clause." *Doe*, 120 F.3d at 1284; *see also United States v. Kebodeaux*, 570 U.S. ---, ---, 133 S. Ct. 2496, 2516 (2013) (holding that SORNA does not violate *ex post factor* "because SORNA's registration requirements are civil"); *United States v. Brunner*, --- F.3d ---, ---, 2013 WL 4033847, at *4 (2d Cir. Aug. 9, 2013) (holding that where a person is indicted for failing to register after the enactment of SORNA that the *ex post facto* clause is not violated); *Singleton*, 2012 WL 864801, at *8 (holding that SORA registration does not implicate the Ex Post Facto Clause); *Manzullo v. People*, No. 07-CV-744, 2010 WL 1292302, at *8 (E.D.N.Y. Mar. 29, 2010) ("'[B]oth the registration and notification provisions of [SORA] [do] not constitute punishment for the purposes of the Ex Post Facto clause,' and therefore, Petitioner's claim has no merit." (citations omitted)); *see also Smith v. Doe*, 538 U.S. 84, 105–06 (2003) (holding that Alaska's sex registration act was "nonpunitive, and its retroactive application does not violate the Ex Post Facto Clause"). Plaintiff cannot sustain a claim pursuant to the *Ex Post Facto* Clause and this claim is dismissed with prejudice.

### viii.  Cruel and Unusual Punishment

Plaintiff argues that since nonresident workers and students are forced to register and are given the highest level of classification, that the classification itself should be considered cruel and unusual punishment.[47]  (Pl. Opp'n to State Defs. at 64–65.)  For the same reasons that Plaintiff's claim pursuant to the *Ex Post Facto* Clause cannot be sustained, Plaintiff's cruel and unusual punishment claim also fails — the registration requirement is not punitive.  *See, e.g.*, *United States v. Crews*, 496 F. App'x 896, 901 (11th Cir. 2012), *cert. denied*, 568 U.S. ---, 133 S.

---

[47]  Risk level classification, while recommended by the Board, is determined by a judge after a hearing where the sex offender can provide evidence and argument to rebut the Board's recommendation and is guaranteed counsel at the hearing, if the sex offender is unable to afford counsel.  Correct. Law. 168-k.  Plaintiff had a hearing and was represented by counsel at his hearing.  (Compl. ¶¶ 66, 83, 166, 167.)

Ct. 1301 (2013) (holding that sex registration does not violate the *Ex Post Facto* Clause nor is it cruel and unusual punishment because it does not "impose additional punishment for past sex offenses"); *see also United States v. Under Seal*, 709 F.3d 257, 265 (4th Cir. 2013) (holding that sex registration is not cruel and unusual punishment because "[a]lthough Appellant is required under SORNA to appear periodically in person to verify his information and submit to a photograph, this is not an affirmative disability or restraint [and] '[a]ppearing in person may be more inconvenient, but requiring it is not punitive'" (quoting *United States v. W.B.H.*, 664 F.3d 848, 857 (11th Cir. 2001)); *Crosby v. Schwartz*, 678 F.3d 784, 791–92 (9th Cir. 2012) (imposing a criminal sentence for the plaintiff's failure to follow registration requirements did not constitute cruel and unusual punishment); *United States v. Davis*, 352 F. App'x 270, 272 (10th Cir. 2009) (holding that registration of convicted sex offenders under SORNA does not violate "the Eighth Amendment's prohibition on cruel and unusual punishment" since it is civil and not punitive). Since registration has been found not to be punitive, even if Plaintiff was targeted with the highest level of registration, it is not cruel and unusual punishment. Plaintiff has not, and cannot, state a claim for cruel and unusual punishment and this claim is dismissed with prejudice.

### ix.    Full Faith and Credit

Plaintiff argues that because his "out-of-state California conviction with a willing participant is no longer registerable [sic]" that New York is violating the Full Faith and Credit Clause by requiring Plaintiff to register in New York. (Pl. Opp'n. to State Defs. 86, 88–91.) According to the Full Faith and Credit Clause, "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State. And the Congress may by general Laws prescribe the Manner in which such Acts, Records and Proceedings shall be proved, and the Effect thereof." U.S. Const. art. IV, § 1. "The purpose of the Full Faith and

Credit Clause 'was to alter the status of the several states as independent foreign sovereignties, each free to ignore obligations created under the laws or by the judicial proceedings of the others, and to make them integral parts of a single nation throughout which a remedy upon a just obligation might be demanded as of right, irrespective of the state of its origin.'" *Rosin v. Monken*, 599 F.3d 574, 576 (7th Cir. 2010) (quoting *Baker v. General Motors Corp.*, 522 U.S. 222, 232 (1998)). "By virtue of its 'exacting' operation with respect to judgments, the Full Faith and Credit Clause results in 'the judgment of the rendering State [gaining] nationwide force.' The primary operational effect of the Clause's application is 'for claim and issue preclusion (res judicata) purposes.'" *Rosin*, 599 F.3d at 576 (alteration in original) (quoting *Baker*, 522 U.S. at 233).

Every court to squarely address the issue of whether the Full Faith and Credit Clause requires a state to give a convicted sex offender who relocates to that state the same classification that he would have had in the state of conviction has agreed that it does not. *See, e.g.*, *Daniels v. Arapahoe Cnty. Dist. Court*, 376 F. App'x 851, 854 (10th Cir. 2010) (holding that Colorado was not bound by the Full Faith and Credit Clause, to give the plaintiff the same sex offender classification status for his California guilty plea as he would have received in California); *Rosin*, 599 F.3d at 577 (holding that the Full Faith and Credit Clause did not prevent Illinois from requiring a plaintiff to register even though registration was not required in the state where he pled guilty); *McGuire v. City of Montgomery*, No.11-CV-1027, 2013 WL 1336882, at *12 (M.D. Ala. Mar. 29, 2013) (plaintiff failed to state a Full Faith and Credit claim because "the judgment of the Colorado court — which is silent on registration in Colorado or any other state — does not preclude Alabama from requiring Plaintiff to register"); *O'Donnell*, 924 N.Y.S.2d at 687–88 (holding that New York could impose a different registration requirement than Virginia where

the plaintiff was convicted); *McGarghan*, 920 N.Y.S.2d at 331 (the requirement that plaintiff register for 20 years in New York when he would only have to register for 10 years in Vermont where his conviction occurred was not a violation of Full Faith and Credit Clause); *Smith*, 898 N.Y.S.2d at 704–05 (holding that New York did not have to give full faith and credit to the plaintiff's registration requirement in Texas, the state where the plaintiff pled guilty); *People v. Arotin*, 796 N.Y.S.2d 743, 745 (App. Div. 2005) (finding that the Full Faith and Credit Clause "is not violated by requiring a convicted sex offender moving into New York to be governed by [New York's] registration requirements").

The rationale used by most of these courts in reaching their decision is that the exercise of the police power of each state over its citizens gives states the power to independently determine sex registration for sex offenders located in its borders. For example, in *Rosin*, the Seventh Circuit found that "Illinois, as a state of the Union, has police power over the health and welfare of its citizens." *Rosin*, 599 F.3d at 577. The Seventh Circuit went on to state that "New York has no authority to dictate to Illinois the manner in which it can best protect its citizenry from those convicted of sex offenses." *Rosin*, 599 F.3d at 577. The Seventh Circuit concluded that "there is no tension between Illinois's police power and the Full Faith and Credit Clause here. As a result, New York could promise Rosin only that he would never have to register as a sex offender within its own jurisdiction. Rosin could not bargain for a promise from New York as to what other states would do based on his guilty plea to sexual abuse in the third degree, for New York had no power to make such a promise." *Rosin*, 599 F.3d at 577.

In New York, two courts have similarly found that requiring a plaintiff to comply with a different registration requirement than the state of conviction was not a violation of the Full Faith and Credit Clause. In *O'Donnell*, the Appellate Division, Third Department found that:

> New York and Virginia have each separately adjudicated the risk posed by petitioner to their respective citizens and imposed registration requirements upon petitioner pursuant to each state's sex offender registration law. As neither state has attempted to adjudicate the same matter, the Full Faith and Credit Clause has not been violated.

*O'Donnell*, 924 N.Y.S.2d at 687-88. In *McGarghan*, the Appellate Division, First Department, found that "[t]he administrative manner in which a state chooses to exercise the registration requirements for a sex offender who moves into its jurisdiction falls squarely within the power of that state and is not governed by the procedures in effect in the state where the offender previously resided." *McGarghan*, 920 N.Y.S.2d at 330–31 (2011) (quoting *Arotin*, 796 N.Y.S.2d 743). The Appellate Division reasoned that "[t]he purpose of the Full Faith and Credit Clause is to avoid conflicts between States in adjudicating the same matters" and that "a different state's registration requirement is not the same matter," and therefore not a violation of the Full Faith and Credit Clause. *Id.* In *Smith*, the Third Department, used the same reasoning as *Rosin* and held that the registration of sex offenders was pursuant to New York State's police powers and "New York is not required under full faith and credit principles to assign an offender the same risk level classification as that designated by the jurisdiction where the registerable conviction occurred . . . ." Plaintiff has not, and cannot, state a claim under the Full Faith and Credit Clause of the Constitution and this claim is dismissed with prejudice.

### x.   Preemption

In his opposition to the State Defendants' motion to dismiss, Plaintiff asserts for the first time that requiring him to remain registered in New York State even though he no longer lives in New York, is a violation of the Supremacy Clause of the Constitution because SORA is preempted by SORNA. (*See, e.g.*, Pl. Opp'n. to State Defs. 1, 44, 46, 52–53, 59, 75.) "The Supremacy Clause establishes that federal law 'shall be the supreme Law of the Land . . . any

Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Hillman v. Maretta*, 569 U.S. ---, ---, 133 S. Ct. 1943, 1955 (2013) (Thomas, J., concurring) (quoting U.S. Const. art. VI, cl. 2). Under the doctrine of federal preemption, when a federal law preempts a state or local law, the preempted law ceases to be in effect and is considered void. *See Mary Jo C.*, 707 F.3d at 161 ("Under the doctrine of federal preemption, 'state laws that conflict with federal law are without effect.'" (citations omitted)). "[A]s the Supreme Court has repeatedly instructed, 'in all pre-emption cases . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, --- F.3d ---, 2013 WL 3863890, at *19 (2d Cir. July 26, 2013) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)); *see also Mary Jo C.*, 707 F.3d at 161 ("Absent clear congressional intent to the contrary, federal preemption of state law is not favored . . . ." (alteration in original) (citations omitted)). "That rule of construction rests on an assumption about congressional intent: that 'Congress does not exercise lightly' the 'extraordinary power' to 'legislate in areas traditionally regulated by the States.'" *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. ---, ---, 133 S. Ct. 2247, 2256 (2013) (citations omitted). "In light of this assumption, the party asserting that federal law preempts state law bears the burden of establishing preemption." *In MTBE*, --- F.3d at ---, 2013 WL 3863890, at *19.

There are three different types of preemption: express, field and conflict preemption. Under express preemption Congress directly states in the statute that it is Congress's intent to preempt all state law on the issue. *See Hillman*, 569 U.S. at ---, 133 S. Ct. at 1949 ("Under the Supremacy Clause, Congress has the power to pre-empt state law expressly."); *In re MTBE*, --- F.3d at ---, 2013 WL 3863890, at *19 ("First, when Congress expressly provides that a federal

statute overrides state law, courts will find state law preempted if, applying standard tools of statutory construction, the challenged state law falls within the scope of Congress's intent to preempt."). Field preemption applies "when Congress legislates so comprehensively in one area as to 'occupy the field,'" and thus courts "may infer from the federal legislation that Congress intended to preempt state law in that entire subject area." *In re MTBE*, --- F.3d at ---, 2013 WL 3863890, at *19 (citing *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)); *see also Mary Jo C.*, 707 F.3d at 161–62 (finding that field preemption applies "where Congress has manifested an intent to 'occupy the field' in a certain area" (citations omitted)). Conflict preemption applies "where state law 'actually conflicts with federal law'" even though the statute does not expressly state that state law is preempted. *Id.* (citations omitted); *see also Hillman*, 569 U.S. at ---, 133 S. Ct. at 1949–50 (noting that conflict preemption occurs "when compliance with both federal and state regulations is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress'" (citation omitted)); *In re MTBE*, --- F.3d at ---, 2013 WL 3863890, at *19 (finding that when "state law directly conflicts with the structure and purpose of a federal statute, we may conclude that Congress intended to preempt the state law"). "Such a conflict occurs when compliance with both federal and state regulations is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Hillman*, 569 U.S. at ---, 133 S. Ct. at 1950 (citations omitted); *see also In re MTBE*, --- F.3d at ---, 2013 WL 3863890, at *19 ("[W]e will find a conflict with preemptive effect only in two circumstances: first, when 'compliance with both federal and state regulations is a physical impossibility,' and second, when the state law 'stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress.'" (quoting

*Arizona v. United States*, 567 U.S. ---, ---, 132 S.Ct. 2492, 2501 (2012))).

According to Plaintiff:

> State Defendants's [sic] malicious attempts to enforce an
> administrative and ministerial SORA policy upon a foreign nation
> and international commerce violates the Supremacy Clause were
> [sic], as stated above and more specifically below, the U.S.
> Congress excluded foreign [sic] nations from the Megan Law
> registration requirements and controls.

(Pl. Opp'n to State Defs. 44.)  Plaintiff argues that since SORNA specifically states that it does

not apply to foreign nations that SORA cannot require those residing abroad to register.  (*Id.*)

According to Plaintiff, SORNA preempts any attempts by New York State to regulate sex

offenders living in other jurisdictions — states and foreign countries.  (*Id.* at 52–53, 59, 75.)

As discussed in Part III.d.ix addressing Plaintiff's claim pursuant to the Full Faith and

Credit Clause, the registration of sex offenders is part of the police powers of a state.  A state's

police powers to protect the health and safety of its citizens are traditional areas of state

authority.  *See Steel Inst. of N.Y. v. City of New York*, 716 F.3d 31, 36 (2d Cir. 2013) ("Protection

of the safety of persons is one of the traditional uses of the police power," which is "one of the

least limitable of governmental powers." (quoting *Queenside Hills Realty Co. v. Saxl*, 328 U.S.

80, 82–83 (1946))).  Therefore, "[t]here is a strong presumption against preemption when states

and localities 'exercise[ ] their police powers to protect the health and safety of their citizens.'"

*Steel Inst. of N.Y.*, 716 F.3d at 36 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475, 484–85

(1996)).  Thus, courts generally require a "clear and manifest" intent by Congress to preempt

statutes that concern the state's police powers.  *Id.* ("Because of the role of States as separate

sovereigns in our federal system, we have long presumed that state laws . . . that are within the

scope of the States' historic police powers . . . are not to be pre-empted by a federal statute unless

it is the clear and manifest purpose of Congress to do so." (quoting *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 894 (2000) (Stevens, J., dissenting))).

None of the three types of preemption apply here. SORNA does not contain an explicit preemption provision. *See* 42 U.S.C. § 16901 *et seq.* This Court has not located a single case to even consider SORNA an implied preemption, or to rule that it has preempted any state law. In addition, since SORNA is opt-in legislation for the states,[48] it suggests that Congress did not intend to fully occupy the field, a field traditionally left to states. Moreover, SORA is not in conflict with SORNA. SORNA, like SORA, would have required Plaintiff to register in New York State, had it applied in New York, since according to Plaintiff, he was a nonresident worker and SORNA requires sex offenders to register where they live, work and study. *See* 42 U.S.C. § 16913(a) (requiring sex offenders to register where they live, work or study in every jurisdiction); *see also* 42 U.S.C. § 16912 (requiring states to maintain registries of sex offenders); N.Y. Correct. Law §§ 168-a, 168-f, 168-k (listing the registration requirements once someone is present in the state after 14 days); *Reynolds*, 565 U.S. at ---, 132 S. Ct. at 978 ("[SORNA], requires those convicted of certain sex crimes to provide state governments with (and to update) information, such as names and current addresses, for inclusion on state and federal sex offender registries.").

Courts have held that SORNA contemplates by its provisions that a sex offender will be registered in more than one state. *See United States v. Begay*, 622 F.3d 1187, 1196 (9th Cir. 2010) ("SORNA clearly contemplates that certain sex offenders might have to register and keep their registration current in multiple jurisdictions. And nothing in the text of the statute limits its

---

[48] *See United States v. Guzman*, 591 F.3d 83, 93–94 (2d Cir. 2010) (noting that New York, Massachusetts and Virginia have not implemented SORNA and have not opted into the statute).

application to only one jurisdiction in each of the three categories mentioned in § 16913(a); rather, the most logical reading of the statute is that it applies to every jurisdiction falling within one of the three categories."); *United States v. Gundy*, No. 13-CR-8, 2013 WL 2247147, at *10 (S.D.N.Y. May 22, 2013) ("Section 16913 requires offenders to register in each jurisdiction in which they reside, work, or study — requirements that all envision individuals outside of prison, free to go about their lives in multiple jurisdictions.").  Moreover, SORNA requires sex offenders to register in states when they move from one state to another state.  *See United States v. Robbins*, --- F.3d ---, 2013 WL 4711394, at *5 (2d Cir. Sept. 3, 2013) (finding that a sex offender is required to register when he moves to a new state pursuant to SORNA and holding that SORNA's provision that a sex offender register when he or she moves is valid); *United States v. Guzman,* 591 F.3d 83, 93–94 (2d Cir. 2010) (noting that SORNA requires a sex offender to register with a state when he or she moves to the state).  Furthermore, SORNA has no provision requiring removal from a state's registry once a sex offender moves out of that state.  *See* 42 U.S.C. § 16901 *et seq.*  Contrary to Plaintiff's claim, SORA is not in conflict with SORNA since SORA only requires that registered sex offenders register their new address when they leave New York State; it does not require that Plaintiff travel back and forth to New York State to re-register every 90 days, as Plaintiff claims.  *See* N.Y. Correct. Law § 168-f(4)–(5).  SORA is not preempted by SORNA and Plaintiff's Supremacy Clause claim is without merit and is dismissed with prejudice.[49]

---

[49] Plaintiff's extraterritoriality argument is without merit as it is not a cognizable Supremacy Clause claim.  The Supremacy Clause only makes a law void when it is in conflict with federal law, as discussed above.  Nothing in SORNA prevents states from keeping individuals on the registry even if they no longer reside in the United States.  SORNA states that the federal government shall initially register qualified foreign nationals when they first enter the United States.  *See* 42 U.S.C. § 16928.  However, Plaintiff is a United States citizen, in addition

xi.   **Commerce Clause and Dormant Commerce Clause**

Plaintiff alleges that attempting to exercise jurisdiction over Plaintiff by requiring him to register in New York as a sex offender, despite the fact that he lives oversees, is a violation of the "international commerce and dormant commerce clause."  (Pl. Opp'n. to State Defs. at 35; *see also id.* at 42, 52.)  Plaintiff refers to dormant Commerce Clause and Commerce Clause as two separate claims.  However, when applied to states, the proper analysis is the Dormant Commerce Clause analysis.  *See Steel Inst. of N.Y. v. City of New York*, 832 F. Supp. 2d 310, 333 (S.D.N.Y. 2011), *aff'd*, 716 F.3d 31 (2d Cir. 2013) ("Although the Constitution does not expressly limit the power of States to regulate commerce, the Supreme Court has 'long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute.'  This implicit restraint is referred to as the 'Dormant' Commerce Clause." (quoting *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007))).  A violation of the "dormant Commerce Clause," or the Commerce Clause in its dormant state, occurs when a state "interfere[s] with the natural functioning of the interstate market either through prohibition or through burdensome regulation." *McBurney*, 569 U.S. at ---, 133 S. Ct. at 1720.  "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Francarl Realty Corp. v. Town of E. Hampton*, 400 F. App'x 605, 607 (2d Cir. 2010) (citations omitted).  "Courts have consistently recognized that '[t]he mere fact that

to being a citizen of Malta, and he was required to register in New York *not* because he relocated to New York from outside of the United States but because he relocated to New York from California.  Thus, under the terms of SORNA, Plaintiff was required to register in New York. *See* 42 U.S.C. § 16912 (requiring states to maintain registries); 42 U.S.C. § 16913(a) (requiring sex offenders to register where they live, work or study in every jurisdiction).

state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids.'" *Freedom Holdings, Inc. v. Cuomo*, 624 F.3d 38, 67–68 (2d Cir. 2010) (citations omitted).

Plaintiff argues that the implementation of SORA violates the Commerce Clause because only Congress can implement legislation that affects interstate and international commerce. (Pl. Opp'n to State Defs. 40–41, 75–76.) According to Plaintiff, Congress enacted SORNA pursuant to its powers under the Commerce Clause and therefore states may not operate in the same area. (*Id.* at 43, 71.) He argues that New York's registration requirement implicates commerce because it hinders the ability for nonresidents to move in and out of New York State as part of interstate and international commerce.[50] (*Id.* at 44.)

Plaintiff's Commerce Clause and Dormant Commerce Clause claim is without merit. First, SORNA explicitly requires states to act in the area of registration of sex offenders. Under the terms of SORNA, all states are to register convicted sex offenders who live, work and study in the state. *See* 42 U.S.C. § 16912 (requiring states to maintain registries); 42 U.S.C. § 16913(a) (requiring sex offenders to register when they live, work or study in a jurisdiction). Second, as discussed *supra*, states have a legitimate interest in protecting the health and safety of their citizens and can do so pursuant to their state powers. Third, New York's law governing sex offenders residing in New York does not impede or interfere with the interstate market. *See, e.g.*, *McBurney*, 569 U.S.at ---, 133 S. Ct. at 1720 ("Because [the regulation in question] [did] not . . . interfere[] with an interstate market through prohibition or burdensome regulations, this

---

[50] Plaintiff also argues that the State Defendants violated the Commerce Clause and the Dormant Commerce Clause by not allowing Plaintiff to file his appeal. (*Id.* at 46.) As discussed *supra*, Plaintiff admits that it was beyond the appeal period when he attempted to file his appeal and, in any event, he was not prevented from filing an appeal but rather told to comply with all procedural rules.

case is not governed by the dormant Commerce Clause."). Plaintiff's Commerce Clause claim is without merit and is therefore dismissed.

The Court finds that none of Plaintiff's constitutional claims have merit and all claims against the State Defendants are dismissed. Because none of Plaintiff's claims have merit, Plaintiff's applications for injunctive and declaratory relief are denied. *See O'Leary v. Town of Huntington*, No. 11-CV-3754, 2012 WL 3842567, at *16 (E.D.N.Y. Sept. 5, 2012) (holding that the plaintiff had failed to plead any constitutional violation and "[granting] defendants' motion to dismiss plaintiff's federal claims in their entirety" including requests for declaratory and injunctive relief); *Wilson v. Emond*, No. 10-CV-659, 2011 WL 494777, at *10 (D. Conn. Feb. 5, 2011) (same); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) (dismissing requests for declaratory and injunctive relief because "[d]eclaratory judgments and injunctions are remedies, not causes of action" and the plaintiff's underlying claims have no merit and therefore declaratory and injunctive relief cannot be granted).

### e. Plaintiff's Substantive Claims Against the Attorney Defendants

Plaintiff brings several federal claims — RICO, RICO conspiracy, FLSA and Thirteenth Amendment — and multiple state law claims — fraudulent misrepresentation, fraudulent concealment, unjust enrichment, legal malpractice, violation of New York Judiciary Law § 487, unpaid wages, unpaid overtime and unpaid spread-of-hours wages against the Attorney Defendants. The Court dismissed the Thirteenth Amendment claim at oral argument.[51] (Oral

---

[51] The Court dismissed Plaintiff's Thirteenth Amendment claim at oral argument because the Complaint failed to allege involuntary servitude. (Oral Arg. Tr. 71:15–72:2.) Plaintiff admitted that he voluntarily agreed to travel from California to New York to work for the Attorney Defendants. (Compl. ¶¶ 27, 48, 50, 52.) Plaintiff has not plausibly alleged that he was coerced through *physical or legal threats* to work for the Attorney Defendants. (*See generally id.*) Plaintiff must allege that his work constituted "involuntary servitude." *McGarry v. Pallito*,

Arg. Tr. 71:15–72:2.)  For the reasons set forth below, the Court finds that Plaintiff's federal claims are without merit and therefore grants the Attorney Defendants' motions to dismiss as to these claims.  The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.

### i. RICO Claim

"RICO provides a private right of action for '[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter.'"  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 283 (2d Cir. 2006) (quoting 18 U.S.C. § 1964(c)).  In order to establish a RICO claim, a Plaintiff must plead "'(1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity,' as well as 'injury to business or property as a result of the RICO violation.'"  *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013) (citations omitted); *see also Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) ("To establish a RICO claim, a plaintiff must show: '(1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962.'" (citations omitted)).  The RICO conduct must be both the proximate and but for cause of the plaintiff's injury.  *Lerner*, 459 F.3d at 283.

Plaintiff's burden is high when pleading RICO allegations.  First, where the "conduct" or predicate acts sound in fraud, as they do here, they must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure.  *See Curtis v. Law Offices of David M. Bushman,*

---

687 F.3d 505, 510–11 (2d Cir. 2012).  Involuntary servitude has been defined as "a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process." *Id.* (quoting *United States v. Kozminski*, 487 U.S. 931, 952 (1988)).  Plaintiff's allegations in the Complaint simply do not meet this standard.  "The guarantee of freedom from involuntary servitude has never been interpreted specifically to prohibit compulsion of labor by other means, such as psychological coercion." *Kozminski*, 487 U.S. at 944.

*Esq.*, 443 F. App'x 582, 584 (2d Cir. 2011) ("[A]ll allegations of fraudulent predicate acts[ ] are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  In addition to alleging the particular details of a fraud, 'the plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" (quoting *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178–79 (2d Cir. 2004))); *see also Spool*, 520 F.3d at 185 (holding that RICO allegations that sound in fraud should be pled with particularity); *Lerner*, 459 F.3d at 290–91 (same).  Second, a pattern of racketeering "must be adequately alleged in the complaint." *Spool*, 520 F.3d at 183 (alteration omitted) (citations and internal quotation marks omitted). Courts look with particular scrutiny at claims for a civil RICO, given RICO's damaging effects on the reputations of individuals alleged to be engaged in RICO enterprises and conspiracies. *See Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 166–67 (E.D.N.Y. 2010) ("Because of this likely powerful effect on potentially innocent defendants who face the threat of treble damages, and the concomitant potential for abuse of RICO's potent provisions, the court is aware of a particular imperative in cases such as the one at bar, to flush out frivolous [civil] RICO allegations at an early stage of the litigation."), *aff'd sub nom. Curtis v. Law Offices of David M. Bushman, Esq.*, 443 F. App'x 582 (2d Cir. 2011); *Purchase Real Estate Grp. Inc. v. Jones*, No. 05-CV-10859, 2010 WL 3377504, at *6 (S.D.N.Y. Aug. 24, 2010) ("'In considering civil RICO claims, a court must be mindful of the devastating effect such claims may have on defendants.'  Accordingly, courts should look 'with particular scrutiny' at civil RICO claims to ensure that the RICO statute is used for the purposes intended by Congress." (citations omitted)).

Courts are "to ensure that 'RICO's severe penalties are limited to enterprises consisting of more than simple conspiracies to perpetrate the acts of racketeering . . . courts must always be

on the lookout for the putative RICO case that is really nothing more than an ordinary fraud case clothed in the Emperor's trendy garb.'" *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 443 (S.D.N.Y. 2004) (alteration in original) (citations omitted); *see also Spool*, 520 F.3d at 184 ("Ordinary theft offenses and conspiracies to commit them are not among the predicate activities defined in 18 U.S.C. § 1961(1)."); *Purchase Real Estate Grp.*, 2010 WL 3377504, at *6 ("[C]ourts should look 'with particular scrutiny' at civil RICO claims to ensure that the RICO statute is used for the purposes intended by Congress."); *DLJ Mortgage Capital*, 726 F. Supp. 2d at 237 ("[I]f an alternate route to recovery is available, a putative RICO plaintiff must pursue it first."); *Curtis*, 758 F. Supp. 2d at 172–73 (holding that "plaintiffs' claims must be rejected because finding otherwise — and allowing malicious prosecution claims such as those attempted to be alleged here to suffice as RICO predicate acts — would lead to absurd results").

There are four different ways in which a plaintiff can plead that a defendant violated RICO:

> A showing . . . [of] the defendant's violation of 18 U.S.C. § 1962, may be made in any one of four ways. Specifically, "any person" may be liable for violating 18 U.S.C. § 1962 who: (i) uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); (ii) "acquire[s] or maintain[s], directly or indirectly, any interest in or control of" such enterprise "through a pattern of racketeering activity," § 1962(b); (iii) by being "employed by or associated with" such an enterprise, "conduct[s] or participate[s], directly or [in]directly, in the conduct of such enterprise's affairs through a pattern of racketeering activity," § 1962(c); or (iv) conspires to violate the substantive provisions of § 1962(a), (b), or (c), § 1962(d).

*Curtis*, 758 F. Supp. 2d at 167. Plaintiff alleges that the Attorney Defendants engaged in violations of § 1962(c) and § 1962(d).[52] (Compl. ¶ 219.) Plaintiff alleges that the Attorney Defendants lied to Plaintiff and told him he would not be subject to SORA registration in order to induce him to travel from California to New York to work for them. (*Id.* ¶ 192.) According to Plaintiff, he was induced to work by a promise that he would be paid $75 an hour wage and a ten

---

[52] The full text of the RICO statute provides:

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.

**(b)** It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C. § 1962.

percent referral fee for all out-of-state clients that Plaintiff referred to the Attorney Defendants and for any judgments or settlements in cases Plaintiff worked on. (*Id.*) According to Plaintiff, the Attorney Defendants and their respective legal practices formed a RICO enterprise, with a purpose to "use . . . their license to practice law in the State of New York, to secure out-of-state clients, obtain a monetary retainers [sic] into the thousands of dollars." (*Id.*) Plaintiff alleges that as result of the RICO activity, the Attorney Defendants "secur[ed] the thousands of dollars from out-state-clients, and refus[ed] to pay Plaintiff for services and out-of-pocket expenses for the sole purpose to enrich themselves, without actually, properly or effectively representing the out-of-state clients, by abandoning them, and enriching themselves by keeping their retainers." (*Id.*) For the reasons discussed below, the Court finds that the Complaint fails to adequately allege predicate acts and a pattern of racketeering activity, and, therefore, dismisses Plaintiff's RICO claims.[53]

### 1. Predicate Acts

Plaintiff states that the Attorney Defendants engaged in the predicate acts of extortion, mail fraud and wire fraud.[54] Plaintiff has failed to sufficiently allege these claims.

---

[53] Since as discussed *infra*, Plaintiff's RICO claim fails to sufficiently allege predicate acts and Plaintiff cannot adequately plead a pattern of racketeering, the Court does not decide whether the Complaint has met the other elements necessary to establish a RICO claim.

[54] In Plaintiff's opposition to the Attorney Defendants' motions to dismiss, he cites the forced labor statute, 18 U.S.C. § 1589, as a RICO predicate act. (Pl. Opp'n to Att'y Defs. 34.) For the same reasons Plaintiff's Thirteenth Amendment claim fails, Plaintiff's claim that he was forced to work in violation of 18 U.S.C. § 1589 fails. As the Court explained at oral argument, Plaintiff has failed to plausibly allege that he was forced to continue to work for the Attorney Defendants given Plaintiff's allegations in the Complaint, his assertions in his opposition to the Attorney Defendants' motions to dismiss, and his representations at oral argument, including his assertions that (1) he traveled freely while working for the Attorney Defendants, (2) he continued to work for other attorneys in California while working for the Attorney Defendants, (3) he worked with a great deal of autonomy, and (4) he freely discontinued working for the Attorney

## A. Extortion

The Supreme Court, citing the Hobbs Act, 18 U.S.C. § 1951(a), has defined federal extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." *Sekhar v. United States*, 570 U.S. ---, ---, 133 S. Ct. 2720, 2723 (2013). "The elements of a claim for extortion under the Hobbs Act are that the defendant (1) induced [the victim], with [the victim's] consent, to part with property, (2) through the wrongful use of actual or threatened force, violence or fear (including fear of economic loss), (3) in such a way as to adversely effect interstate commerce." *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 478 (E.D.N.Y. 2011) (citations and internal quotation marks omitted); *see also Flores v. Osaka Health Spa, Inc.*, 474 F. Supp. 2d 523, 529 (S.D.N.Y. 2007) ("A private individual commits extortion under the Hobbs Act by obtaining or attempting to obtain property from another party by the use or threatened use of force, violence or fear." (citing *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 404–09 (2003))). "To establish extortion, a plaintiff must demonstrate that the person committing the act either pursued or received 'something of value that [he] could exercise, transfer, or sell.'" *Flores*, 474 F. Supp. 2d at 529 (citing *Scheidler*, 537 U.S. at 405); *see also Sekhar*, 570 U.S. at ---, 133 S. Ct. at 2724 ("Extortion required the obtaining of items of value, typically cash, from the victim."); *United States v. Cain*, 671 F.3d 271, 282 (2d Cir. 2012), *cert. denied*, 566 U.S. ---, 132 S. Ct. 1872 (2012) ("[I]n each Hobbs Act case we must now consider . . . whether the property that is the subject of the extortion is valuable in the hands of the defendant.").

---

Defendants to relocate to California using a ticket purchased by Russo. (Compl. ¶¶ 76–77, 83, 99; Pl. Opp'n to Att'y Defs. 30–32; Oral Arg. Tr. 71:15–72:2.) Thus, Plaintiff's claim that he was subjected to forced labor is not plausible.

Plaintiff appears to allege that he was both extorted while he worked for the Attorney Defendants and is being extorted now to discontinue this action.  (Compl. ¶ 201.)  Plaintiff alleges that he suffered from "public attacks based on false and misleading statements, threat[s] to trump up criminal charges, threat[s] [of] fraudulent civil judgments, investigations by government agencies, and ongoing harassment and disruptions of Plaintiff's peace, tranquility and enjoyment of his constitutionally protected right," while he worked for the Attorney Defendants which kept him working for them.  (*Id.* ¶¶ 201, 204.)  Plaintiff asserts that the Attorney Defendants "[c]ontinue to pursue a scheme of misrepresentation to the great harm and public denigration of Plaintiff, unless and until Plaintiff relinquishes his claims against the RICO Attorneys/defendants Russo, Jl [sic] Russo P.C.; Trakas and the Law Office of Arthur G. Trakas, including unfounded attempts in seeking injunction and restraining orders preventing Plaintiff [from] assert[ing] and invok[ing] his First Amendment of the United States Constitution access to courts."  (*Id.* ¶ 203 (emphasis omitted).)  Under the section of the Complaint titled extortion, Plaintiff alleges that:

> By and through their own admission in the aforementioned Motion to Dismiss (ref: FAC fn 12), attorneys/defendants Russo and Trakas, unquestionable [sic] admit that they possessed this information, prior to inducing Plaintiff to work for them as a 'non-New York citizen and non-resident worker,' by using that specific phrase to induce, con and entrap Plaintiff to work for them to enrich themselves and then use the language in their Motion to Dismiss as stated in the above Fn 12 , to avoid liability.

(*Id.* ¶¶ 205.)  It appears that Plaintiff is alleging he was extorted since Plaintiff was told by the Attorney Defendants that he did not have to register while the Attorney Defendants were aware that he would have to register.  (*Id.*)

Plaintiff's claim fails for several reasons.  Plaintiff's argument that he continued to work for the Attorney Defendants because they extorted him is not plausible.  Plaintiff admits that he

freely discontinued working for the Attorney Defendants, with their consent, not because he was able to finally break free of their control but because he chose to leave because he did not want to be registered in New York as a sex offender.  (*Id.* ¶¶ 77, 83 (discussing his meeting with the Attorney Defendants where they agreed he would return to California).)  His claim that he is being extorted during the litigation also fails because a plaintiff can only allege extortion for "'something of value that [the defendant] could exercise, transfer, or sell.'"  *Flores*, 474 F. Supp. 2d at 529 (citing *Scheidler*, 537 U.S. at 405); *see also Sekhar v. United States*, 570 U.S. at ---, 133 S. Ct. at 2725 ("Obtaining property requires 'not only the deprivation but also the acquisition of property.'  That is, it requires that the victim 'part with' his property and that the extortionist 'gain possession' of it." (citations omitted)); *Cintas Corp. v. Unite Here*, 601 F. Supp. 2d 571, 577 (S.D.N.Y. 2009) ("A Hobbs Act violation arises . . . when a defendant exploits a plaintiff's fear of economic loss and receives property to which it has no lawful claim."), *aff'd*, 355 F. App'x 508 (2d Cir. 2009).  "The property extorted must therefore be *transferable* — that is, capable of passing from one person to another."  *Sekhar*, 570 U.S. ---, 133 S. Ct. at 2725 (emphasis in original).  There is no allegation in the Complaint that the Attorney Defendants received or attempted to receive something tangible from Plaintiff and therefore his extortion claim fails.[55]  *See, e.g.*, *Scheidler*, 537 U.S. at 410 ("Because petitioners

---

[55]  Rather than plead that the Attorney Defendants received something tangible from Plaintiff, he alleges that they received his services and prevented him from leaving their employment.  (Compl. ¶ 205.)  As the Supreme Court has explained, extortion is distinct from coercion:  "[w]hereas [extortion] require[s] . . . the criminal acquisition of . . . property, [coercion] require[s] merely the use of threats to compel another person to do or to abstain from doing an act which such other such person has a legal right to do or to abstain from doing."  *Sekhar v. United States*, 570 U.S. ---, ---, 133 S. Ct. 2720, 2723 (2013) (citations and internal quotation marks omitted).  As the Supreme Court has explained, coercion is "a separate, and lesser, offense than extortion."  *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 394 (2003); *Sekhar*, 570 U.S. at ---, 133 S. Ct. at 2725 (citing *Scheidler* for the proposition that

100

did not obtain or attempt to obtain respondents' property, both the state extortion claims and the claim of attempting or conspiring to commit state extortion were fatally flawed.").

## B.   Mail and Wire Fraud

Because allegations of mail and wire fraud are governed by Rule 9(b) of the Federal Rules of Civil Procedure, they must be pled with particularity.  *See Curtis*, 443 F. App'x at 584 (discussing pleading requirements under RICO for fraud claims); *Spool*, 520 F.3d at 185 (same); *Lerner*, 459 F.3d at 290–91 (same); *Curtis*, 758 F. Supp. 2d at 167 (same).  "Allegations of predicate mail and wire fraud acts 'should state the contents of the communications, who was involved, [and] where and when they took place, and [should] explain why they were fraudulent.'"  *Spool*, 520 F.3d at 185 (quoting *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir. 1993)); *see also Purchase Real Estate Grp.*, 2010 WL 3377504, at *8 ("Under Rule 9(b), allegations of fraud in the RICO context must be made with particularity and must 'specify the statements [plaintiffs] claim [ ] were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.'" (alteration in original) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172–73 (2d Cir. 1999))); *Am. Fed'n of State, Cnty. & Mun. Emps. Dist. Council 37 Health & Sec. Plan v. Bristol-Myers Squibb Co*., No. 12-CV-2238, 2013 WL 2391999, at *4 (S.D.N.Y. June 3, 2013) ("[T]o comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent,

---

extortion and coercion are distinct).  The Supreme Court has found that coercion without the transfer of property or an attempt to obtain property is not extortion and not a RICO predicate act.  *Scheidler*, 537 U.S. at 406–08 (holding that coercion is not a RICO predicate act).  As explained *supra*, Plaintiff has failed to plausibly allege that he continued to work for the Attorney Defendants because he was threatened.  Thus, Plaintiff has failed to plausibly allege that the Attorney Defendants coerced him, let alone any facts to plausibly allege extortion.

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" (quoting *Lerner*, 459 F.3d at 290)).  "[W]here multiple defendants are accused of mail or wire fraud, plaintiffs must plead with particularity as to each defendant . . . ."  *U.S. Fire Ins.*, 303 F. Supp. 2d at 443–44 (citations omitted).

Plaintiff has failed to sufficiently plead mail and wire fraud RICO predicate acts.  The acts alleged by Plaintiff that could possibly be predicate mail and wire fraud acts are (1) the alleged fraudulent interstate communications sent by the Attorney Defendants to Plaintiff to induce Plaintiff to work for them and (2) the fraudulent interstate communications sent by Plaintiff on the Attorney Defendants' behalf to recruit and communicate with out of state "victims."  (*See* Compl. ¶¶ 60, 192.)  However, while these communications are discussed generally, Plaintiff does not provide sufficient details, such as the specific content of the communications, when they were sent, to whom they were sent and which Attorney Defendant sent them.  (*See id.*)  Among the communications quoted in detail in the Complaint are a series of emails between Plaintiff and various entities involved with Plaintiff's SORA registration and emails between Plaintiff and the Attorney Defendants.  (*See id.* ¶ 59.)  These emails are dated and identify the speaker and sender, and although Plaintiff contends that these emails are "offensive, humiliating, oppressive, foul and malicious," they do not meet the pleading requirements because Plaintiff has not pled why they are fraudulent or how they were in furtherance of the alleged RICO scheme.  (*Id.*)  The failure of Plaintiff to sufficiently plead mail and wire fraud predicate acts warrants dismissal of Plaintiff's RICO claims.  *See, e.g.*, *Dulsky v. Worthy*, No. 11-CV-4925, 2013 WL 4038604, at *5 (S.D.N.Y. July 30, 2013) (dismissing the plaintiff's RICO claim because "the only allegations in the [second amended complaint] that come close to alleging acts of mail or wire fraud with the particularity required by Rule 9(b) fail

to delineate which defendant committed, or conspired to commit, which predicate act"); *Newby v. Bank of Am. Corp.*, No. 12-CV-614, 2013 WL 940943, at *8 (E.D.N.Y. Mar. 8, 2013) (dismissing RICO claim for failure to plead with particularity mail and wire fraud); *United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 479 (E.D.N.Y. 2007) (holding that allegations "which simply state the dates and the identities of the participants or addressees in various alleged telephone conversations or mailings without identifying what specific statements were made or explaining how those statements furthered the allegedly fraudulent scheme or artifice, fall far short of Rule 9(b)'s pleading standard"); *see also Lundy*, 711 F.3d at 119 ("Bare-bones allegations do not satisfy Rule 9(b)."). There is only one communication provided by Plaintiff that arguably meets the 9(b) pleading requirements. It is a letter dated August 6, 2012 from Russo to Patricia and Maurcio Cerda. (Pl. Opp'n to Att'y Defs. Ex. 2a.) However, one predicate act is insufficient to demonstrate that the RICO enterprise engaged in racketeering activity — a plaintiff must plead at a minimum two predicate acts. *Vaughn v. Air Line Pilots Ass'n*, 377 F. App'x 88, 90 (2d Cir. 2010) (finding that RICO requires at "least two predicate acts of racketeering activity").

Furthermore, as courts in this Circuit have cautioned, a plaintiff cannot turn a state law tort, fraud or contract claim into a RICO claim by merely labeling it RICO. *Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, No. 12-CV-8205, 2013 WL 3943267, at *9 (S.D.N.Y. July 31, 2013) ("[T]he allegations in the Complaint that purport to plead predicate criminal acts sufficient to establish a cause of action under RICO 'amount merely to a breach of contract claim [and common business torts], which cannot be transmogrified into a RICO claim by the facile device of charging that the breach was fraudulent, indeed criminal.'" (quoting *Carr v. Tillery*, 591 F.3d 909, 918 (7th Cir. 2010))); *U.S. Fire Ins.*, 303 F. Supp. 2d at 443 (encouraging courts to review

the allegations to ensure that more than "ordinary fraud" is alleged). Plaintiff alleges that the

Attorney Defendants:

> engaged in a wide-ranging scheme or artifice to defraud Plaintiff, various courts of law, and the greater out-of-state clients/victims and the public by inducing Plaintiff to work long hours without compensation, inducing out-of states [sic] clients/victims, where the RICO Attorneys/defendants Russo, Jl [sic] Russo P.C.; Trakas and the Law Office of Arthur G. Trakas to retain them to represent their interest in States where the RICO Attorneys/defendants Russo, Jl [sic] Russo P.C.; Trakas and the Law Office of Arthur G. Trakas knew that they were not licensed to practice law and/or petitioned the respective jurisdictional Court through Pro Hac Vice process; manufacturing evidence, and defrauding said clients/victims, including the Plaintiff by refusing to "do the right thing" and paid them back and/or reimburse them to adequately represent various clients in legal matters, including Plaintiff, and failed to pay Plaintiff pursuant to an agreement he had with Attorney Defendants.

(Compl. ¶ 208; *see also id.* ¶ 192.) Plaintiff's allegations appear to be simple contract, general

fraud and legal malpractice allegations rather than allegations of an extensive racketeering

fraudulent scheme. The Court finds that Plaintiff has failed to adequately allege mail and wire

fraud RICO predicate acts. *Helios Int'l*, 2013 WL 3943267, at *6–9 (dismissing a complaint that

alleged RICO based on the transportation of stolen goods, sale of stolen goods, money

laundering and mail and wire fraud, among others, because the dispute was actually a contract

dispute between a supplier and a buyer over unpaid fees); *Curtis*, 758 F. Supp. 2d at 174–75

(holding that the plaintiff's claim that defendants began legal actions "with malice [and] . . .

prosecut[ed] . . . such actions by 'acts of champerty,' 'corruption' and 'deceitful' schemes

employing 'suborned perjury and deceit of the court'" were not proper claims for RICO

violations but rather malicious prosecution claims); *Wright v. Brae Burn Country Club, Inc.*, No.

08-CV-3172, 2009 WL 725012, at *6 (S.D.N.Y. Mar. 20, 2009) (holding that the plaintiff clearly

had an employment claim and not a RICO claim).

## 2. Pattern of Racketeering Activity

Even if Plaintiff had properly alleged predicate extortion, mail and wire fraud RICO acts, his RICO claim would nevertheless fail because Plaintiff has not sufficiently alleged a pattern of racketeering activity. "The requisite 'pattern . . . of racketeering activity' required by 18 U.S.C. § 1961(5) must consist of two or more predicate acts of 'racketeering,' as enumerated in 18 U.S.C. § 1961(1)." *Terrell v. Eisner*, 104 F. App'x 210, 212 (2d Cir. 2004) (alteration in original); *see also Moore v. Guesno*, 301 F. App'x 17, 18–19 (2d Cir. 2008); *Newby*, 2013 WL 940943, at *8. "The acts of racketeering activity that constitute the pattern must be among the various criminal offenses listed in § 1961(1), and they must be 'related, and [either] amount to or pose a threat of continuing criminal activity.'" *Spool*, 520 F.3d at 183–84 (alteration in original) (citations omitted); *see also W & D Imports, Inc. v. Lia*, No. 11-CV-4144, 2013 WL 1750892, at *6 (E.D.N.Y. Apr. 22, 2013) (citing *Spool*). "Predicate acts are related if they have the 'same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.'" *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11-MD-2262, 2013 WL 1285338, at *48 (S.D.N.Y. Mar. 29, 2013) (quoting *Davis Lee Pharmacy, Inc., v. Manhattan Central Capital Corp.*, 327 F. Supp. 2d 159, 164 (E.D.N.Y. 2004)). The Second Circuit has held that in order to survive a motion to dismiss, a plaintiff alleging a RICO violation must sufficiently plead a pattern of racketeering. *Spool*, 520 F.3d at 183 ("To survive a motion to dismiss, this pattern must be adequately alleged in the complaint."). There are two ways a plaintiff can demonstrate a pattern of racketeering activity: a closed-ended pattern or an open-ended pattern. *Spool*, 520 F.3d at 183–84.

## A. Close-Ended Pattern

A close ended pattern involves "a series of related predicate acts extending over a substantial period of time." *Spool*, 520 F.3d at 183–84. "The law is clear that 'the duration of a pattern of racketeering activity is measured by the RICO predicate acts' that the defendants are alleged to have committed." *Id.* The Second Circuit has "never held a period of less than two years to constitute a 'substantial period of time.'" *Id.*; *see also Kalimantano GmbH v. Motion in Time, Inc.*, No. 12-CV-6969, 2013 WL 1499408, at *14 (S.D.N.Y. Apr. 12, 2013) ("[T]he Second Circuit has never held a period of racketeering activity lasting less than two years to be substantial enough to qualify as closed-ended continuity."); *U1IT4less, Inc. v. FedEx Corp.*, 896 F. Supp. 2d 275, 288–89 (S.D.N.Y. 2012) (discussing substantial time); *Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 300 (S.D.N.Y. 2011) (same); *Purchase Real Estate Grp.*, 2010 WL 3377504, at *9 (same). Although the Second Circuit has found that two years is not "a bright-line requirement," it has emphasized that "it will be rare that conduct persisting for a shorter period of time establishes closed-ended continuity, particularly where . . . [t]he activities alleged involved only a handful of participants and do not involve a complex, multi-faceted conspiracy." *Spool*, 520 F.3d at 184; *see also U1IT4les*, 896 F. Supp. 2d at 288–89 (discussing requirements for close-ended conspiracy). However, "while two years may be the *minimum* duration necessary to find closed-ended continuity, the mere fact that predicate acts span two years is insufficient, without more, to support a finding of a closed-ended pattern.'" *First Capital Asset Mgmt.*, 385 F.3d at 181 (emphasis in original); *see also Kalimantano GmbH*, 2013 WL 1499408, at *14 (quoting *First Capital Asset Mgmt.*). In addition to considering the length of time over which the pattern is alleged to have occurred, a court also weighs "'a variety of non-dispositive factors,' including 'the number and variety of acts, the number of participants, the number of victims, and the presence of separate schemes.'" *Dolan v. Fairbanks Capital Corp.*, No. 03-CV-

3285, 2013 WL 991002, at *8 (E.D.N.Y. Mar. 13, 2013) (alteration in original) (quoting *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 467 (2d Cir. 1995)); *see also Marini v. Adamo*, 812 F. Supp. 2d 243, 262 (E.D.N.Y. 2011) ("Furthermore '[w]hile closed ended continuity is primarily concerned with the time period of the activities, the court also considers factors such as the 'number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes' as relevant when determining whether closed ended continuity exists.'" (citations omitted)).

It appears that Plaintiff is attempting to allege a close-ended pattern of racketeering activity. According to the Complaint, the crux of the scheme involved recruiting Plaintiff to use Plaintiff's expertise in civil rights and constitutional law and to obtain out-of-state referrals. (*See* Compl. ¶ 60.) In Plaintiff's opposition papers he states that the Attorney Defendants "entered into an agreement with one another, in manipulating and conning Plaintiff to believe that they could handle[] out-of state cases, and that since Plaintiff had several of his friends in need of legal representation, the [Attorney Defendants] conned Plaintiff to refer them said cases." (Pl. Opp'n to Att'y Defs. 33.) The Attorney Defendants then "enriched themselves in collectively obtaining huge amount[s] of thousands of dollars from said out-of-state victim-clients, the [Attorney Defendants] abandoned said out-of-state victim-clients, by either withdrawing from the case, or not filing the required federal court order pleadings and legal documents, thereby causing the out-of-state victim-clients cases to be dismissed." (*Id.*)

Plaintiff generally alleges that he first came to New York in early 2009 to comfort his cousin. (*Id.* ¶ 41.) Plaintiff further alleges that sometime after that he met the Attorney Defendants and they began to use the mail and wires to induce him to relocate from California to New York State to work for them. (*Id.* ¶ 187.) Plaintiff began to work for the Attorney

Defendants in November 2009 and stopped working for them in May 2011.[56] Thus, based on the

dates in the Complaint — November 2009 when Plaintiff began working for the Attorney

Defendants and May 2011 when Plaintiff returned to California to live — Plaintiff has alleged an

eighteen month period during which the fraudulent scheme occurred. Courts have held that *any*

period shorter than two years is too short to establish a close-ended pattern of racketeering

activity. *Spool*, 520 F.3d at 184; *see also Grimes v. Fremont Gen. Corp.*, 785 F. Supp. 2d 269,

301 (S.D.N.Y. 2011) ("Plaintiffs have not sufficiently alleged close-ended continuity, because

they have not adequately pled predicate acts over a period of at least two years, the amount of

time the Second Circuit has generally found necessary to establish close-ended continuity.");

*Kalimantano GmbH*, 2013 WL 1499408, at *15 (finding that the scheme is alleged to "span from

any date after October 4, 2010, until the October 4, 2012 phone call from an anonymous caller to

Davidoff [and] would fall just below the two-year minimum time frame that the case law

demands [and] . . . [the] [p]laintiffs therefore are unlikely to satisfy the duration requirement of a

pattern of racketeering activity"); *Abramo v. Teal, Becker & Chiaramonte, CPA's, P.C.*, 713 F.

Supp. 2d 96, 110–11 (N.D.N.Y. 2010) (dismissing a close-ended RICO claim which, as

originally pled, alleged a series of acts "approximately five months shy of two years"). Based on

the allegations in the Complaint, Plaintiff has not alleged that the scheme lasted a sufficient

length of time to allege a close ended conspiracy.

     Even if the Court were to assume that Plaintiff could allege acts that would take his

allegations beyond the two years, Plaintiff still could not prove a pattern of racketeering activity

---

[56] Plaintiff also alleges that emails were sent to Plaintiff in 2012 from the Attorney
Defendants. (*See* Compl. ¶ 201.) However, these emails do not appear to be related to the
overarching goal of the alleged RICO scheme as described by Plaintiff, which was to induce
Plaintiff to work without compensation and to obtain legal fees from multiple clients recruited by
Plaintiff without performing the required legal work. (*Id.* ¶ 59.)

because "a serious, but discrete and relatively short-lived scheme to defraud a handful of victims, . . . is insufficient to establish closed-ended continuity." *Purchase Real Estate*, 2010 WL 3377504, at *13 (finding that, despite the fact that the plaintiff had alleged a set of actions beyond two years, the allegations were not sufficient to establish a closed-ended pattern (quoting *Spool,* 520 F.3d at 186)); *Kalimantano GmbH*, 2013 WL 1499408, at *15 (holding that even if the court construed the complaint to allege a pattern which was "three days longer than the two-year minimum requirement — it would still fall short of adequately alleging closed-ended continuity" because it was a discrete scheme with a limited number of victims); *Dolan*, 2013 WL 991002, at *10–11 (holding that the plaintiffs had failed to allege a close ended scheme because there were too few victims and perpetrators and the enterprise had "a single and finite goal").

### B. Open-Ended Pattern

An open-ended pattern of racketeering activity "poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." *Spool*, 520 F.3d at 183–84. "This threat is generally presumed when the enterprise's business is primarily or inherently unlawful." *Spool*, 520 F.3d at 185; *see also W & D Imports*, 2013 WL 1750892, at *7 (quoting *Spool*); *Dolan*, 2013 WL 991002, at *8 (same). "When 'the enterprise primarily conducts a legitimate business,' however, no presumption of a continued threat arises." *Spool*, 520 F.3d at 185; *see also W & D Imports*, 2013 WL 1750892, at *7 (discussing legitimate businesses). "In such cases, 'there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity.'" *Spool*, 520 F.3d at 185; *Dolan*, 2013 WL 991002, at *8. In *Spool*, a joint venture between an American adoption company and an international company fell apart and, as a result, employees of the American company took possession of documents, sent fraudulent faxes, and opened up their own branch office of the

international company. 520 F.3d at 181. The Second Circuit found that because the joint venture was a legitimate business and the time period for setting up the new branch of the international company was short, that plaintiff had failed to allege an open-ended pattern and was unsuccessful in its attempts to allege a close-ended pattern. *Spool*, 520 F.3d at 185 ("At most, the amended complaint states that [the international adoption company's] branch office fraudulently continued to process client cases over a period of several months following the fallout between [the members of the joint venture] and the defection of [the American adoption company's employees]. A scheme of this sort is 'inherently terminable' because once the defendants conclude the fraudulent 'processing,' they have no more CFA-related files with which to work."). Similarly in *W & D Imports*, the Honorable Sandra Feuerstein found that a scheme to establish a rival car dealership through multiple fraudulent letters failed to establish an open-ended pattern, despite the fact that the plaintiff had alleged that the dealership could only be maintained through continued fraudulent filings. *W & D Imports*, 2013 WL 1750892, at *7. In *Dolan*, the Honorable Denis Hurley found that a plaintiff's allegation that his mortgage servicer "operated a RICO enterprise to extract money and property" from him was not an open-ended pattern. *Dolan*, 2013 WL 991002, at *8.

Here, according to the Complaint, the Attorney Defendants were attorneys primarily engaged in the practice of law. (Compl. ¶¶ 18, 20.) There is no indication from the Complaint that inducing individuals to work for them without pay and having these individuals then recruit out-of-state clients was the way in which the Attorney Defendants normally conducted business. In fact, according to the allegations in the Complaint, the alleged scheme was conducted because of Plaintiff's specific past legal experience and thus, the scheme was based on Plaintiff as an individual rather than a mode of operation that could be easily duplicated by employing someone

else.  (*Id.* ¶ 19 ("Plaintiff alleges that attorney/defendant Russo associated with attorney/defendant Arthur G. Trakas, and together agreed to manipulate the Plaintiff to induce him, through the use of the United States Postal Service, internet, and the telecommunications system, an [sic] other interstate communication means, to accept a temporary position within their respective law offices, in order to enrich themselves from his knowledge of civil rights, criminal, and other fields of litigation . . . .").)  Plaintiff cannot sustain a claim under a theory of open-ended pattern of racketeering activity.

Plaintiff cannot maintain a claim for extortion and has not sufficiently alleged predicate claims for mail or wire fraud.  Moreover, even if Plaintiff could allege mail and wire fraud claims, Plaintiff cannot sustain a claim under a theory of a closed-ended pattern of racketeering activity or a theory of an open-ended pattern of racketeering activity.  Therefore, Plaintiff cannot sustain a claim for RICO violation and this claim is dismissed with prejudice.

### ii.  RICO Conspiracy

A "RICO conspiracy requires evidence that [a defendant] participated in the enterprise through a pattern of racketeering activity, or agreed to do so."  *W & D Imports*, 2013 WL 1750892, at *8 (quoting *United States v. Tellier*, 83 F.3d 578, 581 (2d Cir. 1996)); *see also United States v. Praddy*, --- F.3d ---, ---, 2013 WL 3884712, at *5 (2d Cir. July 30, 2013) ("RICO's conspiracy provision [§ 1962(d)] proscribes an agreement to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." (citations and internal quotation marks omitted)); *Dulsky v. Worthy*, No. 11-CV-4925, 2013 WL 4038604, at *5 (S.D.N.Y. July 30, 2013) ("The core of a RICO conspiracy is an agreement to commit predicate acts, and a RICO civil conspiracy complaint must specifically allege such an agreement.").  Furthermore, "a substantive RICO violation is a prerequisite to a RICO conspiracy claim."  *Amiron Dev. Corp. v. Sytner*, No. 12-CV-3036, 2013 WL 1332725, at

111

*8 (E.D.N.Y. Mar. 29, 2013); *see also First Capital Asset Mgmt*, 385 F.3d at 168 (holding that "[b]ecause [the p]laintiffs' substantive RICO claims [were] infirm, there [was] no basis for a claim of [RICO] conspiracy"); *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, No. 11-CV-5474, 2013 WL 1454954, at *10 n.3 (S.D.N.Y. Mar. 26, 2013) ("Proper pleading of a substantive RICO violation is required to sustain a RICO conspiracy claim."); *Allstate Ins. Co. v. Tanella*, No. 11-CV-6364, 2012 WL 7188685, at *2 n.7 (E.D.N.Y. Aug. 28, 2012) ("Under any prong of § 1962, a plaintiff in a civil RICO suit must establish a 'pattern of racketeering activity.'" (quoting S*pool*, 520 F.3d at 183)), *report and recommendation adopted*, No. 11-CV-06364, 2013 WL 663924 (E.D.N.Y. Feb. 22, 2013).  Since Plaintiff failed to properly plead an underlying substantive RICO claim by failing to plead a pattern of racketeering activity, he has also failed to plead a RICO conspiracy claim.  *See, e.g.*, *First Capital Asset Mgmt*, 385 F.3d at 168 (upholding the district court's dismissal of the RICO conspiracy claim because the plaintiffs' "substantive RICO claims [were] infirm, [thus] there [was] no basis for a claim of [RICO] conspiracy"); *W & D Imports*, 2013 WL 1750892, at *8 ("Since plaintiffs have failed to adequately allege a pattern of racketeering activity, their RICO conspiracy claim must also be dismissed."); *Dolan*, 2013 WL 991002 , at *12 ("Because, as discussed above, plaintiff has failed to come forward with evidence sufficient to raise a question of fact as to whether a pattern of racketeering activity existed, his RICO conspiracy claim also must be dismissed."); *Petrosurance*, 888 F. Supp. 2d at 507 ("A failure to adequately allege a substantive violation of RICO necessitates that allegations of conspiracy to violate RICO also fail.").  Plaintiff's RICO conspiracy claim is dismissed with prejudice.

### iii.   FLSA

FLSA provides a remedy for employees both for their employer's failure to pay the minimum wage and failure to pay overtime wages.  *See Nakahata v. N.Y.-Presbyterian*

*Healthcare Sys., Inc.*, --- F.3d ---, ---, 2013 WL 3743152, at *5 (2d Cir. July 11, 2013).  An

employer is required under FLSA to pay an employee a legally mandated minimum wage.

*Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 65 (2d Cir. 2003); *see also* 29 U.S.C. § 206(a)(1);

N.Y. Labor Law § 652(1); *Irizarry v. Catsimatidis*, --- F.3d ---, ---, 2013 WL 3388443, at *2 (2d

Cir. July 9, 2013).  FLSA also requires "that covered employees shall be paid at a rate of one-

and-one-half times their regular rate for every hour they work in excess of forty in a given

week."  *McCluskey v. J.P. McHale Pest Mgmt., Inc.*, 147 F. App'x 203, 204 (2d Cir. 2005).

Plaintiff alleges in the Complaint that he worked for the Attorney Defendants "as a civil rights

and constitutional consultant, temporary legal assistant, researcher, investigator and process

server."  (Compl. ¶ 43.)  As set forth below, Plaintiff's allegations are insufficient to state a claim

for failure to pay overtime wage,[57] and, in any event, clearly demonstrate that Plaintiff is an

independent contractor and therefore cannot sustain a claim under FLSA.

### 1.  Plaintiff Failed to Plead An Overtime Wage Claim

While Plaintiff pleads some facts indicating that he worked for the Attorney Defendants,

Plaintiff has failed to plausibly allege the elements of a FLSA claims for unpaid overtime

---

[57] Plaintiff has not alleged a minimum wage claim and cannot do so.  Based on the
allegations in the Complaint, Plaintiff agreed with the Attorney Defendants that he would be paid
$75 per hour for his work, well over the minimum wage.  *See* Compl. ¶¶ 130, 138; *see also* N.Y.
Comp. Codes R. & Regs. ("NYCRR") tit. 12, § 146-1.2 (stating that the current "minimum
hourly rate[is] $7.25 per hour"); *Angamarca v. Pita Grill 7 Inc.*, No. 11-CV-7777, 2012 WL
3578781 (S.D.N.Y. Aug. 2, 2012) (citing 12 NYCRR § 146–1.2 for the minimum wage in New
York); *cf. Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, --- F.3d ---, ---, 2013 WL
3743152, at *5 (2d Cir. July 11, 2013) ("The FLSA statute requires payment of minimum wages
and overtime wages only; therefore, the FLSA is unavailing where wages do not fall below the
statutory minimum and hours do not rise above the overtime threshold."); *Lundy v. Catholic
Health Sys. of Long Island Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) ("An employee who has not
worked overtime has no claim under FLSA for hours worked below the 40–hour overtime
threshold, unless the average hourly wage falls below the federal minimum wage.").

wage.[58]  Plaintiff alleges:

> he was subjected to work in excess of sixty to seventy hours per
> week, as their civil rights and constitutional consultant, legal
> assistant, legal messenger, legal researcher, etc. Plaintiff alleges
> that attorneys/defendants JOHN L. RUSSO and ARTHUR G.
> TRAKAS had him travel back and forth on cases they undertook to
> represent out-of-state clients/victims in California, Montana, New
> Jersey and Pennsylvania with no monetary compensation for said
> services.

(Compl. ¶ 14.)  In other sections of the Complaint, Plaintiff alleges he "worked approximately

fifty (50) to (60) hours per week."  (*Id.* ¶¶ 61, 98, 141.)  Plaintiff alleges that while he worked for

the Attorney Defendants he referred a number of cases to them, and he generally alleges the

hours he worked on the cases.  (*Id.* ¶ 60, 140.)  Plaintiff alleges the aggregate number of hours

worked on all cases he referred to the Attorney Defendants without specifying when those hours

were worked.  (*Id.*)  Plaintiff also alleges that each Attorney Defendant agreed to pay him $75 an

hour and 10 percent commission on referrals and judgments and settlements.  (*Id.* ¶¶ 130, 138.)

In order to plead a FLSA overtime claim the Second Circuit has held that a plaintiff must

plead more "than the number of hours worked in a typical week and the alleged time worked

without pay."  *Nakahata v. N.Y.-Presbyterian Healthcare Sys., Inc.*, --- F.3d ---, ---, 2013 WL

3743152, at *5 (2d Cir. July 11, 2013).  "[P]laintiffs must allege overtime without compensation

in a 'given' workweek . . . ."  *Dejesus v. HF Mgmt. Servs., LLC*, --- F.3d ---, ---, 2013 WL

3970049, at *4 (2d Cir. Aug. 5, 2013); *James v. Countrywide Fin. Corp.*, No. 10-CV-4953, 2012

WL 359922, at *20 (E.D.N.Y. Feb. 2, 2012) (holding that a plaintiff must plead sufficient facts

---

[58]  Plaintiff's allegations as to his employment with both the Attorney Defendants are
deficient, but the allegations are woefully deficient as to Russo.  Plaintiff pleads almost no facts
to support his employment claims against Russo other than conclusory statements that Plaintiff
in fact worked for Russo.  For example, as discussed *infra*, Plaintiff pleads that his work with
Trakas meets the "economic reality test," but makes no such claim as to Russo.  (Compl. ¶ 183.)

detailing the type of work performed and the extent of overtime hours to sustain a claim.);

*DeSilva v. North Shore-Long Island Jewish Health System, Inc.*, 770 F. Supp. 2d 497, 509 (E.D.N.Y. 2011) ("[I]t is not enough 'to merely allege[ ] that Plaintiffs worked beyond forty hours per week.' Instead, plaintiffs must provide at least some approximation of the overtime hours that defendants required them to work and a time frame for when those hours were worked." (citations omitted)).

Plaintiff has only generally alleged that "[d]uring the time relevant herein, Plaintiff worked approximately fifty (50) to (60) hours per week" and then alleged an aggregate number of hours worked on each case. (*See* Compl. ¶¶ 61, 97–98, 140–41.) Plaintiff concedes that he was paid some money for the time he worked (Compl. ¶ 131; Oral Arg. 62:20–63:2), and given that Plaintiff only pleads hours in the aggregate, the Court cannot determine which hours were not paid and whether any unpaid hours qualify for overtime payment. Nowhere in the Complaint does Plaintiff plead the hours he worked with the specificity required by the Second Circuit. Therefore, Plaintiff has failed to plausibly allege that he was not paid for overtime hours worked. *See Dejesus*, -- F.3d at ---, 2013 WL 3970049, at *4 (affirming the district court's dismissal of the plaintiff's FLSA claim for overtime for only alleging that "'some or all weeks' [the plaintiff] worked more than 'forty hours' a week without being paid '1.5' times her rate of compensation"); *Nakahata*, 2013 WL 3743152, at *5 (upholding dismissal of complaint where the plaintiff had "merely alleged that they were not paid for overtime hours worked"); *James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 321 (E.D.N.Y. 2012) (holding that "[a]lthough plaintiff has identified a fourteen-month time period during which he was allegedly not properly paid overtime compensation . . . . [h]e has not specified the 'various' positions he was working in at the time he was allegedly denied overtime compensation, explained whether those positions

were, in fact, exempt, or set forth the number of hours he allegedly worked without overtime compensation.  Plaintiff has done little more than assert, in vague and conclusory manner, his entitlement to overtime compensation under the FLSA and NYLL, and this is insufficient to withstand a motion to dismiss"); *Wolman v. Catholic Health System of Long Island*, No. 10-CV-1326, 2012 WL 5491182, at *2–3 (E.D.N.Y. Dec. 30, 2010) (holding that recitation of facts that are "consistent" with a FLSA claim is not sufficient under *Iqbal* to plead a plausible claim, additional facts were needed to better detail the specific facts giving rise to the claim of unpaid overtime, for example "describing [Plaintiff's] typical or periodic work and missed break schedule, or by identifying 'examples' of when they exceeded the overtime threshold").

## 2.  Independent Contractor Exception

Even if Plaintiff could plead specific facts as required by the Second Circuit, Plaintiff cannot sustain a claim under FLSA because based on the allegations in the Complaint, his opposition to the Attorney Defendants' motions to dismiss and Plaintiff's additional factual representations at oral argument, the Court concludes that Plaintiff was an independent contractor.  Since independent contractors are not governed by FLSA's wage and overtime provisions, Plaintiff's FLSA claim must be dismissed.  *See Norwest Fin., Inc. v. Fernandez*, 225 F.3d 646 (2d Cir. 2000) (finding that independent contractors are not employed within the meaning of FLSA and therefore are not covered by its provisions).

Courts look to the economic reality of the work relationship to determine whether a person was acting as an employee or an independent contractor.  *See Rui Xiang Huang v. J & A Entm't Inc.*, No. 09-CV-5587, 2012 WL 6863918, at *8 (E.D.N.Y. Dec. 3, 2012) ("In order to determine whether a person is an employee or an independent contractor, however, the 'ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves.'" (quoting *Brock*

*v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988))), *report and recommendation adopted*, No. 09-CV-5587, 2013 WL 173738 (E.D.N.Y. Jan. 16, 2013); *see also Irizarry*, --- F.3d at ---, 2013 WL 3388443, at *3 ("Accordingly, the Court has instructed that the determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts.'" (citations omitted)); *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 598 (E.D.N.Y. 2012) (discussing the economic reality test); *Velu v. Velocity Exp., Inc.*, 666 F. Supp. 2d 300, 305–06 (E.D.N.Y. 2009) (same). The Second Circuit has developed a five factor economic reality test to determine if someone is an independent contractor. The factors include: "(1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business." *Barfield v. N.Y.C. Health & Hospitals Corp.*, 537 F.3d 132, 142–43 (2d Cir. 2008) (citing *Brock*, 840 F.2d at 1058–1059); *see also Velez v. Sanchez*, 693 F.3d 308, 327 (2d Cir. 2012) (stating that the *Brock* test is "relevant for distinguishing between independent contractors and employees"); *Arena v. Delux Transp. Servs., Inc.*, No. 12-CV-1718, 2013 WL 654418, at *2 (E.D.N.Y. Feb. 15, 2013) (utilizing the same test); *Browning*, 885 F. Supp. 2d at 599 (same). "The ultimate question of whether a plaintiff is an employee of the defendant, or an independent contractor, is a question of law." *Evans v. MassMutual Fin. Grp.*, 856 F. Supp. 2d 606, 610 (W.D.N.Y. 2012); *see also Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 115 (2d Cir. 2000) ("The District Court's 'ultimate determination' as to whether a worker is an employee or an independent contractor — that is, the District Court's balancing of the Reid factors-is a question of law . . . ." (citations

omitted)); *Browning*, 885 F. Supp. 2d at 599 ("[W]hether one qualifies as an employee or independent contractor can be a question of law."); *Solis v. Gen. Interior Sys., Inc.*, No. 08-CV-0823, 2012 WL 1987139, at *4 (N.D.N.Y. June 1, 2012) ("The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts — whether workers are employees or independent contractors — is a question of law." (alteration omitted) (quoting *Norwest Fin., Inc.*, 225 F.3d at 646).

Plaintiff alleges that he meets the economic reality test and was not an independent contractor as to Trakas because: (1) he engaged in various work tasks for Trakas, including interviewing prospective clients, making appearances at court and administrative hearings on their behalf, (2) Trakas had the ability to fire Plaintiff and other employees, (3) Trakas paid him, (4) Trakas counseled Plaintiff on job performance, (5) Trakas gave Plaintiff office space, a desk, a computer, and a telephone to do his work, and (6) Trakas agreed to pay him a $75.00 per hour rate.[59] (Compl. ¶ 131.) However, given the allegations in the Complaint and Plaintiff's assertions at oral argument, the Court finds that Plaintiff has failed to allege that he was an employee and not an independent contractor.

### A. Degree of Control

The first factor the Court must consider is the degree of control the Attorney Defendants exercised over Plaintiff's work. *Barfield*, 537 F.3d at 142–43. When deciding whether a

---

[59] Plaintiff only specifically applies "the economic reality test" with respect to Trakas, but Plaintiff does allege that he also worked for Russo. (*See generally* Compl. ¶¶ 14, 27, 52; 55; Oral Arg. Tr. 78:1–4.) Thus, the Court will consider whether Plaintiff has sufficiently alleged a FLSA claim against both the Attorney Defendants. The Court notes that Plaintiff uses the incorrect economic reality test. Plaintiff uses the economic reality test that is used to determine whether two employers are joint employers rather than the test utilized by courts to determine whether someone is an employee or an independent contractor. *See Velez v. Sanchez*, 693 F.3d 308, 327 (2d Cir. 2012) (discussing the differences between the various economic reality tests).

defendant exercised control over the plaintiff, a court considers "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Campos v. Zopounidis*, No. 09-CV-1138, 2011 WL 2971298, at *4 (D. Conn. July 20, 2011) (quoting *Carter v. Dutchess Cmty. College*, 735 F.2d 8, 12 (2d Cir. 1984)). Plaintiff has alleged that two of the factors applied as to his relationship with Trakas — the first factor, that Trakas had the ability to fire Plaintiff, and the third factor, that Trakas determined Plaintiff's rate of pay.[60] (Compl. ¶ 131.) However, the second factor supports the contention that Plaintiff was an independent contractor. In his Complaint, Opposition to the Attorney Defendants' motions to dismiss and at oral argument, Plaintiff represented that he had a high degree of autonomy in the work he did for the Attorney Defendants, even for the work done on the cases he did not refer to the Attorney Defendants. (*Id.* ¶¶ 14, 15, 28, 60; Pl. Opp'n to Att'y Defs. 30–32; Oral Arg. Tr. 71:15–72:3.) At oral argument Plaintiff stated that in addition to working in the office, he also worked from home, including from his home in California, and gave the *Garcia* case as an example of a case where Plaintiff flew to California alone to work on the case. (*See* Oral Arg. Tr. 71:15–72:3.) In the Complaint, Plaintiff alleges that much of the work he did was done on his own without the Attorney Defendants' supervision and further represented that the Attorney Defendants would simply sign documents prepared by Plaintiff. (Compl. ¶ 60.) Plaintiff also represented that he attended court appearances alone. (Pl. Opp'n to Att'y Defs. 30–32.) There are no allegations as

---

[60] The Court notes that Plaintiff's claim that Trakas determined his rate of pay is contradicted by Plaintiff's allegations in other parts of the Complaint that he reached an agreement with the Attorney Defendants prior to working for them that he would be paid $75 an hour and ten percent commission on referrals and settlements and judgments. (Compl. ¶¶ 55, 95.)

to the fourth factor — whether the Attorney Defendants maintained employment records.

Balancing the factors, the Court finds that, while Trakas arguably exercised some control over

Plaintiff, Plaintiff primarily acted independently and this factor weighs in favor of Plaintiff being

an independent contactor.[61] *Browning*, 885 F. Supp. 2d at 608 ("As set forth above, the

[d]efendants certainly had some degree of control over [the plaintiffs] . . . . However, the degree

of control is not so great as to weigh in favor of finding the [p]laintiffs to be employees as

opposed to independent contractors."); *Velu*, 666 F. Supp. 2d at 307 (finding on summary

judgment that the plaintiff was an independent contractor and that neither the defendant "nor its

agents supervise [the plaintiff's] work, except to account for payments it owed to [the plaintiff]"

and that neither the plaintiff had "a great deal of control over his own work and work schedule,

subject to the demands of clients").

### B.   Employee's Profit or Loss

The next factor is the worker's opportunity for profit or loss and his or her investment in

the business. *Barfield*, 537 F.3d at 142–43. From the allegations in the Complaint, at least a

portion of Plaintiff's compensation was contingent on his investment in the business, since

according to Plaintiff, the Attorney Defendants agreed to pay him a ten percent commission for

---

[61] At oral argument, Plaintiff, for the first time, stated that he engaged in both independent contractor work on cases he referred to the Attorney Defendants and employee work in the office for cases he did not refer to the Attorney Defendants. (Oral Arg. Tr. 77:7–18.) This allegation fails for several reasons. First, it appears from Plaintiff's representations both in his submissions and at oral argument, that even as to the work he performed in the office on cases he did not refer to the Attorney Defendants, Plaintiff still exercised a great deal of control. (*Id.*) Second, in the Complaint, Plaintiff alleges he worked 50 to 60 hours each week. (Compl. ¶¶ 61, 97–98, 140–41.) The Complaint also identified the aggregate number of hours worked on several cases without specifying when those hours were worked. (*Id.* ¶¶ 60, 140.) At oral argument, Plaintiff identified the list of cases in the Complaint as cases he worked on as an independent contractor. (Oral Arg. Tr. 77:7–18.) Thus, the Complaint woefully fails to allege that Plaintiff worked unpaid overtime hours as an *employee*.

referrals and judgments or settlements on cases referred to the Attorney Defendants. (Compl. ¶¶ 55, 95.) The balance of Plaintiff's earnings were hourly wages at $75 per hour. (*Id.*) Plaintiff has not pled that he was required to work a set number of hours. (*Id.*) Since Plaintiff could earn more money working for the Attorney Defendants if he invested more into the business by referring more cases and getting more cases to go to judgment, this factor weighs in favor of finding that Plaintiff was an independent contractor. *See Dubois v. Sec'y of Def.*, 161 F.3d 2 (4th Cir. 1998) (per curiam) (upholding the district court's determination at summary judgment that while the plaintiff's "investment in the[] business was not 'great,' their opportunity for profit or loss was found to be 'entirely dependent on the [plaintiffs] themselves'" (citations omitted)); *Browning*, 885 F. Supp. 2d at 608 (finding on summary judgment that this factor weighed in favor of finding that the plaintiff was an independent contractor where there was no set amount of work and the plaintiff could make more if the plaintiff invested more in the business); *Evans v. MassMutual Fin. Grp.*, 856 F. Supp. 2d 606, 610 (W.D.N.Y. 2012) ("The fact that plaintiff received commissions rather than a salary, for example, tends to indicate that he may have been an independent contractor . . . ."); *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005) (noting that "plaintiff had an opportunity for profit because he worked on commission").

### C. Degree of Skill and Independent Initiative

The next factor is the degree of skill and independent initiative required to perform the work. *Barfield*, 537 F.3d at 142–43. Crediting the Complaint's description of the work performed by Plaintiff for the Attorney Defendants, this factor weighs in favor of finding that Plaintiff was an independent contractor. Plaintiff alleges that the Attorney Defendants wanted to use "Plaintiff's experience in civil rights, I.D.E.A., ADA and the Rehabilitation Act of 1974, including his knowledge of constitutional issues arising from criminal cases [and his] train[ing]

[from] renowned New York Civil Rights attorney Mel Sachs." (Compl. ¶ 99.) According to the Complaint, Plaintiff acted "as a civil rights and constitutional consultant, temporary legal assistant, researcher, investigator and process server." (*Id.* ¶ 43.) At oral argument Plaintiff stated that he also engaged in office work, (Oral Arg. Tr. 77:7–18), however, office work may be skilled, i.e. legal researcher, and the fact that Plaintiff may have done some administrative tasks does not negate the fact that, according to the Complaint, the majority of his work was highly skilled labor. *See Browning*, 885 F. Supp. 2d at 608–09 ("As for the next relevant factor, the Court finds that the tasks completed by the [p]laintiffs did require a significant degree of skill, although the Plaintiff[']s attempt to minimize this as merely the ability to be a 'people person.'"). As discussed above, Plaintiff's work also required initiative, since he was required to refer new clients to the Attorney Defendants and according to the Complaint, did in fact refer numerous individuals to them. (*See* Compl. ¶ 96.) Thus, this factor weighs in favor of finding Plaintiff to be an independent contractor. *See Browning*, 885 F. Supp. 2d at 608–09 (finding on summary judgment that both the skill and initiative needed to perform the job weighed in favor of finding the plaintiff to be an independent contractor); *Velu*, 666 F. Supp. 2d at 307 (finding on summary judgment that the plaintiff was an independent contractor where there were factors that showed independent initiative such as "a great deal of control over his own work and work schedule"); *see also Gayle v. Harry's Nurses Registry, Inc*., No. 07-CV-4672, 2009 WL 605790, at *8 (E.D.N.Y. Mar. 9, 2009) (distinguishing between skilled employees who "exercise significant initiative in locating work opportunities" and are more likely to be independent contractors and those who do not).

### D.   Duration of Relationship

Next, courts look to the permanence or duration of the working relationship. *Barfield*, 537 F.3d at 142–43. According to Plaintiff, he conducted "temporary work" for the Attorney

Defendants. (Compl. ¶ 95, *see also id.* ¶¶ 14, 19, 43, 55.) He left New York and stopped working for the Attorney Defendants after 18 months, when he had completed his cases for the Attorney Defendants. (*Id.* ¶¶ 76–77; Oral Arg. Tr. 71:16.) When asked by the Court about the nature of his working relationship with the Attorney Defendants and whether he was hired per case, Plaintiff answered in the affirmative and represented that he had specific cases that he worked on with each Attorney Defendant. (Oral Arg. Tr. 73:10–15.) In addition, according to Plaintiff, he flew back and forth between New York and California during his time with the Attorney Defendants and continued to work for lawyers in California, while at the same time working for the Attorney Defendants. (Compl. ¶ 99.) Therefore, this factor supports a finding that Plaintiff was an independent contractor. *See Talbert v. Am. Risk Ins. Co.*, 405 F. App'x 848, 856 (5th Cir. 2010) (finding as a matter of law that the plaintiff was an independent contractor and crediting as a factor in favor of the plaintiff being an independent contractor the fact that she "was aware that her position was expressly temporary"); *Thibault v. Bellsouth Telecomm., Inc.*, 612 F.3d 843, 849 (5th Cir. 2010) (noting that whether the job is "temporary, project-by-project, on-again-off-again relationship" will be important to determining whether a plaintiff is an independent contractor); *Estate of Suskovich v. Anthem Health Plans Of Va., Inc.*, 553 F.3d 559, 568 (7th Cir. 2009) (finding on summary judgment that the plaintiff "never enjoyed any guarantees that his work would extend beyond this limited duration, and accordingly, as this court has held before, this factor favors independent contractor status"); *Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27 (6th Cir. 1998) (noting that in a prior decision the Sixth Circuit "found that the migrant workers were independent contractors" where "[t]he relationship between pickers and growers was a temporary one, potentially renegotiated every year"); *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998) ("Generally speaking,

independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration." (citations and internal quotation marks omitted)); *Gate Guard Servs. L.P. v. Solis*, No. 10-CV-91, 2013 WL 593418, at *12 (S.D. Tex. Feb. 13, 2013) (finding that the "temporary, job-by-job basis [of the work] is . . . relevant and supports a finding [the plaintiffs] are independent contractors"); *Mack v. Talasek*, No. 09-CV-53, 2012 WL 1067398, at *8 (S.D. Tex. Mar. 28, 2012) (same); *cf. Campos v. Zopounidis*, No. 09-CV-1138, 2011 WL 2971298, at *9 (D. Conn. July 20, 2011) (finding on summary judgment that the plaintiff was an employee when he worked "on a permanent rather than a temporary basis and did so over a substantial period of time").

### E.    Work's Importance to Employer's Business

The last factor the Court must consider is whether the work is an integral part of the employer's business.  This is the only factor which weighs in favor of finding that Plaintiff was an employee of the Attorney Defendants.  According to the Complaint, the Attorney Defendants relied on Plaintiff's referrals, legal research and appearances at various proceedings.  (Compl. ¶ 99.)  These are all integral functions of a law office.

Accepting Plaintiff's factual allegations as true, the Court finds that Plaintiff has not plausibly alleged and cannot plausibly allege that he was an employee of the Attorney Defendants, since based on the allegations in the Complaint, his allegations in his opposition to the Attorney Defendants' motions to dismiss and his representations at oral argument, the Court finds that Plaintiff was an independent contractor.  Even if Plaintiff spent part of his time working in the office of the Attorney Defendants, it is clear that based on Plaintiff's allegations in the Complaint and his other submissions to the Court, as well as his assertions at oral argument, (1) he primarily worked independently with little supervision from the Attorney

Defendants, (2) his compensation was greatly influenced by his investment in the Attorney

Defendants' business by the commissions he received from referrals of new clients and

judgments and settlements he helped to achieve, (3) Plaintiff was highly skilled and worked on

his own initiative, and (4) his work was intended to only last a temporary period and Plaintiff

primarily worked on a case by case basis. Therefore, the Court dismisses Plaintiff's FLSA claim

with prejudice. *See, e.g.*, *Torres v. Ridgewood Bushwick Senior Citizens Homecare Council Inc*.,

No. 08-CV-3678, 2009 WL 1086935, at *3 (E.D.N.Y. April 22, 2009) (dismissing the complaint

on motion to dismiss for failure to plausibly allege that the plaintiff worked as an employee

covered by FLSA's provisions and not as an exempt person); *Human Services Home Care*

*Services Corp*., No. 05-CV-10734, 2008 WL 4104025, at *2 (S.D.N.Y. Aug. 8, 2008) (same).

### iv. State Law Claims

#### 1. Diversity Jurisdiction

Plaintiff commenced this action asserting jurisdiction pursuant to, among other

provisions, 28 U.S.C. § 1332(a) and § 1332(b). (Comp. ¶¶ 1-2.) Plaintiff asserts that he is "a

citizen of the State of California, the United States and a citizen of the European Union . . . . a

citizen of the Republic of Malta," (*id.* ¶¶ 1, 11), and that the amount in controversy exceeds

$75,000, (*id.* ¶ 1).

"A party seeking diversity jurisdiction bears the burden of establishing that diversity

exists." *Braten v. Kaplan*, 406 F. App'x 516, 517 (2d Cir. 2011). When a person is a dual

citizen, it is the American citizenship that governs the issue of diversity jurisdiction. *See Action*

*S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 507 (2d Cir. 1991) ("In matters of diversity

jurisdiction American citizenship will determine diversity. As the Seventh Circuit found in

*Sadat v. Mertes*, 615 F.2d 1176 (7th Cir. 1980), 'only the American nationality of the dual

citizen should be recognized under 28 U.S.C. § 1332(a).'"); *see also Molinos Valle Del Cibao,*

*C. por A. v. Lama*, 633 F.3d 1330, 1341 (11th Cir. 2011) ("[A]n individual who is a dual citizen of the United States and another nation is only a citizen of the United States for the purposes of diversity jurisdiction under § 1332(a)."); *Frett-Smith v. Vanterpool*, 511 F.3d 396, 400 (3d Cir. 2008) ("A number of our sister Courts of Appeals have already held that for a dual national citizen, only the American nationality is relevant for purposes of diversity under 28 U.S.C. § 1332."); *Fuerst v. Fuerst*, 832 F. Supp. 2d 210, 217 (E.D.N.Y. 2011) ("Although Wolfgang is a citizen of both Germany and the United States, it is the general consensus among the courts — including the Second Circuit — that, where a party has dual citizenship, '[i]n matters of diversity jurisdiction American citizenship will determine diversity.'" (quoting *Action S.A*, 951 F.2d at 508)); *El-Jurdi v. El-Balah*, No. 11-CV-00520, 2011 WL 2433501, at *3 (N.D. Ohio June 14, 2011) (holding that only American citizenship is considered for diversity jurisdiction where plaintiff is a dual national); *Falken Indus., Ltd. v. Johansen*, 360 F. Supp. 2d 208, 210 (D. Mass. 2005) ("Courts have increasingly held that 'for a dual national citizen, only the American citizenship is relevant for purposes of diversity under 28 U.S.C. 1332.'" (quoting *Coury v. Prot*, 85 F.3d 244, 250 (5th Cir. 1996)); *Brooks v. Girois*, No. 03-CV-3260, 2003 WL 21949702, at *1 (E.D. Pa. Aug. 11, 2003) (holding that "for a dual national citizen, only the American citizenship is relevant for purposes of diversity under 28 U.S.C. § 1332[(a)(2)]" (alterations in original) (citations omitted) (collecting cases)); *Lemos v. Pateras*, 5 F. Supp. 2d 164, 165 (S.D.N.Y. 1998) ("'[T]here is an emerging consensus among courts that, for a dual national citizen, only the American citizenship is relevant for purposes of diversity jurisdiction under 28 U.S.C. § 1332.' Courts in this Circuit have accepted this view. For the purpose of diversity jurisdiction, the plaintiff, therefore, is not "a citizen or subject of a foreign state." (citations omitted)).

In order for an American citizen to sue pursuant to diversity jurisdiction, the person must be both a citizen and domiciliary of a state in the United States. *See H & R Convention & Catering Corp. v. Somerstein*, No. 12-CV-1425, 2013 WL 1911335, at *14 (E.D.N.Y. May 8, 2013) (holding that a United States citizen must be domiciled in the United States for diversity jurisdiction to apply); *Fuerst*, 832 F. Supp. 2d at 217–18 (holding that the dual German-American national had to be domiciled in a state in the United States in order for diversity jurisdiction to apply); *Lemos*, 5 F. Supp. 2d at 165 ("For purposes of diversity jurisdiction, one is a citizen of the state where one is domiciled."). If an American citizen is not domiciled in a state in the United States, the federal court is divested of diversity jurisdiction. *See Frett-Smith*, 511 F.3d at 400 ("The only way that an American national, living abroad, can sue under § 1332 is under § 1332(a)(1) if that national is a citizen, i.e., domiciled, in one of the fifty U.S. states."); *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322 (2d Cir. 2001) ("United States citizens 'domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state,' so that '§ 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties.'" (quoting *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir. 1990)); *H & R Convention*, 2013 WL 1911335, at *14 ("It is undisputed that the Somersteins are domiciliaries of Costa Rica but have not renounced their United States citizenship. They are, for purposes of diversity jurisdiction, 'neither citizens of any state of the United States nor citizens or subjects of a foreign state.' Their status as United States citizens domiciled outside of the country deprives the court of diversity jurisdiction pursuant to 28 U.S.C. § 1332." (citations omitted)); *Fuerst*, 832 F. Supp. 2d at 217–18 (holding that the dual German-American national was domiciled in Germany and not an American state thus the federal court lacked diversity jurisdiction); *Lemos*, 5 F. Supp. 2d at 165 (holding that because the plaintiff,

who was a dual citizen of Greece and the United States, was not domiciled in the United States, "she [was] a citizen of no state for the purposes of diversity jurisdiction" and therefore the court lacked subject matter jurisdiction pursuant to diversity jurisdiction).

Here, Plaintiff asserts that he is a dual citizen of the United States, specifically of California, and the Republic of Malta. However, Plaintiff asserts that he has his "permanent domicile and residence in the Republic of Malta" and no longer resides in California. (Pl. Opp'n to State Defs. 77; *see also id.* at 56, 62, 82; Pl. Opp'n to Att'y Defs. 20; Oral Arg. Tr. 26:4– 27:1.) Therefore, the Court lacks diversity jurisdiction over Plaintiff's claims. *See, e.g.*, *Frett-Smith*, 511 F.3d at 402 (upholding the district court's dismissal for lack of diversity jurisdiction since the plaintiff was a dual citizen who was not domiciled in the United States when she filed the action); *Fuerst*, 832 F. Supp. 2d at 217–18 (dismissing the complaint for lack of jurisdiction because the dual German-American national was domiciled in Germany and not an American state); *Lemos*, 5 F. Supp. 2d at 165 (dismissing the complaint because the court lacked jurisdiction over the dual United States and Greek national who was not domiciled in the United States).

### 2.   Supplemental Jurisdiction

As discussed above, the Court dismisses all of Plaintiff's federal claims and the Court lacks diversity jurisdiction over Plaintiff's state law claims. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Under 28 U.S.C. § 1367(c), a district court may decline to exercise supplemental jurisdiction where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims."

*Pension Ben. Guar. Corp.*, 712 F.3d at 727 (citations and internal quotation marks omitted); *see also Oneida Indian Nation of N. Y. v. Madison County*, 665 F.3d 408, 437 (2d Cir. 2011) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of [those] factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." (alteration in original) (citations omitted)).

Courts routinely decline to exercise supplemental jurisdiction where the only remaining claims are state law claims, including fraud-based, unjust enrichment, New York Judiciary Law § 487, unpaid wages, unpaid overtime and unpaid spread-of-hours wages claims. *See, e.g.*, *Petroleos Mexicanos v. SK Eng'g & Const. Co. Ltd.*, No. 12-CV-9070, 2013 WL 3936191, at *4 (S.D.N.Y. July 30, 2013) ("The Court declines to exercise supplemental jurisdiction over plaintiffs' remaining claim for common-law fraud."); *Nabatkhorian v. County of Nassau*, No. 12-CV-1118, 2013 WL 1233247, at *11 (E.D.N.Y. Mar. 27, 2013) (declining to exercise supplemental jurisdiction over the plaintiff's state law claims for fraud); *Sampson v. MediSys Health Network, Inc.*, No. 10-CV-1342, 2013 WL 1212655, at *6 (E.D.N.Y. Mar. 18, 2013) (dismissing the remaining New York Labor Law claims after the federal claims had been dismissed); *2022 Fulton St. LLC v. Akande*, No. 11-CV-3993, 2012 WL 3637458, at *4 (E.D.N.Y. Aug. 22, 2012) (declining to exercise jurisdiction over the plaintiff's New York Judiciary Law § 487 and fraud claims); *Edmonds v. Seavey*, No. 08-CV-5646, 2009 WL 2949757, at *7 (S.D.N.Y. Sept. 15, 2009) (declining to exercise jurisdiction over state law claims including claims for unjust enrichment), *aff'd*, 379 F. App'x 62 (2d Cir. 2010). Plaintiff's state law claims are therefore dismissed without prejudice.

### f.  Motions to Strike

At oral argument the Court denied motions for sanctions made by the Attorney Defendants and Plaintiff, and motions to strike made by Plaintiff, except that the Court reserved

judgment on Plaintiff's motion to strike as to the specific statements in the Attorney Defendants' motions to dismiss that Plaintiff forged the signature of an individual on an affidavit filed with the Court. (Oral Arg. Tr. 88:23–90:24; 91:8–21, 97:5–21.) Specifically, Plaintiff moves pursuant to Rule 12 (f) of Federal Rules of Civil Procedure to strike the following statements in both the Attorney Defendants' motions to dismiss:

> Nevertheless, we would be remiss if we left unaddressed the fact that virtually all of Mr. Spiteri's 'factual' submission to this Court is irrelevant, false or fabricated and, in most instances, actionable at law. Indeed, his endless spitting of insults, lies and character assassinations against members of this Court's bar are despicable and we pray that appropriate sanctions be imposed.

(Docket Entry No. 112, Request for a Telecom Re: Plaintiffs Request to Strike Re: Defendant/Attorneys Russo & Trakas Memorandum of Law in Support of Defendants' Motion for Judgment and Dismissal of the Complaint Pursuant to Rule 12 of the Federal Rules of Civil Procedure ("Pl. Request to Strike"); Russo Mem. 8–9 n.2; Trakas Mem. 4–5 n.2.) For the reasons set forth below, the Court denies Plaintiff's motion to strike the above statements.

Rule 12(f) of the Federal Rules of Civil Procedure provides in pertinent part:

> The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:
> **(1)** on its own; or
> **(2)** on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

Fed. R. Civ. P. 12.[62] Pleadings are defined by Rule 7 of the Federal Rules of Civil Procedure as "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a

---

[62] The Court notes that generally motions to strike pursuant to Rule 12 "are disfavored and granted only if there is a strong reason to do so." *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-CV-2227, 2013 WL 1746062, at *3 (S.D.N.Y. Apr. 23, 2013); *see also G.L.M. Sec. &*

counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a). The Attorney Defendants' motions to dismiss are not pleadings, and therefore, Plaintiff cannot properly strike portions of the Attorney Defendants' motions to dismiss. *See Dekom v. New York*, No. 12-CV-1318, 2013 WL 3095010, at *6 (E.D.N.Y. June 18, 2013) (denying motion to strike because a party can strike only pleadings pursuant to Rule 12, not legal briefs); *Bridgeforth v. Popovics*, No. 09-CV-0545, 2011 WL 2133661, at *1 n.2 (N.D.N.Y. May 25, 2011) (finding that the plaintiff cannot move to strike a motion to dismiss pursuant to Rule 12(f)); *Huelbig v. Aurora Loan Servs., LLC*, No. 10-CV-6215, 2011 WL 4348281, at *2 (S.D.N.Y. May 18, 2011) (dismissing motion to strike portions of the defendant's motion to dismiss because motions to dismiss cannot be struck pursuant to Rule 12(f)), *report and recommendation adopted*, No. 10-CV-6215, 2011 WL 4348275 (S.D.N.Y. Sept. 16, 2011); *Gaymon v. Tarscio*, No. 10-CV-653, 2010 WL 4340689, at *2 (D. Conn. Oct. 26, 2010) (holding that the plaintiff could not move to strike the defendant's motion to dismiss because a motion to dismiss is not a pleading); *cf. Marshall v. Webster Bank, N.A.*, No. 10-CV-908, 2011 WL 219693, at *12 (D. Conn. Jan. 21,

---

*Sound, Inc. v. LoJack Corp.*, No. 10-CV-4701, 2012 WL 4512499, at *7 (E.D.N.Y. Sept. 28, 2012) ("While Courts 'possess considerable discretion in weighing 12(f) motions,' 'motions to strike are not favored and will not be granted unless it is clear that the allegations in question can have no possible bearing on the subject matter of the litigation."); *Greenwald v. City of New York,* No. 06-CV-2864, 2012 WL 6962297, at *1 (E.D.N.Y. July 19, 2012) ("[A] motion to strike an affirmative defense pursuant to Rule 12(f) for legal insufficiency 'is not favored and will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense.'" (quoting *Salcer v. Envicon Equities Corp.*, 744 F.2d 935, 939 (2d Cir. 1984)), *report and recommendation adopted*, No. 06-CV-2864, 2013 WL 354169 (E.D.N.Y. Jan. 29, 2013). "As the Second Circuit has instructed, 'courts should not tamper with the pleadings unless there is a strong reason for so doing.'" *Low v. Robb*, No. 11-CV-2321, 2012 WL 173472, at *8 (S.D.N.Y. Jan. 20, 2012) (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)).

2011) (finding that a "reply memorandum is not a 'pleading'" and therefore not subject to be struck pursuant to Rule 12).

### g. Motions to Take Judicial Notice

At oral argument, the Court also instructed Plaintiff that his motions for the Court to take judicial notice of various cases were unnecessary because the Court may consider any relevant case law that Plaintiff would like the Court to consider. (Oral Arg. Tr. 87:10–88:21.) The Court denies Plaintiff's remaining requests for the Court to take judicial notice of various documents, filings, etc.[63] Rule 201 of the Federal Rules of Evidence allows courts to take judicial notice of: (1) a fact that "is generally known within the trial court's territorial jurisdiction"; or (2) a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 227 (2d Cir. 2012) (noting that the court "take[s] judicial notice, pursuant to Federal Rule of Evidence 201"). Plaintiff has made voluminous requests for the Court to take judicial notice of matters including, but not limited to, California cases, documents filed in California cases, documents filed in the case before the Court, documents in other cases, letters sent to Plaintiff by California officials, sex registration data of other individuals required to register and statements from the Attorney Defendants which Plaintiff asserts are inappropriate. (*See* Docket Nos. 46, 63, 65, 66, 112, 140, 146, 149, 165, 183.)

As the Court explained at oral argument, Plaintiff need only cite to any relevant case or statute that he would like to bring to the Court's attention. (Oral Arg. Tr. 87:10–23.). For court

---

[63] The Court notes that Docket Entry Number 149 is titled "MOTION for Leave to Appeal in forma pauperis, MOTION for Reconsideration;" however, in substance it is a motion for the Court to reconsider an order denying Plaintiff's request for the Court to take judicial notice.

documents filed in other proceedings that Plaintiff would like the Court to take judicial notice of to support Plaintiff's assertion that he is no longer required to register in California, the Court notes that even if it took judicial notice of these documents, the Court could only take judicial notice of the fact that these documents exist. The Court would not be able to take judicial notice of these documents for the truth of the matter asserted in the documents by Plaintiff, i.e., that Plaintiff is not required to register in California, which appears to be the reason Plaintiff seeks their acceptance by the Court.[64] *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 355 n.5 (2d Cir. 2010) (taking judicial notice of SEC filings not "for their truth, but 'rather to establish the fact of such litigation and related filings'"); *Global Network Commc'n, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("[A] court may take judicial notice [of public records], 'it may do so on a motion to dismiss only to establish the existence of the opinion, not for the truth of the facts asserted in the opinion.'"); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."); *Landow v. Wachovia Sec., LLC*, No. 12-CV-3277, 2013 WL 4432383, at *10 (E.D.N.Y. Aug. 12, 2013) ("The Court takes judicial notice of the following media report and court filings, not for the truth of the matters asserted therein, but rather to establish the fact that the information in those materials was publicly available . . . ." (citation omitted)); *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 412 (S.D.N.Y. 2011) ("In the motion to dismiss context, . . . a court should generally take judicial notice 'to determine

---

[64] As discussed *supra*, while Plaintiff would like the Court to review California cases and filings to determine whether Plaintiff was under an obligation to register in California, the Court will not opine on whether Plaintiff is or is not required to register in California. As explained *supra*, whether or not Plaintiff must register in California is immaterial to whether or not he must register in New York.

what statements [the documents] contain[ ] . . . not for the truth of the matters asserted.'"
(alteration in original) (citations omitted)).

The Court may not take judicial notice of several of the documents which Plaintiff seeks
to have the Court take judicial notice of because the facts are not generally known within the
Court's jurisdiction and they do not contain facts which can be accurately and readily determined
from sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201.

## IV.  Conclusion

For the reasons discussed above, the State Defendants' motion to dismiss the Complaint
is granted and the Complaint is dismissed with prejudice in its entirety as to all the State
Defendants — Governor Andrew Cuomo, Judge Fernando Camacho, Michelle Harrington,
Michelle Mulligan and New York State.  In addition, Plaintiff's application for injunctive and
declaratory relief as to the State Defendants is denied.  The Attorney Defendants' motions to
dismiss as to Plaintiff's federal claims — RICO, RICO conspiracy and FLSA — is granted and
these claims are dismissed with prejudice.  The Court declines to exercise supplemental
jurisdiction over Plaintiff's state law claims for unjust enrichment, fraud, deceit and
misrepresentation, fraudulent concealment, legal malpractice, unpaid wages, unpaid overtime
and spread of hours and these claims are dismissed without prejudice.  Plaintiff's remaining

motion to strike is denied and his motion for the court to take judicial notice of various

documents is denied.

SO ORDERED:

_____s/MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 7, 2013
        Brooklyn, New York